UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

REUVEN GILMORE, et al            )
                                 )
                                 )  01-00853(GK)
          vs.                    )
                                 )
                                 )
THE PALESTINIAN INTERIM          )
SELF-GOVERNMENT AUTHORITY, et al )

**Defendants Memorandum In Support of Their Motion To
Supplement The Record**

Preliminary Statement

This memorandum is being submitted by defendants in support of their motion to supplement the record on defendants Rule 12(b) motion. This motion is being made with leave of the Court granted on April 13, 2004.

As was set forth in defendants motion, this action is one of at least five actions in federal court against the PA and PLO under the Anti-Terrorism Act of 1991, in which Rule 12(b) motions have been filed by the PA and PLO raising the same issues of fact and law with respect to Palestinian statehood, sovereignty and immunity. The other cases are: Ungar (D.R.I. 00 CV 0105(L)), Biton (D.D.C. 01 CV 0382 (RMC)), Shatsky (D.D.C. 02 CV 2280(RJL)) and Knox (S.D.N.Y. 03 CV 4466(VM)).

As defendants previously observed, it is important to the judiciary, and both parties, as well as the Courts, are better served, if these fundamentally important common issues are decided on fully developed and equivalent records, which can be readily

1

accomplished since plaintiffs and defendants are represented by the same attorneys in all five cases, which means, among other things, that the attorneys in each case have personal knowledge of what is happening as it happens in all the cases.

Most of the present record on the revised Rule 12(b) motion in this case was submitted before the end of the year 2002 reflecting the status of the issues based on conditions at that time. This record therefore does not include the extensive materials that were included in the Rule 12(b) motions filed after May 27, 2003 in <u>Ungar</u>, <u>Shatsky</u> and <u>Knox</u>. These later motions were much more "fully supported" as suggested by the First Circuit Court of Appeals in the judgment it rendered on May 27, 2003, on defendants interlocutory appeal in <u>Ungar</u>, Dkt No. 03-1544. The Rule 12(b) motions thereafter submitted, were supplemented with important official materials, overwhelmingly in the public record, relating to Palestinian statehood, sovereignty and immunity, such as the documents attached to or cited in the affidavit of Palestinian Ambassador Al-Kidwa, dated June 13, 2003, that was filed as part of the "fully supported" motions in all three cases all of which are being offered for filing on the present motion. Extensive documentation on the same issues was also filed by plaintiffs. Plaintiffs and defendants are represented by the same attorneys in all five cases, which means, among other things, that the attorneys in each case have personal knowledge of what is happening as it happens in all the cases.

<u>Argument</u>

The record on the Rule 12(b) motion before the Court in this case was sparse with respect to its evidentiary support of statehood.   The same is true of the record on the

Rule 12(b) submissions in Gilmore and initially in Ungar.

When defendants filed and briefed their Rule 12(b) motion in this case in 2002 it was defendants position that the facts demonstrating statehood were contained in publicly available official and other documents and could be established as a matter of judicial notice.

It has consistently been defendants position in these ATA cases that they are entitled to a final determination with respect to their claims of statehood, sovereignty and immunity including interlocutory review before they can be required to face the burdens of litigation, such as the burdens of discovery or addressing the complaint on the merits. See, In re Papandreou, 139 F.3d 247 (D.C. Cir. 1998).

Defendants took such an interlocutory appeal in Ungar. The First Circuit, on this interlocutory appeal, Dkt. No. 03-1544, ruled in its judgment of May 27, 2003, which is defendants first exhibit offered on this motion, that the record lacked sufficient evidence to meet defendants burden of proof and suggested that a properly supported Rule 12(b)(i) motion might be filed. Thereafter defendants filed a heavily documented Rule 12(b)(1) motion in the District Court on June 13, 2003 which the District Court has just decided. This also led defendants to expand the evidentiary scope of the Rule 12(b) motions they made thereafter in Shatsky and Knox. Decisions on defendants' claims of sovereign and governmental immunity and nonjusticiability asserted by Rule 12(b) motions have now been rendered in three of the five ATA cases identified above. The motions are sub judice in this case and Shatsky.

In Knox following the denial of their Rule 12(b) motion by order entered on

March 5, 2004 defendants sought and were granted a 30 day extension of their time to appeal under FRAP 4(a)(5).  A notice of appeal was filed on May 3, 2004, Second Circuit Dkt. No. 04-2406.

In <u>Biton</u> a decision and order was entered on March 18, 2004, 2004 U.S. Dist. LEXIS 4238 (D.D.C. 2004), dismissing the individual defendants for lack of personal jurisdiction and denying the immunity and statehood asserted by the PA and PLO.  Defendants have moved for limited reconsideration of this order and have also filed a protective interlocutory appeal, Docket No. 04- 7054 from the denial of immunity.  The <u>Biton</u> court expressly recognized the record in the District Court on the Rule 12(b) motion bearing on Palestinian statehood was sparse.  Exhibits supplementing the Rule 12(b) record have now been filed in <u>Biton</u> with the motion of the PA and PLO for limited reconsideration.

In <u>Unger</u>, the Court dismissed the individual officials of the PA and PLO for lack of personal jurisdiction and most recently denied Rule 12(b)(1) relief to the PA and PLO in a decision and order entered on April 23, 2004.  2004 U.S. Dist. LEXIS 7093.

The Court in this case took a significant action that is lacking in the other four ATA cases.  On March 11, 2004, this Court issued an order calling upon the United States to take a position or file a statement of interest in the case within 21 days, i.e. by April 1.

On April 1, 2004 Justice Department officials filed a perfunctory response to the Court's

March 11, 2004 order declining participation or comment.

On April 12, 2004 defendants moved in this case for leave to file a motion on or before May 15, 2004, to supplement the record on their revised Rule 12(b) motion. The Court granted the motion on April 13, 2004.

Biton and this case are on much the same footing however with respect to the sparseness of the evidentiary record on the issues of Palestinian statehood, sovereignty and immunity, as was expressly recognized in the <u>Biton</u> opinion rendered on March 18, 2004.

It is as important in this case as it was in <u>Biton</u> to supplement the record on these fundamental issues of subject matter jurisdiction.  Defendants of course hope that the record will be supplemented and that the supplemented record will lead the Court to different conclusions on the issues of Palestinian statehood, sovereignty and immunity. But in any event the fuller record will tend to ensure that the Court of Appeals will be able to reach and decide the merits of these issues on defendants interlocutory appeal. Given the basic importance of these issues, to U.S. foreign relations, the peace process and the Israeli-Palestinian conflict, as well as a matter of law, this is a result well-worth achieving.

**Palestine Is A Sovereign State And Defendants PA And PLO Are Accordingly Foreign States For Purposes Of The Foreign Sovereign Immunities Act And 18 U.S.C. Sec. 2337(2).**

This point and the next one in the main parallel defendants reply briefs filed in Shatsky and Knox in late February 2004 are based on essentially the same record as defendants are seeking to establish on this motion and demonstrate the value of a supplemented motion.

Palestine has long been the state of the Palestinian people. The PA and PLO are core elements and perform core functions of the Palestinian government and are therefore foreign states for purposes of the Foreign Sovereign Immunities Act, 28 U.S.C. secs. 1330 and 1602 et seq. ("FSIA"). See Transaero Inc., v. La Fuerza Aerea Boliviana, 30 F.3d 148 (D.C. Cir. 1994) (2-1), cert denied, 513 U.S. 1150 (1995).

Plaintiffs reject this position, arguing that neither the PA nor PLO satisfy the Restatement's four criteria of statehood, which plaintiffs contend the PA and PLO are required to assert explicitly and prove.

Plaintiffs are wrong. Under Transaero the PLO and PA need not themselves satisfy the four criteria for statehood. They need prove only that they are core parts and serve core functions of the government of Palestine which satisfies the four criteria of statehood.

Plaintiffs contend that the law review article of Prof. John Quigley of the Ohio State University Law School, Making Peace Agreements Work, 30 Cornell Int'l L.J. 717 (1997) included in Exhibit A on this motion as Exhibit 3, "argues that the PLO should be considered a state," and that the article "Addresses the PLO only."

Plaintiffs misread the article and ascribe to Prof. Quigley a view he does not hold. Prof. Quigley makes no claim the PLO is a state.

The supplemental declaration of plaintiffs proffered expert, Prof. Ed Morgan, Pl. Ex. B, similarly attributes to Prof. Quigley a position his article does not assert -- that the PLO as distinguished from Palestine, has a "plausible claim" to be a state.

Prof. Quigley makes no such assertion. His article clearly expresses the view that

Palestine is a state. See, for example, Section II of the article, beginning at p. 722: "II. The Claim of Palestine to Statehood".

Prof. Quigley does refer to a "plausible claim" of statehood on the page cited by Prof. Morgan, but it is to the claim of Palestine, not the PLO, as follows, at 726:

> "Whether or not Palestine is a state is not a question for Israel to decide. That determination turns on objective criteria,... Applying these criteria, Palestine has a plausible claim to statehood..."

Prof. Quigley's article repeatedly makes clear that it is the statehood of Palestine he is considering, not the PLO.

Prof. Morgan further argues that Prof. Quigley's analysis is fundamentally flawed because it fails to make necessary distinctions between the PLO and the PA. This argument, to which Prof. Morgan gives pivotal importance, again rests on the same misconception and has little force once it is recognized that Prof. Quigley is analyzing the statehood of Palestine, not the PLO.

Statehood is an historical and factual matter and there is no domestic, external or international authority capable of conferring a conclusive imprimatur of statehood upon Palestine or any other entity. The FSIA does not define the term "foreign state." It provides only that the term "includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b) [of 28 U.S.C. sec. 1603]". See Garb v. Republic of Poland, 207 F.Supp.2d 16, 25 (E.D.N.Y. 2002), vacated and remanded on other grounds, 2003 U.S. App. LEXIS 16112 (2d Cir. 2002). Nor does the ATA define the term.

The conclusive effect given to Palestine's less than full U.N. membership as a

basis for rejecting its statehood in Ungar v. PA, 228 F.Supp.2d 40 (D.R.I. 2002) is mistaken for these reasons as a matter of law.  The United States was a sovereign state though it had not joined the League of Nations, just as Switzerland among others was a sovereign state though for 50 years it did not join the United Nations.  It is also mistaken because Palestine's status at the United Nations is tantamount as a practical and legal matter to full membership and the reasons why Palestine's full membership has been blocked are political, and have nothing to do with the criteria by which statehood is measured.

A recent, compelling demonstration of Palestine's statehood is the action of the International Court of Justice in the Hague, created in the Charter of the United Nations, in recognizing in Palestine the prerequisites of a state in connection with the Court's considerations at the request of the U.N. General Assembly of the "legal consequences" of the wall Israel is constructing in the occupied Palestinian territory of the West Bank.  The Court's order of December 19, 2003, General List No. 131, recognizes in Palestine the same right as U.N. Member States to submit to the Court a written statement on the question and to take part in the open hearings held in February, 2004.

Plaintiffs dwell repeatedly on the Klinghoffer case as a precedent on the issue of statehood.  Klinghoffer is outdated factually as a precedent.

The facts in Klinghoffer were much different then the facts in the actions now pending.  In 1985 the PLO was located in Tunis and under attack by Israel.  It had no organizational presence in Palestine.  The international peace process including the Oslo Accords beginning in or about 1992 and more recently, the road map, had not yet

commenced, and the PLO was then considered by the United States for foreign aid and several other purposes as a terrorist organization, a designation defendants submit that was at all times undeserved and has long since been abandoned.

Although in defendants' view Palestine was then and had long been a sovereign state, albeit occupied, the facts as they appeared to the Second Circuit were drastically different from the facts that now appear in the record establishing the four criteria in support of Palestine's statehood. They fully warrant the conclusion that the PA and PLO are foreign states for purposes of this action.

Defendants' reliance on some of the documents executed as part of the peace process that impose limits on Palestine that may appear inconsistent with full sovereignty is misplaced. The peace process overall powerfully confirms Palestine's statehood. Israel obviously included many provisions in the documents in a deliberate effort to delay diplomatic recognition of Palestinian statehood. Plaintiffs admit this. For example, their opposing memorandum sets forth the following quote "[T]he Oslo Accords deny the PA the capacity to conduct foreign relations with the specific intention of preventing the PA from achieving (or claiming) state status," Joel Singer, <u>The West Bank and Gaza Strip: Phase Two</u>," Justice, No. 7 (1995) p. 13. The inherently coercive conditions under which Palestinians negotiated while an occupied state during the peace process greatly diminish any effect these provisions should be permitted to have on Palestine's statehood which every occupied state retains, however oppressive the occupation.

**II**      **In The Context Of The Longstanding Israeli-Palestinian Conflict The Charges Of Terrorism In This Action Against Palestine And Its Officials Should Be Dismissed As Barred By Sec. 2337(2) and/or As Nonjusticiable.**

Plaintiffs take the position, which they state ipse dixit and do not explain, that the definition of international terrorism in 18 U.S.C. sec. 2331(1) is easily and readily met, stating "Clearer judicially discoverable and manageable standards than those codified in sec. 2331 could hardly be imagined." Pl. Memo. 10.

This will come as a surprise to the State Department given its concerns, set forth below, on difficulties presented by sec. 2331(1).

Plaintiffs also scoff at defendants' contention that this action will require the Court to assess the Israeli-Palestinian conflict and the illegality of Israel's oppressive actions in its occupation of the West Bank and Gaza, terming this view "completely frivolous, if not absurd."  P. Memo. n.8 at p. 10.

Plaintiffs are wrong.  The Israeli-Palestinian conflict is the context in which the alleged conduct at issue in this case occurred and the actions and the intent and motivation for them cannot be understood and evaluated for purposes of sec. 2331 without this context being taken into account.

Plaintiffs have brought this case as one of international terrorism as defined in sec. 2331(1).  The definition is a source of this case's nonjusticiability.

Sec. 2331(1) provides in part:

**Section 2331. Definitions**

As used in this chapter—

(1)  the term "international terrorism" means activities that–

(A)     involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State

>> (B) appear to be intended—
>
>> (I) to intimidate or coerce a civilian population;
>
>> (ii) to influence the policy of a government by intimidation or coercion; or
>
>> (iii) to affect the conduct of a government by mass destruction, assassination, or kidnaping; and
>
> ©) occur primarily outside the territorial jurisdiction of the United States, ...
>
> Sec. 2337 exempts foreign states from actions brought under the act, as follows:
>
> **Sec. 2337. Suits against Government officials**
>
>> No action shall be maintained under section 2333 of this title against–
>
>> (1) the United States, an agency of the United States, or an officer or employee of the United States or any agency thereof acting within his or her official capacity or under color of legal authority; or
>
>> (2) a foreign state, an agency of a foreign state, or an officer or employee of a foreign state or an agency thereof acting within his or her official capacity or under color of legal authority.

Thus the PA and the PLO are exempt by statute and in addition the question whether the charges plaintiffs make in this case meet the definition of international terrorism is essentially non-justiciable. In testimony at a Senate subcommittee hearing in 1990, Alan Kreczko, a State Department deputy Legal Adviser, pointed to the difficulties presented by this definition and the importance of exempting foreign states and their officials from actions under the ATA. The State Department was then recommending that the provision which is now sec. 2337 be added to the bill. Mr. Kreczko explained that exemption under sec. 2337 afforded greater protection to foreign states and their officials than immunity under the FSIA. This conflicts directly with plaintiffs' argument

that the provisions of 18 U.S.C. sec. 2337(2) and 28 U.S.C. sec. 1604 provide a single defense.

Mr. Kreczko stressed the importance of the absolute protection the exemption afforded foreign states and their officials in answer to written questions posed by Senate committee members, as follows:

> As a matter of jurisprudential theory, our proposed change [now sec. 2337] would exempt sovereign states and their officials from the bill's scope, not entitle them to immunity. Existing law recognizes this distinction; ... (emphasis in original)
>
> Existing theories of immunity are generally limited to "official acts" immunity...
>
> Our proposal would, however, exempt foreign officials from this new cause of action. We believe this is necessary because of the nature of this cause of action: S. 2465 defines an "act of terrorism" as an intentional tort committed for political ends. No other tort of which we are aware requires a demonstration of this motivation, or a ruling by our courts of motivation and intent that have such potential to embarrass other states or to interfere in the Executive Branch's ability to conduct foreign affairs. Moreover, since in most foreseeable actions against a government official the defendant would have been acting in his or her official capacity, adopting our proposed amendment would not deprive plaintiffs of an opportunity to sue that would otherwise have existed... (emphasis in original)

Mr. Kreczko expressed the need to protect foreign states and their officials from political claims under the ATA.

> We have indicated a concern that without an exception for foreign officials, the cause of action provided under S. 2465 could become a vehicle for court suits to harass foreign officials in the United States or to challenge the policies of foreign governments. ...
>
> Foreign officials will be subject to suit, and the litigation will revolve around whether the official's country has a policy of terrorism which made his support of terrorism "official" or non-official."
>
> Moreover, we are concerned that, unless our amendment is adopted, most

12

>litigation will be brought against officials of friendly governments.  Far more British or Israeli officials travel to the United States than Iraqi or Syrian officials.  Some of the practices of these governments in Northern Ireland and the West Bank respectively have been criticized by some American groups as "terrorism."  Without an exemption in the bill, visiting officials of these governments would have to defend against suits alleging their involvement in terrorism and would have to defend, <u>inter alia</u>, on the grounds that their acts were "official," thereby bringing into the courts the policies of their countries.
>
>We do not see sufficient reason to risk this litigation.  We have no reason to believe that acts of terrorism are being committed against Americans by foreign officials acting in a non-official capacity.  Furthermore, there is no exemption in the bill, and we are seeking none, for members of terrorist organizations.  Exempting officials, including their nonofficial acts, will not benefit such organizations.

<u>Sen. Hrg. 101-1193, on S. 2465, 101st Cong., Second Session, Serial No. J-101-87</u>, at pages 22-

23, included in Pl. Ex D on this motion.

With respect to personal jurisdiction, it's noteworthy that this testimony contemplates that actions under the ATA would be commenced against officials while visiting the United States recognizing that their presence in the United States was necessary, and more broadly that compliance with dictates of due process was required for personal jurisdiction over them.

The definition of international terrorism in sec. 2331 bears on both subject matter jurisdiction and the legal sufficiency of the civil cause of action plaintiffs are alleging under sec. 2333.

This definition is drawn verbatim from the definition of international terrorism under the Foreign Intelligence Surveillance Act, 50 U.S.C. sec. 1801©), see <u>Boim</u> v. <u>Quranic Literacy Inst.</u> 291 F.3d 1000, 1009 (7th Cir. 2002).  The issues of motivation and

intent the definition raises were deemed by Mr. Krezcko to require U.S. courts to make rulings of unique difficulty on "motivation and intent... [with] potential to embarrass other states or to interfere in the Executive Branch's ability to conduct foreign affairs." These are among the principal hallmarks of nonjusticiability. Application of the definition in <u>Boim</u> raised no such political questions because, among other things, none of the defendants in <u>Boim</u> remotely approached being a foreign state or government.

 As previously mentioned, neither the FSIA nor the ATA define "foreign state." Given the unique difficulties recognized by the State Department in applying the ATA's definition, warranting the exemption of foreign states and their officials from actions under the ATA, the term "foreign state," which Palestine meets for all purposes, should be given a broader reading under the ATA than the FSIA, to include a de facto, functioning government though it might not meet all the four criteria for statehood. Similar political embarrassment and interference with the Executive conduct of foreign affairs are at risk. So that even if Palestine were not a foreign state for all purposes, it must be considered a foreign state for purposes of the ATA and the exemption granted by sec. 2337. In addition, the nonjusticiability of the ATA's definition of international terrorism when applied to a functioning government as substantial as that of Palestine with day to day and long-term responsibility for a population of millions, in the midst of ongoing conflict, requires dismissal of this action, whether or not Palestine is considered a state.

 The context provided by the Israeli-Palestinian conflict would include the many factors that govern the motivation and intent with which defendants allegedly acted.

These would have to be judicially assessed to judge the feasibility of a Court's determining whether the activities plaintiffs allege constitute international terrorism. These factors include defendants' need to address and take into account the continuing oppression, poverty, malnutrition and humiliation of the Palestinian people, the violation of the people's human rights by excessive military force and other means, and relative popular support of the people from time to time for the Palestinian government, militant factions and violence –all of which are directly affected by Israel's oppressive and illegal conduct.  Recent U.N. reports submitted to the International Court of Justice as part of the U.N.'s Dossier in support of the pending request for an advisory opinion on the legal consequences of the wall Israel is constructing confirm that throughout the period covered by this case the intent and motivation with which defendants acted was constantly and powerfully affected by many aspects of the Israeli-Palestinian conflict including, violation of Palestinian human rights and the humanitarian crises suffered by the Palestinian people.  Part III of the Dossier consists of four current U.N. reports.  A listing of the Reports is attached hereto.  The listing and the reports are posted in full on the Court's website: www.icj-cij.org.  The Dossier is posted on the Court's website in a pdf file of 1164 pages.  The four reports in Part III appear in the order listed at pdf pages 389, 418, 446 and 461.

Conclusion

     Defendants' motion to supplement the record on its Rule 12(b) motion should be granted.

                        Respectfully submitted,

Maher Hanania
6066 Leesburg Pike Suite 101
Falls Church, VA 22041
(703) 778-2400
(703) 778-2407 fax

Ramsey Clark
Lawrence W. Schilling
36 East 12th Street
New York, NY 1003
212-475-3232
Attorneys for defendant