## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| REUVEN GILMORE, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil Action No. 1:01cv853 (GK) (DAR) |
| | ) | |
| PALESTINIAN INTERIM SELF- | ) | |
| GOVERNMENT AUTHORITY, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANTS' MOTION TO
## VACATE CLERK'S ENTRY OF DEFAULT

Defendants The Palestinian Authority and The Palestine Liberation Organization hereby move pursuant to Rule 55(c) of the Federal Rules of Civil Procedure to vacate the January 29, 2007, entry of default by the clerk. Pursuant to Local Rule 7(f), an oral hearing is requested on the motion.

For the reasons stated in the accompanying memorandum of points and authorities and supporting exhibits, including the declaration of Prime Minister Fayyad, and for any other reason the Court deems appropriate, we urge the Court to vacate the entry of default and to permit expedited litigation on the merits of this case subject to conditions discussed more fully in the memorandum of points and authorities. Defendants have submitted a verified answer along with these pleadings as is required by Local Rule 7(g).

Respectfully submitted,

Dated:  November 15, 2007

/s/ Mark J. Rochon
Richard A. Hibey (D.C. Bar #74823)
Mark J. Rochon (D.C. Bar #376042)
Charles F.B. McAleer, Jr. (D.C. Bar #388681)
Timothy P. O'Toole (D.C. Bar # 469800)
655 Fifteenth Street, N.W., Suite 900
Washington, DC  20005-5701
Tel. (202) 626-5800
Fax. (202) 628-0858
rhibey@milchev.com

*Attorneys for the Palestinian Authority and the*
*Palestine Liberation Organization*

## CERTIFICATE OF SERVICE

  I HEREBY CERTIFY that, on this 15th day of November 2007, a true and genuine copy of the foregoing was sent by electronic mail and ECF to the following:

    David J. Strachman
    McIntyre, Tate & Lynch, LLP
    321 South Main Street, Suite 400
    Providence, RI  02903
    Djs@mtlhlaw.com
    *Attorneys for Plaintiffs*

        /s/ Charles F. B. McAleer, Jr._____

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| REUVEN GILMORE, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| v. ) | Civil Action No. 1:01cv853 (GK) (DAR) |
| ) | |
| PALESTINIAN INTERIM SELF- ) | |
| GOVERNMENT AUTHORITY, *et al.*, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM IN SUPPORT OF DEFENDANTS'
## MOTION TO VACATE CLERK'S ENTRY OF DEFAULT

The Court should vacate the January 29, 2007, clerk's entry of default and allow the

remaining Defendants, the Palestinian Authority and the Palestine Liberation Organization (the

"PA" and the "PLO") to challenge the Plaintiffs' claim that they are legally responsible for the

shooting death of Esh Kodesh Gilmore that occurred on October 30, 2000, at the Israeli National

Insurance Institute in East Jerusalem.  Defendants are mindful of the age of this lawsuit, and the

current stage of the proceedings before Magistrate Judge Robinson.  Defendants also

acknowledge that, in the past, their conduct of the litigation has not always conformed to the

standards of consistency and transparency that the Court rightly demands.  We regret these

failings, and new counsel and the new Palestinian leadership will ensure that those standards are

met going forward.

Respectfully, however, Defendants submit the Court should vacate the default and permit

merits litigation.  Defendants genuinely desire to defend themselves against the baseless charges

that they are legally responsible for Plaintiffs' loss.  Defendants emphatically deny involvement

with the acts that are the subject of this lawsuit.  Plaintiffs cannot proceed in this case merely on the theory that the Defendants are responsible for every attack that takes place on or near Palestinian territory or is conducted by Palestinians.  However, review of the Complaint and the record in this case shows that this is exactly Plaintiffs' theory.

Instead, the only permissible theory of liability is that the Defendants actively aided and abetted the attack or committed it themselves.  Vacating this judgment will most certainly not be a "futile gesture," *FG Hemisphere Associates v. Democratic Republic of Congo*, 447 F.3d 835, 842 (D.C. Cir. 2006), because there is no objective reason to believe that Plaintiffs could ever make such a showing if Defendants were to receive their day in court. The shooting in this case does not bear the hallmark of a terrorist attack at all; indeed, at the very same time the Plaintiffs filed their complaint in this case, the State Department left the incident off of its list of terror attacks, explaining that "we still don't know the exact circumstances of these incidents."  *See* Exh. A, M. Radler, *United States Urges Discrete Hunt for Terrorists*, Jerusalem Post, at 4 A (April 6, 2001).  This same report concluded that the State Department "has identified *no confirmed information that would indicate that any of the suspects in any of the aforementioned attacks is a member of the Palestinian police, Palestinian security forces or any Palestinian governing body.  We have looked into such allegations but have found no evidence to substantiate them.*"  *Id.*  (emphasis added).

The crime remains unsolved and there are multiple conflicting reports about what happened. Although the State Department ultimately added this incident to its list of terror attacks -- without any discussion of why it did so -- it also continues to offer a reward for information about the unsolved incident.  But even if Plaintiffs' can identify who performed the shooting, Plaintiffs still cannot establish liability because Defendants did not sponsor the attack.

A different State Department report describes the PA's many counter-terrorism measures during the year 2000, praises its coordination on such measures with Israeli authorities, and describes the specific damage the PA's measures had done to rejectionist forces sponsoring violent acts, such as HAMAS and Islamic Jihad.  U.S. Department of State, "Patterns of Global Terrorism 2000, Middle East Overview," available at *http://www.state.gov/s/ct/rls/crt/2000/2438.htm*.  This is, in short, a case where the Defendants, if they receive their day in court, will have strong arguments that they were not responsible for this attack, and in fact were working hard at the time to prevent violent attacks.

After briefly reviewing the procedural background of the case, Defendants will discuss (1) their commitment -- reflected in the accompanying declaration of Prime Minister Fayyad -- to defend the case on the merits and why, given the foreign policy implications of the case, their commitment warrants the Court's careful consideration of the motion to vacate, (2) why despite Defendants' previous conduct -- though not blameless -- the Court must still vacate the default in light of the totality of the circumstances, (3) the meritorious defenses Defendants seek to present, and (4) the steps Defendants are prepared to take to minimize any prejudice to Plaintiffs associated with vacating the default.

## PROCEDURAL BACKGROUND

### A.    The Initial Default Occurs When Defendants Are Attempting to File a Lengthy Motion to Dismiss on Jurisdictional Grounds.

Plaintiffs initiated this lawsuit in April 2001 but spent the majority of 2001 effectuating service of the Complaint.  In October 2001, when the operative Complaint was purportedly served, Defendants were represented by attorneys Ramsey Clark and Lawrence Shilling, as well

as local counsel Maher Hanania.  Clark and Schilling were also handling similar lawsuits filed

against the Defendants in federal court here and in Rhode Island.[1]

The next month, on November 29, 2001, the Plaintiffs moved for entry of default when

the PA and PLO allegedly failed to file a timely answer.  Dkt. No. 17.  On December 20, 2001,

the Court directed entry of default, which the Court entered on the docket on January 9, 2002.

Dkt. No. 18.  Soon after, on January 25, 2002, the Plaintiffs moved for entry of a default

judgment and a hearing on damages.  Dkt. No. 19.

On January 29, 2002, the PA and PLO filed an extensive motion to dismiss the complaint

on jurisdictional grounds, for insufficiency of service of process, for lack of personal jurisdiction,

for failure to state a claim on which relief could be granted and for non-justiciability.  Dkt. No.

20.  In that same motion, the PA and PLO moved to set aside the default based on the turbulent

situation in the Middle East, and offered to elaborate on their explanation if Plaintiffs declined to

agree to set aside the default.  Dkt. No. 20 at 2-3.  On February 1, 2002, Defendants filed a

revised version of the motion.  Dkt. No. 21.

On February 12, 2002, Plaintiffs renewed their motion for entry of default judgment.

Dkt. No. 22.  Three days later, on February 15, 2002, the PA and PLO filed an extensive

opposition, which attached a similar motion to vacate that had been filed in *Biton v. Palestinian*

*Interim Self Government Authority*, No. 01-cv-382 (D.D.C.), which described how Plaintiffs had

sought entry of default despite knowledge that a responsive pleading was imminent.  Dkt. No. 23.

On March 6, 2002, Plaintiffs' counsel filed a lengthy "objection", claiming that the Defendants

---

[1] *Biton v. Palestinian Interim Authority,* 01cv382 RMC (D.D.C.); *Ungar v. Palestinian Authority*, 00cv105 (D.R.I.).

had somehow engaged in lengthy delay for strategic reasons -- even though Defendants had not even been served until October 2001 at the earliest.  Dkt. Nos.  24 & 25.

On April 17, 2002, the Court granted the motion to vacate the default and denied the motion for default judgment -- emphasizing the strong legal preference in favor of merits litigation.  Dkt. No. 28.  The Court also noted that both "parties ha[d] repeatedly failed to comply" with the governing local rules.  Dkt. No. 28 at 1 n.1.

### B.   Years of Extensive, Complex Litigation over Jurisdictional Issues Follow During Which the Court Seeks a Statement of Interest from the United States.

This Court's April 2002 order vacating the default permitted the immediate filing of the Defendant's motion to dismiss on jurisdictional grounds.  *See* Dkt. No. 29, 30 & 31.  One month after the order, the parties entered a stipulation setting a briefing schedule.  Dkt. No. 29.  The Plaintiffs then filed their opposition on July 26, 2002, and Defendants filed their reply brief May 15, 2003 pursuant to order of the Court.  Dkt. Nos. 30 & 40.  Plaintiffs filed a sur-reply in June 2003, representing that such a pleading was needed to respond to several of the arguments in the reply.  Dkt. No. 43.  Even after the filing, both sides filed a number of supplemental pleadings informing the Court of new legal authority.  Dkt. Nos. 44-48, 50, 56-59, 64-67.  Plaintiffs' counsel's pleadings, along with exhibits, consumed hundreds of pages.  *See* Dkt. Nos. 44 (notice of supplemental authority), 45 (Plaintiffs' second notice of supplemental authority), 47 (Plaintiffs' third notice of supplemental authority), 50 (bulky attachments to third notice of supplemental authority), 65 (Plaintiffs' motion to close defendants' briefing on their Rule 12(b) motion).

On March 11, 2004, after reviewing the briefing already on file, the Court asked the United States to consider filing a Statement of Interest.  Dkt. No. 46.  On April 1, 2004, the

United States respectfully informed the Court that, although it declined to participate, it would "monitor closely the subsequent proceedings in the case." Dkt. No. 49.

On January 27, 2006, Plaintiffs' counsel moved to refer the proceedings to a magistrate judge. Dkt. No. 68. Despite the hundreds of pages of briefing and exhibits he himself had filed on the jurisdictional issues, he stated that "[f]or nearly five years, since the filing of this action until today, defendants have engaged in systematic and intentional dilatory tactics that have prevented any progress whatsoever in this case." [Dkt. No. 68] He made this statement, with its capacity to mislead the Court or engender animosity towards the Defendants, even though both parties had fully briefed a motion to dismiss and were awaiting a ruling from the Court. Nonetheless, Plaintiffs' counsel asked the Court to refer the case to a magistrate because of this purportedly "contumacious conduct" by Defendants. Dkt. No. 68.

On March 7, 2006, the Court entered a memorandum opinion granting in part and denying in part Defendants' motion to dismiss. Dkt. No. 73. The Court dismissed the individual Defendants, but permitted the Plaintiffs to proceed against the PA and PLO. In its decision, the Court rejected Defendants' arguments concerning the political question doctrine, sovereign immunity and failure to state a claim. On this last point, the Court found that it must "take as true" Plaintiffs' allegations at "this early stage of the litigation," and therefore rejected the argument that Plaintiffs had failed to plead a cause of action under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333. Dkt. No. 73 at 11. In a final footnote to the opinion, the Court also candidly acknowledged that "the Revised Motion to Dismiss has been pending for an extraordinarily long time," explaining that the Court "regret[ed] the delay in issuance of this

opinion" but that "other matters on this Court's calendar made an earlier ruling impossible." Dkt. No. 73 at 17 n.6.[2]

### C.   Proceedings Following Denial of the Motion To Dismiss:  The Instant Default Occurs After Defendants File and Then Withdraw an Answer.

After denying the PA and PLO motion to dismiss, the Court set an initial scheduling conference for March 21, 2006.  Dkt. No. 74.   Even before the conference, however, Plaintiffs began seeking to prevail by default, filing a pleading claiming that "Defendants [would] refuse to file an answer the complaint or participate in the litigation."  Dkt. No. 76 at 3.  Though the motion to dismiss had just been denied by the Court two weeks earlier and the Court had referred to the litigation as being in its "early stages," Plaintiffs' counsel faulted Defendants for their "bad-faith dilatory tactics," and "prior contumacious conduct in this action."  Dkt. No. 76 at 3-4.

At the March 21, 2006 scheduling conference, Plaintiffs' counsel again asked the Court to act preemptively on the theory that they should win the case by default, and that Defendants would not file an answer because they had not done so in similar cases. Tr.  3/21/06 at 4-5. Attorney Clark acknowledged that the Defendants had "not appear[ed] and defend[ed] on the merits" in other cases but informed the Court that he had been unable to contact the new government in order to determine whether that would occur in this case.  Tr. 3/21/06 at 7:19-9:12.  The Court refused to act preemptively, explaining that it would take this case "on its own," await Defendants' answer and then file a scheduling order within a week.  Tr. 3/21/06 at 4:19-20 & 11:11-16.  On April 24, 2006, Defendants filed a timely answer, denying each and every

---

[2]   The Court expressed the same sentiment at the initial scheduling conference several weeks later.  Tr. 3/21/06 at 3:14-16 ("Counsel, this has been a long delayed case.  I indicated in the opinion that I issued my regrets about that for both sides certainly.  I can only say that it was a function of my calendar.").

allegation in the Complaint, and also requested that the Court "enter a discovery order forthwith." Dkt. Nos. 82, 83.

On May 18, 2006, this Court entered a detailed scheduling order setting the case on a six month discovery schedule. Dkt. No. 84. Over the next six months, discovery appeared to proceed apace, with the parties entering stipulations to extend the schedule until December 2006. Dkt. No. 85.

On December 5, 2006, however, attorney Clark appeared on behalf of the Defendants at a status conference, informed the Court that attorney Hanania had been fired because he purportedly had no authority to file an answer and to engage in discovery in the case. Tr. 12/5/06 at 3:3-6. Nonetheless, Mr. Clark indicated that there was still confusion on the matter because Mr. Clark was receiving conflicting representations about Mr. Hanania's status from Palestinian officials. Tr. 12/05/06 at 5:6-9. Mr. Clark also noted that Mr. Hanania had engaged in discovery on behalf of the Defendants, although Plaintiffs disputed the extent to which discovery had occurred. Tr. 12/05/06 at 7-8.

In response, the Court stated, "All right. I understand where everybody's at now to the extent that they are at any place. Mr. Clark has made representations . . . Correct me if I'm misstating anything. As of today, the position of your client is that it is no longer to be represented by Mr. Hanania and that you and your partner or associate are the only lawyers representing the PLO in this case." Tr. 12/05/06 at 8:9-17. Mr. Clark agreed. The Court then continued, "And that you don't intend to engage in any discovery. You intend to allow the case to take its course . . . and at the end of the cases generally in the District Court, if there is a judgment against your client, you will be appealing it . . . on jurisdictional grounds?" Mr. Clark again agreed. Tr. 12/05/06 at 8:19-25.

8

At the end of the conference, the Court inquired whether Mr. Hanania had had authority to file the answer; the Court learned from Mr. Clark that Mr. Hanania claimed to have had such authority, and from Plaintiffs' counsel that Mr. Hanania had been communicating from Ramallah about the case.  Tr. 12/05/06 at 10-11.  The Court accordingly directed Mr. Hanania to file a statement setting forth his authority to file an answer.  Tr. 12/05/06 at 11.

In response, Plaintiffs' counsel moved to strike the answer, and for entry of default.  Dkt. Nos. 88 & 91.  At approximately the same time, Attorney Hanania filed a notice, in which he informed the Court that he had previously been instructed to file an answer and to avoid a default judgment by persons whom he thought had the authority to provide such directions.  Dkt. No. 90.  Attorney Hanania explained, however, that he was "now informed that [he] had no authority to file answers addressing the merits," and thus requested that the Court strike the answer.  Dkt. No. 90.  On January 29, 2007, the Court directed the Clerk to enter a default, and referred the case to Magistrate Judge Robinson for a hearing on damages.  Dkt. Nos. 92 & 93.

At virtually the same time this Court was entering the default, PA President Mahmoud Abbas was seeking guidance with respect to all U.S. litigation from Secretary of State Condoleeza Rice.  On January 12, 2007, in response to President Abbas' inquiries, Secretary Rice encouraged the Palestinian Authority to "respond to U.S. legal proceedings in a good faith and a timely manner."  Exh. B (Secretary Rice's letter).  Following receipt of the Secretary of State's letter, President Abbas charged Finance Minister Salam Fayyad with responsibility for engaging new counsel to defend the cases on the merits.  After engaging in appropriate inquiries, Defendants retained new counsel from Miller & Chevalier Chartered, discharged predecessor counsel, and are now committed to full and complete participation in numerous cases in the United States courts.  *See* Declaration of Prime Minister Salam Fayyad, attached as Exhibit C.

In late May 2007, current counsel entered the case on behalf of the PA.  Dkt. No. 94.

Following the entry of new counsel into the case, the Defendants have fully participated in all

proceedings, including a damages hearing before Judge Robinson and on-going briefing with

regard to questions that arose at that hearing.

## ARGUMENT

**I.**    **DEFENDANTS ARE COMMITTED TO LITIGATING THE CASE ON THE MERITS AND SHOULD BE ALLOWED TO DO SO, ESPECIALLY IN LIGHT OF THE FOREIGN POLICY CONSEQUENCES OF A DEFAULT JUDGMENT.**

**A.**    **Introduction**

A number of cases have been brought against the PA and PLO in the United States under

the Anti-Terrorism Act, 18 U.S.C. § 2333.  The unstated premise of these cases, including the

instant case, is that the PA and PLO are responsible for every alleged act of violence committed

within the Occupied Territory.  Every act of alleged terror is assumed to be committed by a

Palestinian acting at the behest of the PA or PLO, even though the reality is that the acts are

committed by individuals operating as part of militant groups or factions who have their own

agendas, agendas that are at odds with that of the PA and PLO.

Collectively, the U.S. Plaintiffs are seeking well over $4 billion.  Such judgments would

have a devastating impact on the Palestinian economy and people.  The United Kingdom Foreign

Office describes the current state of the PA economy as follows:

> As a result of Israeli restrictions imposed both within the West
> Bank and Gaza Strip and on Palestinian external economic
> relations since the start of the Intifada (uprising) in September
> 2000, the economy has been fragmented.  Significant damage has
> been done to infrastructure, and economic activity and incomes
> have contracted very sharply.  Levels of poverty have increased
> dramatically, and much of the population is now dependent on
> food aid.

Exh. D at 2 (Country Profile of the "Occupied Palestinian Territories" from the U.K.'s Foreign & Commonwealth Office's website). Courts have been particularly wary of the potential windfall effect of default judgments in cases involving "large sums of money." *Livingston Powdered Metal, Inc. v. NLRB*, 669 F.2d 133, 137 (3d Cir. 1982); *Hutton v. Fisher*, 359 F.2d 913 (3d Cir. 1966); *Rooks v. American Brass Co.*, 263 F.2d 166 (6th Cir. 1959); *Hester Int'l Corp. v. Federal Republic of Nigeria*, 879 F.2d 170, 175 (5th Cir.1989) ("We have recognized previously that if the amount of money involved is very great the amount militates in favor of granting a full trial on the merits.") These concerns are heightened when the windfall is at the expense of the public fisc, and should be especially heightened here in light of the financial state of the PA.

**B.     The PA/PLO's Commitment to Litigate the Case on the Merits, and the United States' Commitment to Support the Current Leadership of the Palestinian Authority.**

At the time this case was brought and during the motions litigation, the PA and PLO might rightly have wondered why they would be haled into U.S. courts to litigate claims, such as Plaintiffs', involving an unsolved shooting in Jerusalem that arose against the backdrop of the Palestinian-Israeli conflict. Despite the PA's and PLO's understandable confusion concerning the jurisdiction of the U.S. courts over such claims, Defendants have come to appreciate that they need to address these cases head on rather than continue to rely on jurisdictional defenses.

As noted, this change was already beginning at almost precisely the time when the default was entered here, when President Abbas sought guidance from Secretary Rice about how to respond to the U.S. litigation. Upon receipt of this guidance, President Abbas charged then-Finance (now Prime) Minister Salam Fayyad with responsibility for "mak[ing] decisions for both the PA and the PLO in connection with these lawsuits." *See* Declaration of Prime Minister Salam Fayyad, attached as Exhibit C at ¶ 10. As Prime Minister Fayyad describes more fully in

11

his attached declaration, he reviewed President Abbas' correspondence with Secretary Rice,
engaged in appropriate inquiries and "decided to retain new counsel for the PA and PLO to
handle all of the U.S. lawsuits, to provide them with clear instructions about their responsibilities
with respect to the litigation, and to discharge predecessor counsel." Exh. C at ¶ 12. As a result
of Prime Minister Fayyad's actions, within the past few months, Miller & Chevalier counsel have
entered appearances (or, in the non-D.C. cases, have been admitted pro hac vice) on behalf of the
PA/PLO in seven cases.[3]

   During this same period, forces associated with Hamas sought to oust the PA from the
Gaza Strip. In response, in June 2007, President Abbas expelled the Hamas-led government and
appointed new leadership, naming Dr. Fayyad as Prime Minister in addition to his role as
Finance Minister. The United States has since resumed diplomatic relations with the new
leadership of the PA, and the PA is now actively engaged in negotiations with Israel, with the
goal of agreeing to a framework for the U.S.-sponsored peace summit to be held in Annapolis,
probably by year end. *See* Exh. E ("Rice Says Palestinian State Within Reach," *CNN.com*, Nov.
5, 2007).

   Prime Minister Fayyad's declaration fully describes the manner in which the new
Palestinian leadership intends to conduct the litigation going forward:

> I have instructed new counsel that the Defendants will participate
> fully in this and other litigation, in a cooperative manner, including
> complete participation in the discovery process. I have further
> instructed new counsel to transmit this commitment to the United
> States courts. I personally commit to sustain this instruction

---

[3] *See Shatsky v. Syrian Arab Republic*, No. 02cv2280 (RJL) (D.D.C.); *Gilmore v. Palestinian Interim Auth.*, No. 01cv853 (GK) (D.D.C.); *Estate of Esther Klieman v. PA*, No. 04cv1173 (PLF) (D.D.C.); *Sokolow v. PLO*, No. 04cv397 (GBD) (S.D.N.Y.); *Knox v. PLO*, No. 03cv4466 (VM) (S.D.N.Y.); *Saperstein v. PA*, No. 04cv20225 (S.D. Fla.); *Estate of Yaron Ungar v. PA*, No. 00cv105L (D.R.I.). Miller & Chevalier counsel also have pending pro hac vice motions in another case involving the PA and PLO, *Mohamad v. Rajoub*, No. 05cv8335 (LAP) (S.D.N.Y.).

> throughout the effort to litigate these cases. It is my belief there are
> meritorious defenses to the claims brought in the United States and
> it is important to the PA to present those defenses. Moreover, it is
> important to the PA's role in the international community to
> participate in the legal process, even when it is process brought in
> the United States for actions that occurred far from the United
> States. The importance of this was not fully appreciated by the PA
> government, as a whole, until recently. Now we can act on that
> understanding, and we therefore seek to contest this litigation, fully
> and responsively.

Exh. C at ¶ 13.

Prime Minister Fayyad's declaration deserves the Court's serious consideration. The

United States has praised the new Palestinian leadership for "striving to build the institutions of a

modern democracy," "working to strengthen Palestinian security services, so they can confront

the terrorists and protect the innocent," and "ensuring that Palestinian society operates under the

rule of law." Exh. F at 1 (July 16, 2007 Speech of President Bush). As President Bush explained

in his July 2007 speech, "[b]y supporting the reforms of President Abbas and Prime Minister

Fayyad, we can help them show the world what a Palestinian state would look like -- and act

like." *Id.* at 1-2. One of many indications of the PA's and PLO's commitment to "operate[]

under the rule of law," is the Defendants' unambiguous desire to fully defend this lawsuit within

the American legal framework. Defendants thus ask the Court, in reviewing this motion, to

weigh the importance of encouraging the designated representatives of the Palestinian people --

representatives who have won the support of our own Government -- to participate fully in the

American legal process. As further evidence of Defendants' readiness to participate in the

litigation, Defendants have attached as Exhibit G a Verified Answer, which the Defendants

would file if the Court grants permission to do so.

13

**C.**     **U.S. Law Recognizes the Importance of Giving Foreign Governments an Opportunity to Litigate on the Merits and Avoid Default Judgments.**

As noted, a number of cases have been brought against the PA and PLO in the United States under the Anti-Terrorism Act, 18 U.S.C. § 2333. Because the U.S. courts lack jurisdiction over the individuals and militant groups responsible for the acts, the plaintiffs sue the PA and PLO, with the hopes that the courts will take jurisdiction over the PA and PLO and the PA and PLO will default due to the difficulty of defending such suits in the United States. Plaintiffs also understand they have a greater prospect of collecting on a judgment against the PA and PLO than they do against the individuals and groups actually responsible for the acts.

Recognizing the necessity of protecting the public fisc from unfounded, unproven claims, U.S. law -- both statutory and case law -- goes to great lengths to protect foreign governments from default judgments based solely on a procedural default. Accordingly, the Foreign Sovereign Immunities Act precludes the entry of a default judgment "against a foreign state, a political subdivision thereof, or an agency or instrumentality of a foreign state, unless the claimant establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). As the Eleventh Circuit explained in *Compania Interamericana v. Campania Dominica*, 88 F.3d 948, 951 (11th Cir. 1996), "Section 1608(e) is modeled after Fed. R. Civ. P. 55(e), which similarly protects the federal government from default judgments based solely upon procedural defaults." Both Rule 55(e) and Section 1608(e) "reflect congressional recognition that public fisc should be protected from unfounded claims which would be granted solely because of government's delay in responding." *Id.* (citing *Commercial Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 242 (2d Cir. 1994)).

Although the Palestinian Authority is not recognized as a foreign state for purposes of the Foreign Sovereign Immunities Act, any default judgment against the PA would be paid from the public fisc.  The Palestinian taxpayers, many of whom, as noted, live in poverty, are as deserving as other taxpayers of being protected from a procedural default.  No doubt opposing counsel will assert that the satisfaction of any judgment would not come at the expense of the Palestinian people, but the U.S. plaintiffs' own collections efforts demonstrate that is not the case.  Plaintiffs in *Estate of Yaron Ungar v. PA*, No. 00cv105L (D.R.I.), have, for example, sought to attach Arab League funds earmarked for humanitarian aid to the PA, garnish the Value Added Taxes collected by Israel on goods delivered into the Palestinian Territories, and attach funds of the Palestinian Pension Fund for state employees.[4]  The Ungars' counsel (Mr. Strachman) represents Plaintiffs here.

Indeed, Plaintiffs' counsel appears to be working in these cases in conjunction with the Shurat HaDin Israel Law Center (ILC), an advocacy group whose stated goal is to "economically destroy" the PA, which it refers to on its website as a "hate group in the Middle East."[5]   The leader of the ILC, Nitsana Darshan-Leitner, has taken credit in the media for decisions favorable to plaintiffs in the federal litigation in Rhode Island (where Mr. Strachman is also counsel), and the ILC website similarly claims credit for the federal litigation in the United States, asserting

---

[4]  *See, e.g., Ungar v. PA*, 05-mc-00180-GK (D.D.C.) (Arab League funds); *Unger v. PA*, No. H/P 4318/05 (Jerusalem District Court) (action to domesticate *Ungar* judgment in Israel and attach VAT funds); *Estate of Yaron Ungar v. PA*, 841 N.Y.S.2d 61 (N.Y. App. Div. 2007) (discussing plaintiffs' actions with regard to Palestinian Pension Fund).

[5]  Shurat HaDin Israel Law Center, "About Us" (last checked on Nov. 13, 2007), available at *http://www.israellawcenter.org/template.php?section=AU*.  The ILC also brings lawsuits supporting teachers who refuse to teach Israeli children about the work of the late Prime Minister Yitzhak Rabin. *See* Etkar Levkowits, "Teacher Suspended Over Rabin Studies Wins Suit," Jerusalem Post (Jan. 6, 2004), available at *http://www.israellawcenter.org/articlenav.php?id=23*.

that the ILC "won judgments of over $702 million against terrorist organizations, including the Palestinian Authority, and their state sponsors."[6]  Ms. Darshan-Leitner has stated in interviews that the international legal team ultimately hopes to "bankrupt" the PA, and to "expose" what she describes as the European Union's "reckless" humanitarian subsidies to the PA.  Exh. H, John Turley-Ewart, *Fighting Terrorism in Court: Israeli Lawyer Sues in Bid to Cut off Funds to Palestinian Authority*, National Post (Nov. 23, 2002).  The ILC website also asks supporters to send (ostensibly tax deductible) donations to an address in New York, in order "to assist in the funding of the terror victim litigation against the Palestinian terrorist organizations, their leaders and financial patrons."[7]

It is precisely because foreign governments can easily be the target of these sorts of unfounded, politically-motivated lawsuits (and for other reasons as well) that courts generally exercise great caution before enforcing defaults and even default judgments against foreign governing entities.  *Practical Concepts, Inc. v. Republic of Bolivia*, 811 F.2d 1543, 1552 & n.19 (D.C. Cir. 1987); *Hester Int'l Corp. v. Federal Republic of Nigeria*, 879 F.2d 170, 175 (5th Cir. 1989); *Gregorian v. Izvestia*, 871 F.2d 1515, 1525 (9th Cir. 1989); *First Fidelity Bank v. Government of Antigua & Barbuda-Permanent Mission*, 877 F.2d 189, 196 (2d Cir. 1989) ("Courts go to great lengths to avoid default judgments against foreign sovereigns or to permit those judgments to be set aside.").  This caution stems from the "broad divergence" of "cultural, governmental and political" approaches to litigation when a foreign government is involved, and the importance of encouraging foreign entities to submit their disputes to resolution by the United States courts on the merits "on the basis of all relevant legal arguments," particularly in

---

[6] *Id.*

16

cases involving serious foreign policy overtones.  *Practical Concepts, Inc. v. Republic of Bolivia*, 811 F.2d at 1551-52.  Just last year, the D.C. Circuit, applying rule Rule 60(b), vacated a default judgment against the Democratic Republic of Congo.  *FG Hemisphere Assocs., LLC v. Democratic Republic of Congo,* 447 F.3d 835 (D.C. Cir. 2006).  The court explained: "Intolerant adherence to default judgments against foreign states could adversely affect this nation's relations with other nations and undermine the State Department's continuing efforts to encourage foreign sovereigns generally to resolve disputes within the United States' legal framework."  *Id.* at 838-39 (internal quotation and citation omitted).

   *Jackson v. People's Republic of China*, 794 F.2d 1490 (11th Cir. 1986), highlights the unique concerns raised by the imposition of default liability against foreign governing entities.  In *Jackson*, a group of bondholders brought a class action suit in federal court in Alabama to collect on a debt purportedly owed to them by the Chinese national government.  The Chinese government believed that it was entitled to complete sovereign immunity, and refused to defend the case or even submit filings to the Court.  Instead, over a three year period beginning in 1979 when the suit was filed, China repeatedly contacted the United States government through diplomatic means, asserting that it had no obligation to defend.  As a result, the district court clerk entered a default two years after the suit was filed and, after a hearing on damages, the district court entered a $41 million default judgment.

   Ultimately, the State Department convinced the Chinese government to appear in Court to contest the default judgment and to seek relief on jurisdictional grounds under Rule 60 of the Federal Rules of Civil Procedure, arguing that China had sovereign immunity in light of the

---

[7]  Shurat HaDin Israel Law Center, "Donate Now" (last checked on Nov. 13, 2007), available at *http://www.israellawcenter.org/template.php?section=DN.*

United States' recognition of that government in 1979.  The State Department filed a Statement

of Interest in the case explaining that the default judgment had significant foreign policy

implications, and urged the court to vacate the default.  The district court agreed, and the

Eleventh Circuit affirmed.  The Eleventh Circuit explained that the "law disfavors default

judgments," and that "where a defendant has meritorious defenses the interest in resolving the

case on the merits prevails over the interest in finality of judgments." *Id.* at 1496.

> D.  **It Is Especially Imperative that a Foreign Government Be Given a Second Chance at Having Its Day in Court Where, as Here, as a Result of Terrorism Allegations and the Sheer Size of the Judgment, the Default Judgment Would Have Serious Foreign Policy Consequences.**

It is true that courts have sometimes declined to provide state-owned instrumentalities

relief from default judgments in cases involving ordinary contract disputes.  *See, e.g., Compania

Interamericana v. Campania Dominica*, 88 F.3d 948, 951-52 (11th Cir. 1996) (applying abuse of

discretion standard in affirming denial of national airline's motion for relief from entry of default

and default judgment in breach of contract action); *Transaero v. La Fuerza Area Boliviana*, 24

F.3d 457, 462 (2d Cir. 1994) ("The case before us is fundamentally an ordinary contract dispute

which has no such profound [foreign policy] implications.").  This case, however, does not

involve an ordinary contract dispute with a state-owned instrumentality but rather involves a

claim against the foreign government itself and involves charges that the government sponsored

terrorism, not charges that it breached a commercial contract.

Such claims require the courts to give special and careful consideration to the

Defendants' commitment to litigate on the merits -- even if this commitment comes at what

might be considered an inexcusably late stage in the litigation if an individual or corporate

defendant were involved.  In *Owens v. Republic of Sudan*, 374 F. Supp. 2d 1, 9 (D.D.C. 2005),

for example, the Court vacated a default against the Sudanese government after noting the "uniquely sensitive nature of a suit in which a foreign state wishes to challenge the allegation that it has harbored terrorists."

Moreover, though the PA does not enjoy the "foreign state" recognition enjoyed by China, the foreign policy implications of this case are far greater than those present in *Jackson v. People's Republic of China*, 794 F.2d 1490, where the court vacated a default judgment employing the much less forgiving Rule 60(b) standard than the Rule 55 "good cause shown" standard under which Defendants seek relief.  First, *Jackson* involved allegations that China had breached its obligations to holders of railroad bonds; here the PA and PLO are accused of supporting an act of international terrorism.  In addition, the size of the default judgment sought in relation to the annual GDP of the defendant is vastly greater here than it was in *Jackson*. Jackson involved a $41 million default judgment against China; this case involves a potential $125 million (or more) default judgment against the Palestinian Authority, whose financial situation is so dire that it is a regular recipient of financial assistance and humanitarian aid from other countries, including the United States.  *See* Exh. F at 2 (July 16, 2007 speech of President Bush).

If the Court has any doubt about the foreign policy implications of entering a default judgment against the PA and PLO in a terrorism case, we invite the Court to again seek a Statement of Interest from the State Department.  Although the State Department previously declined to present an SOI, choosing instead to closely monitor the case, the Palestinian leadership has changed significantly, and any Statement of Interest can speak to the importance of continuing the progress toward stability being made by the current PA leadership and how the imposition of default liability in cases like this one might affect any current progress.  As recently

as October 15, 2007, Secretary Rice, in a statement made alongside President Abbas, described the effort to establish a Palestinian state and to achieve a peaceful resolution of the Israel-Palestinian conflict as one of President Bush's "highest priorities." *See* Exh. I at 1-2 ("I hope you understand and that everybody understands that the President has decided to make this one of the highest priorities of his Administration and of his time in office. It means that he is absolutely serious about moving this issue forward and moving it as rapidly as possible to conclusion.").

## II.   DEFENDANTS SATISFY THE GOVERNING LEGAL STANDARD UNDER FEDERAL RULE 55 FOR VACATING THE DEFAULT.

A fair and reasoned application of the controlling legal standards should lead the Court to vacate entry of default.  The Defendants should be permitted to contest, in open court, Plaintiffs' unfounded claims that they have supported the commission of terrorist acts.

### A.   Rule 55's "Good Cause Shown" Standard.

Federal Rule of Civil Procedure 55(c) governs motions to vacate defaults before judgment has been entered and permits the setting aside of the entry of default "for good cause shown."  As the United States Court of Appeals has explained, this provision must be interpreted in light of the "strong policies favoring the resolution of genuine disputes on their merits." *Jackson v. Beech*, 636 F.2d 831, 835 (D.C. Cir. 1980).  Accordingly, although a district court has some discretion in resolving a motion to set aside a default, exercise of that decision will be closely scrutinized for proper application of the controlling factors and "an abuse of discretion need not be glaring to justify reversal, modern federal procedure favoring trials on the merits." *Keegel v. Key West & Caribbean Trading Co.,* 627 F.2d 372, 373-74 (D.C. Cir. 1980); *Jackson v. Beech*, 636 F.2d at 835; *Whelan v. Abell*, 48 F.3d 1247, 1258 (D.C. Cir. 1995).

The Court of Appeals has also made clear that "there is a distinction between the appropriate standard for setting aside a default and that appropriate for setting aside a default judgment," in that the standard for setting aside a default is substantially lower when judgment has not yet been entered. *Jackson v. Beech*, 636 F.2d at 835; *Keegel v. Key West & Caribbean Trading Co.,* 627 F.2d at 375 n.5 (noting that Rule 55 standard is "less rigid" and requires a "more liberal attitude" than Rule 60 allows); *Capital Yacht Club v. Vessel Aviva*, 228 F.R.D. 389, 393 (D.D.C. 2005) ("courts grant vacatur of default more freely than vacatur of default judgment."). The standard for setting aside a default is also applied differently depending upon whether the Court is dealing with a "totally unresponsive party" or one who has simply missed certain deadlines. *H.F. Livermore Corp. Aktiengesellschaft Gebruder Loepfe*, 432 F.2d 689, 691 (D.C. Cir. 1970) ("the default judgment must normally be viewed as available only when the adversary process has been halted because of an essentially unresponsive party"); *Jackson*, 636 F.2d at 836 (suggesting that default is reserved for a "totally unresponsive party"). As Judge Walton has recently explained, "Courts do not favor default judgments and will only resolve cases in this manner when the adversary process has been halted because of an essentially unresponsive party." *Candido v. District of Columbia*, 242 F.R.D. 151, 154-55 (D.D.C. 2007).

This preference for merits litigation is at its highest where enforcing the default will have significant foreign policy overtones. Such cases generally involve an initially-reluctant foreign entity, which eventually agrees to submit to the jurisdiction of the United States Courts after long-standing and on-going efforts of the State Department to achieve this result. Under such circumstances, courts have shown extreme reluctance to deprive a previously-recalcitrant foreign defendant of its day in court. *E.g.*, *Owens v. Republic of Sudan*, 374 F. Supp. 2d 1, 9 (D.D.C. 2005) ("strong presumption against the entry of default," as well as "uniquely sensitive nature of

a suit in which a foreign state wishes to challenge the allegation that it has harbored terrorists,"

warrants vacatur of "somewhat willful" default); *Jackson v. People's Republic of China*, 794

F.2d 1490, 1496 (11th Cir. 1986) (upholding vacatur of willful default by People's Republic of

China that refused for several years to litigate in United States courts and even refused to appear

at oral argument to defend vacatur).

     In ruling on any motion filed under Rule 55(c) to set aside a default, the court must

consider three criteria:  "whether (1) the default was willful, (2) a set-aside would prejudice

plaintiff, and (3) the alleged defense was meritorious."  *Jackson v. Beech*, 636 F.2d at 836;

*Keegel v. Key West & Caribbean Trading Co.,* 627 F.2d at 374; *Whelan v. Abell*, 48 F.3d at 1259.

The court must apply these standards so that "all doubts are resolved in favor of the party seeking

relief." *Jackson v. Beech*, 636 F.2d at 836; *United States v. Schofield*, 197 F.R.D. 6 (D.D.C.

2000).   Thus, "all ambiguous or disputed facts [must be considered] in the light most favorable

to the defendants."  *Jackson v. Beech*, 636 F.2d at 838.

     When the controlling legal standards are brought to bear in this case, it is clear that they

counsel in favor of vacating the default.  Prior to this motion, the Court has not had the benefit of

any direct representations from the PA leadership, much less the credible, unambiguous

representations contained here.  The record, fairly read in light of controlling law, shows that the

default was not sufficiently culpable to warrant the imposition of automatic, multi-million dollar

liability in a case that has serious foreign policy implications, that any cognizable prejudice to the

plaintiffs can be readily eliminated, and that Defendants have identified meritorious defenses

they will pursue vigorously.  This Court should vacate the default and permit the PA and PLO to

defend on the merits.

**B.      In Light of the Defendants' History of Actively Litigating the Case, Their Desire to Present a Vigorous Defense Going Forward, and the Important Foreign Policy Concerns at Stake, This Record Will Not Support a Finding of Willfulness That Deprives a Governing Entity of the Opportunity to Present a Full Defense to Charges That It Has Sponsored Terrorist Acts.**

Under the controlling law, the first factor to be considered is whether the default was willful.  Even though the earlier conduct of this case was far from perfect, the Court's entry of default was based on conflicting representations from different defense counsel, at a time when the Palestinian leadership was in a state of flux.  While it is understandable why the Court would enter a default based on the representations before it in December 2006, the leadership has changed and the Defendants have come forward with compelling assurances that this litigation will proceed expeditiously, vigorously and in good faith going forward.  Indeed, as we have noted, President Abbas and Prime Minister Fayyad were beginning to make this change at almost the same time the default was entered here.  These assurances should suffice to permit the Defendants to have their day in court even as of this late date.

1.      *Rule 55's Willfulness Standard.*

The standard for willfulness is a high one because it is "inherently unfair to use the court's power to enter judgment as a penalty for filing delays." *Peak v. District of Columbia*, 236 F.R.D. 13, 15 (D.D.C. 2006).  Thus, as the Court of Appeals has emphasized, "all doubts" must be resolved "in favor of the party seeking relief" when considering whether Defendants' conduct was sufficiently willful to warrant entry of default. *See Jackson v. Beech*, 636 F.2d at 836 (reversing default judgment because district court failed to resolve all doubts in favor of defendant on willfulness issue).  Thus, a finding of willfulness generally is reserved for a "totally unresponsive" litigant or one who intentionally sought to defy the authority of this Court.

23

*Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980) (suggesting that default is reserved for a "totally unresponsive party").

> 2. *A Finding of Willfulness Is Not Appropriate Here Where Defendants Were Neither Totally Unresponsive nor Intentionally Sought to Defy the Authority of the Court, but Rather Were Contending with Significant Political Turmoil.*

These standards are relevant because, as of January 2007, President Abbas was already seeking guidance about the litigation from the Secretary of State, guidance that would soon change the course of the litigation. At the same time, the Defendants here had seriously litigated the case over the course of a lengthy period, they had filed an answer and participated in some discovery but ultimately defaulted the case less than a year ago after the Court heard a set of conflicting signals from counsel. The Court also now has before it a repentant foreign governing entity that is making firm representations about its readiness to fully defend the case going forward, and is supporting those assurances with monetary security and sworn declarations. The Defendants have also made substantial efforts in that direction, retaining new counsel and participating fully in all proceedings since at least May 2007. The period of any refusal to participate therefore lasted only a few months after a lengthy period of participation, and it has only been a total of approximately 10 months since the default took place.

A finding of willfulness is particularly inappropriate here where the political turmoil in the PA during the 2004-2006 time period, and the associated leadership changes, also directly impeded Defendants' ability to act in as timely and responsive a manner as the Court otherwise has a right to expect. In *FG Hemisphere Assocs., LLC v. Democratic Republic of Congo*, the D.C. Circuit vacated a default judgment where political turmoil hampered the foreign government's ability to defend. 447 F.3d 835, 841 (D.C. Cir. 2006) ("DRC was plainly

hampered by its devastating civil war, which cost over three million lives, shattered the DRC's already shaky political structure, and set off hyperinflation that peaked at over 500% per year in 2000. It is not surprising that the war would be accompanied by substantial confusion over responsibilities in the Foreign Ministry--indeed the Office of the Foreign Minister itself appears not to have any record of receiving the Motion."). Here, at crucial stages of the litigation, defense counsel were unable to obtain clear instructions about whether to limit the defense to jurisdictional challenges or to defend on the merits. Defense counsel's explanations were far from frivolous.

Both Arafat's death and Hamas's election victory were momentous political events in the PA. Even now, hundreds of thousands of people turn out to commemorate the anniversary of Arafat's death, and these demonstrations focus on his unclenched control of the entire governmental apparatus. *See* Exh. J, Agence France Presse, *Hamas Cracks Down On Fatah After Deadly Rally* (Nov. 12, 2007). Regardless of how one views Arafat himself, there can be no denying that he was an overwhelming force, whose death shook the Palestinian Territory and its government. Understandably, it took time and considerable education for changing PA leadership to fully appreciate the implications of the U.S. litigation and that U.S. courts truly intend to exercise jurisdiction over what appeared to the PA to be the product of a purely Palestinian-Israeli conflict.

> 3.    *A Finding of Willfulness Is Not Appropriate Where Defendants Have Expressed an Unequivocal Commitment to Litigate on the Merits, Especially When the Case Involves Allegations of Terrorism Against a Foreign Government.*

One factor that is often controlling on the willfulness question is the history of Defendants' participation in the case and any stated intention to pursue the case vigorously going

forward.  For example, in *United States v. Schofield*, 197 F.R.D. 6, 8 (D.D.C. 2000), the court

refused to find willfulness where the Defendant did nothing for 14 months in response to a

properly served complaint, and continued to do nothing for 8 months after the Clerk had entered

a default.  In refusing to find willfulness, the Court relied exclusively on the fact that plaintiff

was "now vigorously mounting a defense," explaining that "[s]uch an act cuts strongly against

any willfulness of the defendant's previous delay."  *Id.*  Similarly, in *Candido v. District of

Columbia*, 242 F.R.D. 151, 154-55 (D.D.C. 2007), the court permitted relief from default where

a Defendant, after denial of its motion to dismiss, failed to timely file an answer in compliance

with the Court's scheduling order.  The court determined that the objective of the default rule is

punishment for a party's complete inaction, and was simply not appropriate where the defendant

has "actively litigated this matter."  *Id.* at 156.

     Because the instant case involves a governmental entity, where the public fisc is at stake,

the Court has additional reasons to accord Defendants some leniency on the willfulness question.

As previously noted, the Eleventh Circuit affirmed the district court's vacatur of the default

judgment in *Jackson v. People's Republic of China* despite China's intentional default.  The

Eleventh Circuit emphasized the nuanced nature of the situation, where the default had arisen

from

> the misconception by an ancient and proud sovereign of its
> responsibility to reply to the demand of a United States court
> whose authority it does not recognize as a matter of international
> law, at a time when concepts of United States law and international
> law are changing.  The issues arise in the highly sensitive area of
> relations of our government with another sovereign with whom
> tolerable relations have been restored after many years.  They
> affect not only the interests of the PRC but of our own nation.

26

*Jackson v. People's Republic of China*, 794 F.2d at 1496.  The Court's ruling in *Jackson* is precisely on point here.  As described above, the United States has very recently reestablished strong diplomatic relations with the PA due to the leadership's renunciation of Hamas and the rise to primacy of Prime Minister Fayyad and President Abbas, and is currently seeking to broker a peace agreement in the Middle East by working with the PA's new leadership.   This matter -- which seeks to impose liability for sponsoring terrorism against U.S. allies -- accordingly involves a "highly sensitive area of relations of our government."

The special concerns raised by the imposition of default liability against foreign governing entities have prompted other courts to generally limit findings of willfulness to cases of clear-cut recalcitrance and inaction.  For example, in *Owens v. Republic of Sudan*, 374 F. Supp. 2d 1, 5-10 (D.D.C. 2005), the court vacated a default against the Sudanese government in a case alleging it had sponsored attacks on the American embassies in Tanzania and Kenya.  The default had been entered in May 2003 but the Sudanese government, despite filing other pleadings in the action, had made no effort to vacate until February 2004.  The court reasoned that the "strong presumption against the entry of default," as well as the "uniquely sensitive nature of a suit in which a foreign state wishes to challenge the allegation that it has harbored terrorists," warranted vacatur of a "somewhat willful" default.  *Id.* at 9-10 & n.5.  As the court explained, failing to hear the claims of a foreign governing entity that has appeared in the United States courts to contest charges of sponsoring terrorism can, even after entry of a default judgment, have a profound effect on United States' foreign policy by undermining State Department efforts to encourage the resolution of disputes within the United States' legal framework.  *Id* at 8.

A similar result occurred in *Lawton v. Republic of Iraq*, No. 02-0474, 2006 U.S. Dist. LEXIS 94335 (D.D.C. Dec. 6, 2006), where the court vacated entry of default and refused to find willfulness in a case alleging that Iraq should be held responsible for the 1995 bombing of a federal building in Oklahoma City.  An entry of default occurred in January 2003 when Iraq failed to answer the complaint.  A host of proceedings were conducted in the absence of the Iraqi government in 2004 and 2005, but plaintiffs ultimately filed an amended complaint and transmitted notice of the proceedings to the ministry of Foreign Affairs in January 2006.  In March 2006, the Clerk entered a second default after the Iraqi government failed to respond. Ultimately, however, after plaintiffs moved for default judgment, the Iraqi government appeared and moved to vacate the default, representing that the governing authority was "committed to defending fully against Plainitffs' alleged claims, on all available grounds, in accordance with the laws, procedures and Court directives applicable to this litigation." *Id.* at *7.  Based largely on this representation, and Defendants' representations that earlier delays and missed deadlines had been the result of "transitioning governmental authority to act from the Interim Government of Iraq to the yet-to-be-fully-established Permanent Government of Iraq," the court vacated the default. *Id.* at *9.

Indeed, unlike *Jackson* and several of the other cases discussed above, the instant case does not present the sort of "totally unresponsive" litigant that courts have found default-worthy, particularly when that litigant is a governing foreign entity.  In any event, regardless of what happened in this case previously, there can be no doubt that the Defendants currently before the Court desire to litigate vigorously on the merits.  That alone was the sole consideration in vacating a default judgment in *Jackson v. PRC* and it has also been a dispositive factor in other cases involving foreign governing entities.

    4.    *Even if the Court Concludes that the Default Was Willful, the Court Nonetheless Should Vacate the Default Under Rule 55's "Good Cause Shown" Standard.*

A fair reading of this record demonstrates that the PA's default was not willful as that term has been construed under the controlling law, and that the default cannot be maintained in light of current representations from PA leadership about the intent to vigorously contest the case going forward. But even if the Court were to conclude otherwise, it must nonetheless address countervailing foreign policy concerns and the other *Jackson v. Beech* factors. Particularly in the case of a defendant whose default raises foreign policy concerns, the law is clear that the test for vacatur is a *three* part analysis, and no one factor is dispositive.

As the Federal Circuit has held, "[t]he majority of Circuits balance the three [*Jackson v. Beech*] factors in determining whether to grant relief" and it is accordingly erroneous to rely solely on willfulness to enforce a default in a case where meritorious defenses exist and where vacating the default will not result in significant prejudice. *Information Sys. & Networks Inc. v. United States*, 994 F.2d 792, 795-96 (Fed. Cir. 1993); *accord National Bank of Kuwait, S.A.K. v. Rafidain Bank*, No. 93civ3324,1994 U.S. Dist. LEXIS 9817, *8, *30-31 (S.D.N.Y. 1994) ("[e]ven where a party's default is willful, default judgment is not appropriate if there exist meritorious defenses to the claims asserted.").

The Eleventh Circuit's decision in *Jackson v. People's Republic of China*, 794 F.2d at 1496, is also fundamentally inconsistent with the notion that the Court can limit its consideration of a motion to vacate to questions surrounding the willfulness of any default. The law is the same in this Circuit. *See Keegel*, 627 F.2d at 374 (reversing in part because district court failed to consider all three "listed criteria" in considering motion to vacate); *United States v. Schofield*, 197 F.R.D. at 8 (vacating despite indications of initial willfulness based on subsequently stated

representations of intent to litigate going forward); *Owens v. Republic of Sudan*, 374 F. Supp. 2d

at 9 (vacatur of "somewhat willful" default based on absence of prejudice and potentially

meritorious defense).  This Court must accordingly consider the other *Jackson v. Beech* factors

regardless of its determination on willfulness.  When it does, the Court must conclude that the

balance of these factors tilts strongly toward allowing litigation of the PA's defenses on the

merits.

      **C.**      **Plaintiffs Will Not Be Unfairly Prejudiced by Setting Aside the Default,**
                       **Particularly Under the Defendants' Proposed Conditions for Vacatur.**

           1.     *The Nature of the Prejudice at Issue*

The second factor that the Court must consider is whether the Plaintiffs were prejudiced

by any delay.  On this point, it is well-established that "delay in and of itself does not constitute

prejudice." *Capital Yacht Club v. Vessel Aviva*, 228 F.R.D. 389, 393-94 (D.D.C. 2005); *Welzel

v. United States*, No. 06-838, 2007 U.S. Dist. LEXIS 35087 (Mar. 30, D.D.C. 2007) (same); *see

also Keegel v. Key West*, 627 F.2d at 374 ("that setting aside default would delay satisfaction of

plaintiffs' claim, should plaintiffs succeed at trial, is insufficient to require affirmance of the

denial.").  Rather, the question in determining prejudice is whether the plaintiff can demonstrate

tangible harm from any delay such as "loss of evidence, increased difficulties of discovery, or an

enhanced opportunity for fraud or collusion." *Capital Yacht Club v. Vessel Aviva*, 228 F.R.D. at

394, *quoting in part*, *KPS & Assocs. Inc. v. Designs by FMC, Inc.*, 318 F.3d 1, 15 (1st Cir. 2003).

           2.     *Plaintiffs Will Not Be Tangibly Harmed, in a Legally Cognizable Way,*
                     *from any Delay Associated with Vacating the Default.*

Here, Plaintiffs did not suffer any of these injuries as a result of the default in January

2007.  There is no indication that evidence has been lost, that discovery has become more

difficult, or that anything happened to make fraud or collusion likely.  In addition, the years of

active litigation that occurred prior to January 2007 make it unlikely that plaintiffs would suffer any prejudice from delay. *Candido v. District of Columbia*, 242 F.R.D. at 154-55 (active litigation indicates lack of prejudice because plaintiff is on notice of need to pursue claims).

Rather than focus on the lost evidence or discovery, the Plaintiffs will likely claim prejudice as a result of the damages hearing held before Magistrate Judge Robinson in the Summer of 2007.  However, the prejudice caused by the commencement of the damages hearing should not suffice to prevent merits litigation.  Those days of testimony do not amount to cognizable prejudice for two reasons.

First, testimony from the damages hearing can and should still be utilized if, after the default is vacated, the Defendants are ultimately found liable.  In that event, Defendants will stipulate that the prior damages testimony may be used in its entirety, subject to any preserved objections and the ability of both sides to supplement the record to include information gained during the liability phase of the litigation.   Thus, from Plaintiffs' perspective, none of the testimony from the damages hearing will be wasted.  If plaintiffs succeed on the merits, they would have had to present evidence of damages anyway, and they can now do so using testimony from the proceeding already conducted before Magistrate Judge Robinson rather than starting from scratch.  By contrast, if Defendants prevail, Plaintiffs cannot complain about prejudice from putting on evidence in a damages hearing where Defendants were never liable in the first place.

Second, Plaintiffs can be easily reimbursed for reasonable costs unnecessarily incurred in the damages hearing if there are any such costs.  The situation here, in fact, is largely identical to the one the Court of Appeals addressed in *Jackson v. Beech*, where the only asserted prejudice was a damages proceeding that had occurred after the default.  The Court of Appeals rejected the notion that any prejudice occurred from having held such a hearing in the interim:

31

> It is true that time and energy have been spent on the damages
> hearing . . . But [i]t cannot be argued that justice requires the
> enforcement of a judgment based on that report to save the time
> consumed in two days of hearings and in preparing the eight-page
> report.

*Jackson v. Beech*, 636 F.2d at 837 (footnote omitted).

It similarly cannot be argued here that justice requires the enforcement of a potentially

multi-million dollar default in order to save the time consumed in a relatively brief damages

hearing, particularly when those proceedings can be used later if liability is found.

3.    *Defendants Agree to Take Appropriate Measures to Minimize Any
Prejudice to Plaintiffs.*

As Judge Urbina explained in *Capital Yacht Club v. Vessel Aviva*, 228 F.R.D. 389, 395

(D.D.C. 2005), "[i]n determining whether to exercise its discretion to set aside a default, a

district court has inherent power to impose a reasonable condition on the vacatur in order to

avoid undue prejudice to the opposing party." The two most common conditions imposed in

these circumstances are that the defendant (1) reimburse the plaintiff for reasonable costs--

typically court costs and attorney fees -- incurred as a result of the default, and (2) post a bond as

evidence of good faith. *Id.*

Defendants agree that Plaintiffs should be compensated for reasonable costs incurred as

the result of the default. Defendants, however, suggest that the Court would be warranted in

imposing *only* the condition of reimbursement of reasonable costs as part of any order vacating

the default. This is a case, like *James Elec. Co. v. Cougar Enter., Inc.*, 111 F.R.D. 324, 326

(D.D.C. 1986), where "prejudice to plaintiff can largely be ameliorated by requiring [defendant]

to pay the costs incurred by plaintiff in obtaining the default . . . ." Consequently, Defendants do

not believe that any bond is necessary in this case for purposes of security.

32

Nonetheless, to demonstrate that the motion to vacate is not an effort to delay the litigation with the plan of again defaulting in the future, Defendants would agree to post a $1 million bond, payable to the Plaintiffs if -- after the Court vacates the January 29, 2007 entry of default so that the Defendants can litigate on the merits -- the Defendants again default.  The $1 million would not reduce the amount of damages to which the Plaintiffs are entitled, but instead would be intended to compensate Plaintiffs for any delay caused by the vacatur of the current default.

This bond is unusually high.  Indeed Defendants, were they not consenting to it, could argue that it is too high.  *See Thorpe v. Thorpe*, 364 F.2d 692, 694-95 (D.C. Cir. 1966) (approving bond condition generally but noting that amount of bond ordered by court was so high that it could potentially give rise to due process concerns).  However, Defendants' strong desire to litigate this matter brings them to propose such a high bond.

Defendants also are aware that the Gilmore family has already traveled to the U.S. to testify about their damages.  Defendants have already agreed that all of the testimony from the damages proceedings can be utilized if liability is found, subject to both sides' ability to raise meritorious objections or supplement the record.  To be clear on this point, however, and to eliminate any hardship or expense to the Plaintiffs associated with returning to the U.S. to testify again, Defendants specifically agree that, if liability is established, Plaintiffs will not need to testify again but instead their previous testimony regarding their damages could be admitted as evidence in a new damages proceeding.

**D.**     **Meritorious Defenses Exist.**

1.     *The Meritorious Defense Standard.*

The final factor in the *Jackson v. Beech* analysis cuts strongly in favor of the Defendants

because meritorious defenses exist to the underlying charges.  The threshold for this factor is a

low one:  "the movant is not required to prove a defense, but only to assert a defense that it may

prove at trial."  *Whelan v. Abell*, 48 F.3d 1247, 1259 (D.C. Cir. 1995); *Capital Yacht Club v.*

*Vessel Aviva*, 228 F.R.D. at 394.   As the Court of Appeals has explained, "Likelihood of success

is not the measure.  Defendants' allegations are meritorious if they contain even a hint of a

suggestion which, proven at trial, would constitute a complete defense."  *Keegel v. Key West &*

*Caribbean Trading Co.,* 627 F.2d at 374 (internal quotation omitted).

Courts in this district have thus found the "meritorious defense" criterion satisfied in a

variety of circumstances.  For example, the Court of Appeals determined in *Keegel*, 627 F.2d at

374, that "broad and conclusory" allegations of jurisdictional defenses "adequately meet the

meritorious defense criterion."  Likewise, in *Jackson v. Beech*, 636 F.2d at 835, the Court of

Appeals found the standard satisfied by an affidavit in which defendants' alleged that plaintiffs'

claims were false and motivated by bias.  And, in *Capital Yacht Club v. Vessel Aviva*, 228 F.R.D.

at 394, the district court found the standard satisfied by the recitation of a potential legal defense

to the charges.  Finally, in *Candido v. District of Columbia*, 242 F.R.D. at 157, the court found

the factor met merely by a "broad and conclusory" allegation that the defendants would dispute

the amount of damages claimed by the plaintiffs, reasoning that such allegations sufficed because

"the Court cannot conclude that any possible defenses [defendants] may raise will be entirely

without merit."  In the instant case, the meritorious defenses described below far out-distance the

showings in these previously decided cases.

1.    *Defendants Are Not Responsible for the Shooting*

The Defendants' were not responsible for the October 2000 shooting at the Israeli National Insurance Institute in East Jerusalem.  If the default is vacated, Defendants will vigorously defend against the central allegation in this litigation by defeating any claim that they were responsible for Mr. Gilmore's death.   The PA's and PLO's defense to this allegation is, viewed objectively, a strong one that warrants full and fair litigation.

The defense to this claim is strong in part because Plaintiffs' broad charges of responsibility -- that seem premised on the theory that the PA and PLO are responsible for the acts of all militant groups in Palestine -- have never been supported by anything more than the most speculative of circumstantial theories.  In their complaint, Plaintiffs seek to hold the Defendants generally responsible for allegedly directing, planning, and authorizing the shooting but plaintiffs do not identify the shooters' relationship to the defendants in any detail other than the fact that the shooter was Palestinian and allegedly involved with militant groups.  *Id.*  The complaint does allege that two gunmen, Bashar Al-Hatib and Muhand Abu Haliwa, committed the shooting.  Dkt. No. 1.  The complaint does not, however, explain or attempt to reconcile this allegation with the many conflicting reports concerning the number of shooters, their identities and their motive.

Indeed, on the most basic level, there has long been substantial confusion about who committed the shooting, how many shooters there were, and what the motive was.  Six months after the incident, the United States Department of State left the incident off its list of terror attacks, explaining that "we still don't know the exact circumstances of these incidents."  *See* Exh. A; M. Radler, *United States Urges Discrete Hunt for Terrorists*, Jerusalem Post, at 4 A (April 6, 2001).  This same report concluded that the State Department "has identified *no*

*confirmed information that would indicate that any of the suspects in any of the aforementioned attacks is a member of the Palestinian police, Palestinian security forces or any Palestinian governing body. We have looked into such allegations but have found no evidence to substantiate them." Id.* (emphasis added).

To date, it thus appears that the crime still has not been solved. Although the State Department ultimately added this incident to its list of terror attacks -- without any discussion of why it did so -- it also continues to offer a reward for information about the unsolved incident. [8]

The "unknown circumstances" originally referred to by the State Department could have been a reference to the identity of the shooters and/or their number. Public reports about the incident reveal substantial confusion on these issues; confusion that the complaint does not even begin to address. One unverified report suggests that three individuals -- Talal Ghassan, Marzouk Abu Naim, and Na'man Nofel -- were caught, charged and convicted of the killing.[9] These individuals, however, do not appear anywhere in the Complaint. Another unverified report indicates that Mahmoud Meter, Ziyad Whadan and Yusef Metir (also not named in the complaint) admitted responsibility for the *Gilmore* shooting during their capture and interrogation by the Israeli General Security Service.[10]  Other sources -- apparently the

---

[8]  The State Department list is available at
*http://www.rewardsforjustice.net/english/index.cfm?page=MEP_Victims.*

[9]  "Reduction in Force 17" (September 6, 2006), available at
*http://thisongoingwar.blogspot.com/2006_09_01_archive.html.*

[10]  JINSA Reports, "This is Why Mr. President" (March 19, 2001), available at
*http://www.jinsa.org/articles/articles.html/function/view/categoryid/122/documentid/1138/history/3,2359
,650,122,1138.* To the extent the Plaintiffs' allegations rely on out-of-court confessions, the Public Committee Against Torture in Israel (PCATI), released a comprehensive report based on hundreds of interviews and extensive investigation of the period between September 2001 and April 2003, which concluded that torture during interrogation of Palestinian suspects in Israeli custody remained "a matter of course." *See Public Committee Against Torture In Israel,* Back to a Routine of Torture, Torture and

confessions of their alleged co-conspirators -- have suggested the involvement of Muhanad Abu

Halawah and Bashir Al-Hatib.[11]  In contrast to these reports -- all of which involve multiple

suspects -- the Israeli Ministry of Foreign Affairs reports that there was only one shooter in the

incident.[12]  All of these considerations will be important for the fact-finder to address during any

proceeding that focuses on whether the PA or PLO can appropriately be assigned responsibility

for the shooting.

Plaintiffs attempt to paper over these problems in their complaint with bald assertions

about the shooters and their links to the Defendants.  Indeed, leaving aside the demonstrated

absence of proof of PA and PLO involvement, the complaint does not even sufficiently allege

any such involvement.  Federal Rule of Civil Procedure 8(a)(2) requires that a complaint shall

contain "a short and plain statement of the claim showing that the pleader is entitled to relief."

Earlier this year, the Supreme Court had occasion to revisit Rule 8(a)(2)'s pleading standard and

emphasized that the complaint must provide sufficient factual allegations to provide the

defendants fair notice not only of the *nature* of the claim but also of the *grounds* on which the

claim against them rests.  *See Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 n.3 (2007).  The

Court explained:

---

Ill-Treatment of Palestinian Detainees During Arrest Detention and Interrogation (Sept. 2001 through
Apr. 2003), available at *http://www.stoptorture.org.il/eng/publications.asp?menu=7&submenu=1*.

[11]  Zionist Organization of America, "State Department's Outrageous New Policy Won't Mention Names
of Palestinian Arab Killers of America," (March 1, 2002), available at
*http://www.zoa.org/2002/03/state_deparment.htm*.

[12]  Israeli Ministry of Foreign Affairs (October 30, 2000), available at
*http://www.mfa.gov.il/MFA/Terrorism-+Obstacle+to+Peace/Memorial/2000/Eish-Kodesh+Gilmore.htm*
("Shortly after noon, a man entered the National Insurance Institute on Rehov Issfani in the heart of
eastern Jerusalem. From close range, he fired a number of shots at the two security guards seated in the
first floor waiting room. The assailant then fled on foot.").

> While a complaint attacked by a Rule 12(b)(6) motion to dismiss
> does not need detailed factual allegations, a plaintiff's obligation to
> provide the "grounds" of his "entitlement to relief" requires more
> than labels and conclusions, and a formulaic recitation of the
> elements of a cause of action will not do.  Factual allegations must
> be enough to raise a right to relief above the speculative level, on
> the assumption that all the allegations in the complaint are true
> (even if doubtful in fact).

*Id.* at 1964-65 (citations omitted).  *See also In re: Terrorist Attacks on September 11, 2001*, 392

F. Supp. 2d 539, 563-64 (S.D.N.Y. 2005) (even under the simplified notice pleading standard of

Rule 8(a)(2), "Plaintiffs must still give Defendants fair and adequate notice of their claims and

the grounds on which they rest.").

Plaintiffs cannot identify which individuals carried out the attack, and so name "John

Does 1-99" as Defendants.  With respect to the PA's and PLO's supposed involvement in the

incident, Plaintiffs allege:

> The murder of Esh Kodesh Gilmore was planned and carried out
> by defendants ABU SHARAH, DAMARA, BARGHOUTI, AL-
> HATIB, ABU HALIWA, SUISH, MISALMANI, MATAR,
> WAHADAN, MATIR and JOHN DOES 1-99 within the scope of
> their agency and employment, pursuant to the prior authorization,
> instructions, solicitation and directives of defendants PA, PLO and
> ARAFAT, in furtherance of the goals and purposes of defendants
> PA, PLO and ARAFAT and using funds, weapons, means of
> transportation and communication and other material support and
> resources supplied by defendants PA, PLO and ARAFAT for the
> express purpose of carrying out terrorist attacks of this type.

Dkt. No. 1 ¶ 30.

Nothing else is offered except these bald, conclusory assertions.  While this Court had

concluded, prior to the decision in *Bell,* that such conclusory allegations could withstand a

motion to dismiss, (Dkt. No. 73 at 12), the fact remains that the complaint offers absolutely no

grounds for Plaintiffs' assertion that the PA or PLO authorized, directed, funded, or provided material support for the attack.  With regard to Plaintiffs' aiding and abetting allegation, it bears emphasis that, even if Plaintiffs' could identify the individuals or group responsible for the attack, it would not be enough to show some associational connection between the PA or PLO and the perpetrators.  Almost all Palestinians are affiliated with the PLO, and many people in the Occupied Palestinian Territory have been on the PA payroll at one time or another.  In order to establish liability under an aiding and abetting theory, Plaintiffs, *at the very least*, would have to establish that the PA and PLO *knowingly* and *intentionally* provided funding or material support in furtherance of terrorist acts.  *See Boim v. Quranic Literacy Inst.*, 291 F.3d 1000, 1021 (7th Cir. 2002).

Thus, it is already clear that there will be a substantial dispute on the merits on the threshold issue regarding who committed the shooting.  Plaintiffs will eventually need to contend with the multiple, conflicting reports on the question in convincing a fact-finder to impose liability.  While counsel recognize that discovery was not yet completed when the default was entered, and they recognize that a complaint need not lay out all the facts upon which a plaintiff might rely, it is certainly appropriate for the Court to consider on the meritorious defense question the paucity of evidence or claims made in the complaint, combined with the changing identities of the supposed assailant(s).  These factors suggest that if Defendants receive their day in Court, there will be substantial disputes over the threshold question of who performed the shooting, as well as the dispositive question of whether the PA and PLO can ultimately be held responsible for the shooter's conduct.

Indeed, in addition to the fact that no evidence links the PA or PLO to the attack, the U.S. State Department also has acknowledged that the PA was supporting specific counter-terrorism

measures in 2000, when the attack occurred.  Specifically, the State Department observed that the

PA's counter-terrorism measures were "coordinated" with Israeli authorities, "inflicted . . .

damage on HAMAS's military wing," and "disrupted" a number of specific HAMAS attacks.

U.S. State Department Report, "Patterns of Global Terrorism 2000, Middle East Overview,"

available at *http://www.state.gov/s/ct/rls/crt/2000/2438.htm*.  A later report from the State

Department to Congress further notes that many Israeli officials believe that the level and

intensity of the violence in 2000 "took the [PA] leadership by surprise."  U.S. Department of

State, Report Pursuant to Title VIII of Public Law 101-246 Foreign Relations Authorization Act

for Fiscal Year 2000-2001, as amended, PLO Compliance Report (Dec. 15, 2000-June 15, 2001).

Thus, in contrast to Plaintiffs' unsupported, non-specific allegations of PA and PLO

involvement in the attack, Defendants can show that the PA and PLO leadership, far from

authorizing or supporting terrorist acts, were working with the Israelis to disrupt and inflict

damage on radical groups.

2. *The Shooting Is Not An Act of "International Terrorism" As Defined Under The Anti-Terrorism Act.*

Defendants emphasize that they condemn the shooting that is the subject of this lawsuit,

and deny any responsibility for the act.  However, leaving aside the question of who is

responsible, there is a strong argument that this shooting is not the sort of act for which liability

can be imposed under the Anti-Terrorism Act.

As noted, this is a case that the United States Department of State originally left off its list

of terrorist incidents because the circumstances of responsibility remain unclear.   While the

shooting has now been added to the list, this addition does not appear to reflect additional

knowledge about the shooters and could have been as a result of political pressure and the

unsupported allegations raised by the Plaintiffs and their counsel.  The facts of the case

themselves do not carry obvious terrorism-related implications.  The incident was a shooting of a

security guard in a government building.  Such a shooting, while obviously regrettable and tragic,

occurs routinely around the world in the absence of terrorist motivations.

 The ATA provides a remedy only for those injured by an act of "international terrorism."

18 U.S.C. § 2333(a).   The ATA then goes on to define such acts as only those that are "appear to

be intended -- (i) to intimidate or coerce a civilian population; (ii) to influence the policy of a

government by intimidation or coercion; or (iii) to affect the conduct of a government by mass

destruction, assassination or kidnapping."  18 U.S.C. § 2331(1)(B).

 On its face, this shooting does not "appear" to fit any of those categories.  The Defendants

are not suggesting the issue is ripe for resolution at the pleadings stage in the absence of

additional factual development.  Defendants assume for the purpose of this motion that

Plaintiffs' assertion that this was an act of international terrorism suffices to withstand a motion

to dismiss, as this Court has already concluded. Dkt. No. 73 at 12.  However, given the lack of

clarity regarding who committed the incident, much less what their purpose was, the shooting of

a security guard in a government building does not "appear" to be the type of intimidating

incident of mass destruction or violence that must be demonstrated in order to impose liability

for international terrorism.  Thus, after factual development, it may become clear that this critical

element is missing in this case, making the matter susceptible to resolution on summary

judgment or, if the Court determines that an evidentiary dispute exists, at a trial.  Indeed, this

Court concluded as much when it noted that such issues were "for the jury to decide" and thus

not amenable to resolution on the pleadings. Dkt. No. 73 at 12.  Defendants possess another

strong defense to liability if they are permitted to have their day in Court.

II.     **CONCLUSION**

Prime Minister Fayyad's declaration demonstrates the seriousness with which the Defendants take this litigation, and provides strong evidence of their good faith desire to participate fully, in a cooperative and complete manner, including compliance with lawful discovery. The Court should afford this declaration great weight and, in light of that declaration, the law's strong preference for merits litigation, and other tangible evidence of Defendants' desire to litigate on the merits, it should vacate entry of the default.

If the Court has any doubts about the important foreign policy interests at stake in this litigation, it should again request a statement of interest from the United States pursuant to 28 U.S.C. § 517. Defendants do not presume to speak for the United States, but Defendants submit that it is in the United States' short and long term interest to permit the new, reform-minded leadership of the PA to defend this case on the merits. An SOI would allow the Court to fully consider this interest in determining whether to vacate the default.

Regardless of whether the Court solicits and receives an SOI, however, it should vacate the default and permit merits litigation to occur. Defendants recognize that the Court has already exercised considerable patience in this litigation and thank the Court for its full and fair consideration of the arguments raised in this motion.

Respectfully submitted,


Dated:  November 15, 2007                  /s/ Mark J. Rochon
                                          Richard A. Hibey (D.C. Bar #74823)
                                          Mark J. Rochon (D.C. Bar #376042)
                                          Charles F.B. McAleer, Jr. (D.C. Bar #388681)
                                          Timothy P. O'Toole (D.C. Bar # 469800)
                                          655 Fifteenth Street, N.W., Suite 900
                                          Washington, DC  20005-5701
                                          Tel. (202) 626-5800
                                          Fax. (202) 628-0858
                                          rhibey@milchev.com

                                          *Attorneys for the Palestinian Authority and the*
                                          *Palestine Liberation Organization*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 15th day of November 2007, a true and genuine copy

of the foregoing was sent by electronic mail and ECF to the following:

> David J. Strachman
> McIntyre, Tate & Lynch, LLP
> 321 South Main Street, Suite 400
> Providence, RI  02903
> Djs@mtlhlaw.com
> *Attorneys for Plaintiffs*

/s/ Charles F. B. McAleer, Jr.