## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| REUVEN GILMORE, *et al.*, | ) )  |
| Plaintiffs, | ) ) |
| v. | ) ) |
| PALESTINIAN INTERIM SELF-GOVERNMENT AUTHORITY, *et al.*, | ) ) ) |
| Defendants. | ) ) ) |

Civil Action No. 1:01cv853 (GK) (DAR)

### REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO VACATE

In October 2000, security guard Esh Kodesh Gilmore was shot while on duty at the "National Insurance Institute (the Israeli equivalent of the Social Security Administration)" in East Jerusalem. Dkt. No. 147 at 2. Plaintiffs ask this Court to impose liability by default on the Palestinian Authority ("PA") and Palestine Liberation Organization ("PLO") under the Anti-Terrorism Act, 18 U.S.C. § 2333(a), for Mr. Gilmore's death even though the PA and PLO have demonstrated for the past two years their commitment to defend the U.S. lawsuits brought against them and even though Plaintiffs cannot substantiate their claims of PA or PLO liability.

A court considering whether to set aside an entry of default pursuant to Federal Rule of Civil Procedure ("Rule") 55(c) must balance three factors: "whether (1) the default was willful, (2) a set-aside would prejudice plaintiff, and (3) the alleged defense was meritorious." *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980) (internal citation and quotation omitted); *see also Canales v. A.H.R.E., Inc.,* 254 F.R.D. 1, 8-12 (D.D.C. 2008) (applying the *Jackson* v. *Beech* three-factor test). When weighing these three factors, "all doubts are resolved in favor of the party seeking relief." *Jackson*, 636 F.2d at 836. *Accord Acree v. Republic of Iraq*, No. 1:06-cv-723 (RWR), 2009 U.S. Dist. LEXIS 90229, at *6 (D.D.C. Sept. 30, 2009). Thus, "while a trial

court has discretion whether to set aside an entry of default, 'there is a strong policy favoring the adjudication of a case on its merits.'" *Strong-Fisher v. Lahood*, 611 F. Supp. 2d 49, 51 (D.D.C. 2009) (quoting *Baade v. Price*, 175 F.R.D. 403, 405 (D.D.C. 1997)).

As explained below, the PA/PLO have a clear meritorious defense to Plaintiffs' essentially unsubstantiated claim of liability (Part II.A), Plaintiffs have not identified any legally cognizable prejudice that would result from setting aside the default (Part II.B), any willfulness associated with the default is not dispositive (Part II.C), and there are compelling foreign and public policy reasons for supporting the reform efforts of the Palestinian government and not imposing liability on the PA and PLO by default (Part III). Before turning to an analysis of the Rule 55(c) factors, Defendants will update the Court on the developments since they filed their Motion to Vacate.

## I.    Developments in the Past Two Years Provide Further Support for Vacatur.

The PA/PLO filed their motion to vacate the January 29, 2007, clerk's entry of default (Dkt. No. 93) on November 15, 2007. Dkt. No. 107. Plaintiffs waited two years -- until November 14, 2009 -- to file their Opposition. Dkt. No. 147. Plaintiffs use an interesting strategy regarding their own delay in filing an Opposition: they claim that developments in the ensuing two years militate against granting the motion, and they misconstrue entirely what has, in fact, happened during those two years. According to Plaintiffs, "developments over the past two years since the Motion to Vacate was filed provide further -- and overwhelming -- grounds to deny the motion." Dkt. No. 147 at 1. *See also id.* at 37 (arguing that Plaintiffs will be "severely prejudiced" by vacatur of the default because their 2007 "damages testimony will be useless since the Magistrate Judge's memory thereof will be long faded"); *id.* at 35 (arguing that

Plaintiffs will be severely prejudiced by vacatur of the default because the PA may "cease[] to exist -- this year, next year, or even the year after").

Stating the obvious, Plaintiffs should be precluded from treating any prejudice created by their own two-year delay as a basis for denying the motion to vacate.  More intrinsically, Plaintiffs' assertion that recent developments provide further grounds to deny the motion is pure rhetoric entirely divorced from actual events.  In the past two years, the following has happened: (1) two federal district courts granted the PA/PLO's motions to vacate, rejecting the very arguments Plaintiffs are making here; (2) the PA/PLO have created a two-year track record of participating in U.S. litigation, including participating in discovery in a number of cases, in a good faith and timely manner, and (3) two of the pending cases have been successfully resolved.

A.      **The *Knox* and *Saperstein* Decisions Support Vacatur Here.**

Since Defendants filed their motion to vacate in the instant case, two district courts have granted motions to vacate filed by the PA/PLO despite finding that the underlying defaults were willful.  *See Knox v. PLO*, 248 F.R.D. 420 (S.D.N.Y. 2008); *Saperstein v. Palestinian Auth.,* No. 1:04-cv-20225, 2008 WL 4467535 (S.D. Fla. Sept. 29, 2008).

The *Knox* court concluded that the PA/PLO's meritorious defenses, the lack of prejudice to plaintiffs, the PA/PLO's changing political dynamics, the size of the judgment, and historical and public interest concerns all weighed in favor of vacating a $193 million final default judgment entered against the PA/PLO in 2006, subject to conditions.  248 F.R.D. at 427-32, 433.  Moreover, the court granted the PA/PLO's motion under the Rule 60(b)(6) standard, which is considerably more rigorous than the Rule 55(c) standard at issue here.  *See, e.g., Capital Yacht Club v. Vessel Aviva*, 228 F.R.D. 389, 393 (D.D.C. 2005) ("in this circuit courts grant vacatur of default more freely than vacatur of default judgment").

1011183.1

In *Saperstein*, the district court vacated a willful default entered in 2006, citing the very factors on which Defendants rely in this case. 2008 WL 4467535, at *13-16. In so doing, the court noted that the PA and PLO "are not a recognized, much less typical, foreign state plus the changing political dynamics and volatility in the area create realities that have non-standard effects in this litigation." *Id.* at *12. The court further recognized that, since "new defense counsel's appearance, Defendants have stated a desire to proceed with merits litigation in good faith." *Id.* The *Saperstein* court concluded the following factors supported vacatur: (1) the "strong preference for deciding cases on their merits"; (2) "Defendants have come forward with a meritorious defense"; (3) plaintiffs "will not be significantly prejudiced by vacating the default"; (4) the size of the potential default judgment in that case ($48 million); and (5) "resolution of some of the issues in this case have broad and significant ramifications from a historical and public interest standpoint that default judgment cannot address." *Id.* at *12-16.

The *Saperstein* court then noted one last factor favoring vacatur, which bears particular emphasis: "It is essential that in our zeal to thwart terrorism and compensate its victims, we do not trample on the fundamental principles of our judicial system." *Id.* at *16. One of those fundamental principles is providing "all litigants, even unpopular ones," the "right to their day in court" and providing all litigants "equal justice under our laws without sympathy or prejudice for either side." *Id.*

### B. Plaintiffs' Assertion that "Defendants Have Not Changed Their Litigation Conduct" Since Retaining New Litigation Counsel Is Demonstrably False.

Plaintiffs assert that "defendants' actions since they changed leaders and counsel in 2007 demonstrate clearly that they have *not* changed their conduct." Dkt. No. 147 at 46. Plaintiffs' assertion is not borne out by the facts.

After retaining new counsel in mid-2007, the PA and PLO have established through their actions their commitment to litigate and their respect for the U.S. litigation process. Of the nine Anti-Terrorism Act cases that have been brought against the PA and PLO in the United States, they are actively participating in discovery in four cases. *See Saperstein v. Palestinian Auth.*, No. 1:04-cv-20225 (S.D. Fla.); *Estate of Klieman v. Palestinian Auth.*, No. 1:04-cv-01173 (D.D.C.) (PLF); *Estate of Parsons v. Palestinian Auth.*, No. 1:07-cv-1847 (D.D.C.) (JR); *Sokolow v. PLO*, No. 1:04-cv-00397 (S.D.N.Y.). Motions to vacate are pending in another two: *Shatsky v. Syrian Arab Republic*, No. 1:02-cv-02280 (D.D.C.) (RJL), and this case.

In December 2008, a voluntary dismissal with prejudice was entered in *Biton v. Palestinian Interim Self-Government Auth.*, No. 1:01-cv-00382 (D.D.C.) (RMC) (Dkt. No. 115). In *Knox*, Defendants participated in extensive discovery over their assets in connection with litigation over the amount of the vacatur bond. *See Knox v. PLO*, No. 1:03-cv-4466, 2009 U.S. Dist. LEXIS 52610 (S.D.N.Y. Mar. 26, 2009). Then, on October 20, 2009, the *Knox* parties "entered into a Settlement Agreement . . . which, if fully performed, will ultimately result in the parties' joint submission to the Court of a proposed order unconditionally vacating the Judgment and dismissing the action with prejudice." *Knox v. PLO*, No. 1:03-cv-4466 (S.D.N.Y.) (Dkt. No. 214 at 2). In the ninth case, *Estate of Yaron Ungar v. PA*, No. 1:00-cv-105 (D.R.I.), Defendants filed a Rule 60(b)(6) motion for relief from the $116 million default judgment entered against them in 2004. The district court's denial of that motion, reported at *Ungar v. PA*, 613 F. Supp. 2d 219 (D.R.I. 2009), is on appeal. *See Ungar v. PLO*, No. 09-1778 (1st Cir.). In addition, in mid-2008, the PA/PLO satisfied an outstanding judgment against them in a commercial dispute before this Court, in *Bucheit v. PLO*, No. 1:00-cv-01455 (D.D.C.) (Dkt. No. 104). *See* Exh. 1 (Notice of Satisfaction of Judgment). Further, in early 2009, the PA/PLO satisfied the conditions

1011183.1

imposed by the court for vacatur in *Saperstein v. PA*, which included the payment of plaintiff's

costs and attorneys fees associated with the default. No. 1:04-cv-20225 (S.D. Fla.) (Dkt. No.

261). *See* Exh. 2 (Notice of Compliance).[1]

Plaintiffs assert that "[t]hree federal courts have found that defendants have continued

their bad-faith, dilatory litigation tactics even after changing their leadership and counsel." Dkt.

No. 147 at 46 (referring to *Knox*, *Saperstein*, and *Biton* cases). This is absolutely untrue.

Plaintiffs' counsel, who also represents the *Knox* and *Biton* plaintiffs, and who often serves as

co-counsel with the *Saperstein* counsel, knows that the record does not support any such

statement.

With respect to Plaintiffs' suggestion that the *Knox* court deemed the PA/PLO to have

"concealed relevant information during discovery," *id.*, the court was merely summarizing the

claim of Plaintiffs' counsel, the same counsel who argues before this Court, not endorsing the

claim. *See Knox v. PLO*, 628 F. Supp. 2d 507, 509-10 (S.D.N.Y. 2009). The fact is that, after

presiding over extensive asset-related discovery, Magistrate Judge Katz denied the *Knox*

plaintiffs' efforts to obtain further discovery despite their unfounded allegations of PA/PLO

misconduct. In an endorsed order dated February 17, 2009, Magistrate Judge Katz wrote:

"Implicit in this Court's determination that there would be no further discovery on bond-related

issues was the conclusion that Defendants had not improperly failed to comply with Court

discovery Orders. If the Court had reason to believe that Defendants had failed to comply with

its Orders without justification, it would have ordered further discovery." Exh. 3 (endorsed

order) at 2.

---

[1] On September 30, 2009, Judge Leon granted the PA/PLO's motion to dismiss in *Mohamad v. Rajoub*,
No. 1:08-cv-1800 (Dkt. Nos. 22, 23), a case brought under the Torture Victim Protection Act and Alien
Tort Statute.

1011183.1

Plaintiffs' reliance on the *Knox* court's concern, when imposing a bond condition for the vacatur, about a lack of "evidence indicating" that the PA and PLO "would willingly pay any judgment entered against them" is even more remarkable.  Dkt. No. 147 at 47.  As previously noted, the PA and PLO entered into a settlement agreement with the *Knox* plaintiffs, represented by Plaintiffs' counsel here, in October 2009.  *See also id.* at 45 (referencing settlement).  Such an agreement moots any concern expressed by the *Knox* court about the PA/PLO's commitment to resolve the case.

With respect to *Biton*, Plaintiffs correctly note that Judge Collyer, in denying Defendants' Opposition to Plaintiffs' Motion for Entry of Default Judgment, characterized the Opposition as an "*effort to derail conclusion* of this hoary litigation."  *See* Dkt. No. 147 at 46 (quoting Judge Collyer's ruling) (emphasis in Plaintiffs' brief).  Judge Collyer undoubtedly was frustrated with the PA/PLO's second effort to vacate a second default, which had been entered in 2005.  *See Biton v. Palestinian Interim Self-Government Auth.*, 510 F. Supp. 2d 144, 145 (D.D.C. 2007) (describing procedural history of case).  But any effort to vacate a default or default judgment could be characterized as an effort to "derail" an adverse conclusion to litigation.  Defendants realize the frustration associated with the delay in resolution caused by the vacaturs, but assure the Court that the vacatur effort is not a "bad-faith, dilatory litigation tactic."  Instead, the 2007 vacatur effort was in response to Prime Minister Fayyad's commitment that the "Defendants will participate fully in this and other litigation, in a cooperative manner, including complete participation in the discovery process" and his "belief that there are meritorious defenses to the claims brought in the United States and it is important to the PA to present those defenses."  Dkt. No. 107 (Exh. C at 3) (Fayyad Declaration).  Moreover, motions to vacate filed by new counsel in *Saperstein* and *Knox* resulted in conditional vacaturs, demonstrating that the vacatur efforts

7

were both worthwhile and had substantial merit.  Finally, subsequent to Judge Collyer's ruling in

*Biton*, the case was voluntarily dismissed by plaintiffs with prejudice -- hardly a sign of bad-faith

behavior by the PA/PLO.  *Biton v. Palestinian Self-Interim Authority*, No. 1:01-cv-382 (D.D.C.)

(Dkt. No. 115); *see also* Dkt. No. 147 at 45 (referencing dismissal).

As to *Saperstein*, the court there did not find that the PA/PLO had engaged in "bad-faith,

dilatory litigation tactics" or anything of the sort.  Rather, in the course of resolving a discovery

dispute between the parties, the court commented as to both parties' discovery conduct:

"Unfortunately for the Court and their clients, it appears that Plaintiff's counsel has not been

communicative or efficient, Defendants counsel has not been cooperative, and neither parties'

counsel has met their potential and the Court's expectations." *See* Dkt. No. 147-18 at 1

(*Saperstein* Order of August 6, 2009).  This kind of statement, in addressing a discovery spat, is

hardly supportive of the notion advanced by Plaintiffs here, that the PA/PLO are engaged in the

same sort of conduct that precipitated the default in this and other cases.  The PA/PLO have been

actively engaged in discovery in *Saperstein* for nearly a year and have participated in a number

of hearings before both the district court and magistrate judge, neither of whom has accused the

PA/PLO of engaging in "bad-faith, dilatory litigation tactics."

Plaintiffs' additional reliance on a discovery dispute currently before the *Saperstein* court

over a particular Notice of Deposition is inappropriate. *See* Dkt. No. 147 at 47.  That dispute

relates to the PA/PLO's currently pending motion for protective order. *See* Dkt. No. 147-19

(Defendants' motion).  Moreover, despite Plaintiffs' suggestion to the contrary (*see* Dkt. No. 147

at 47) the potential deponent is ***not*** an officer or director of the PA, and the court has not decided

the individual's status as to the PLO, or whether the individual's testimony is even relevant.

Plaintiffs' assertion that "defendants are demanding that the *Saperstein* court exempt them from

1011183.1

any depositions their officers choose not to attend -- which of course means *any* depositions at all" (*id.*) misrepresents the *Saperstein* record.  Plaintiffs do not provide citation to any actual statements Defendants or their counsel made to any such effect and, indeed, this alleged "demand" is solely a product of Plaintiffs' hyperbole.

Plaintiffs' efforts to cast aspersions on Defendants through a series of out-of-context references to disputes and statements in other cases will be rejected by this Court upon review of the actual record referenced herein.  The fact that, after two years of the PA/PLO being actively engaged in the U.S. litigation -- including by participating in depositions -- this is the best Plaintiffs can come up with to show "bad-faith, dilatory litigation tactics" speaks for itself. Entering into a settlement agreement in *Knox*, actively engaging in discovery in a number of the U.S. cases, obtaining the entry of a dismissal with prejudice in *Biton*, and paying the *Bucheit* judgment all reflect marked changes in the PA/PLO's conduct of the U.S. litigation and display the PA/PLO's good faith in its dealing with the U.S. courts and U.S. plaintiffs.  Unlike the *Knox* and *Saperstein* courts, this Court does not need to guess at the good intent of the PA/PLO.  In that sense, Plaintiffs' delay in opposing the vacatur motion works to support, not to deny, vacatur here.

## II.    ANALYSIS OF THE RULE 55(c) FACTORS SHOWS THAT VACATUR SHOULD BE GRANTED.

### A.    The PA/PLO's Strong Meritorious Defense Warrants Vacatur.

Despite the strong policies favoring merits litigation, Plaintiffs attempt to assure the Court that a default judgment nonetheless should be entered against the PA and PLO because Mr. Gilmore's "murder was planned and carried out by a terrorist cell operated and controlled by defendants Palestinian Authority . . . and Palestine Liberation Organization." Dkt. 147 at 2. Plaintiffs' allegation is not borne out by the very "evidence" on which they purport to rely.

1011183.1

Plaintiffs allege that an individual named Mohand Said Muniyer Diriya (or, Abu Haliwa) shot Mr. Gilmore. Dkt. No. 147 at 2-3. Plaintiffs' information comes not from any conviction of Diriya by the Israeli courts, not from any admission from Diriya, not from any eyewitness, and not even from supposition or intelligence from our Government. Indeed, our Government still treats the crime as unsolved. *See* Dkt. No. 107 at 36 and n.8. Instead, Plaintiffs rely on a claim from an Israeli Defense Force ("IDF") spokesman trying to justify the IDF's extra-judicial assassination of Diriya and others in March 2002. *See* Dkt. No. 147-4. *See also* Dkt. No. 147-3 (Palestinian Centre for Human Rights Report stating that Diriya was killed when IDF helicopters launched "four air-to-surface missiles at a civilian car," killing all three occupants and injuring "two passing civilians").

Particularly in the absence of any other evidence supporting the involvement of Diriya in the Social Security shooting, the reliability and probity of an IDF announcement purporting to justify the IDF's own extra-judicial killing of Diriya is highly questionable. Governments have been known to lie -- to their own people, let alone their adversaries. Governments have been known to make mistakes -- and to refuse to acknowledge them. And, in particular, intelligence services have been known to lie, make mistakes, and justify their missteps with supposed "intelligence."

But, even assuming, only for the sake of argument, that Plaintiffs could establish through admissible evidence that Diriya shot Mr. Gilmore, Plaintiffs have not alleged that Diriya acted with the authority or support of the PA or PLO. Instead, Plaintiffs find significance in the March 2002 statement from the "IDF spokesman" that Diriya "was a member of a Ramallah-based terrorist cell along with other Force 17 members." Dkt. No. 147-4 at 1. (Plaintiffs allege Force 17 is a "PA security unit." Dkt. 147 at 2.) But Plaintiffs neglect to mention that, in March 2001,

1011183.1

when describing the "terror apparatus" allegedly responsible for the October 30, 2000, shooting

attack on Gilmore, an "IDF Spokesman" described the responsible "terror apparatus" as

consisting of Force 17 members acting "in conjunction with terrorists *from opposition*

*organizations to the Palestinian Authority.*" Dkt. 147-2 (emphasis added).

Equally troublesome, Plaintiffs also omit any reference to a deposition they took of one

of the individual defendants Mustafa Mahmoud Misalmani in this case on December 30, 2001.

*See* Exh. 4 (English translation of deposition transcript).[2]  Plaintiffs have alleged that Misalmani

was in the same "terrorist unit" as Diriya (Abu Haliwa) and Force 17 commander Mahmoud

Damara. *See* Dkt. No. 1 (Complaint) ¶ 27. Yet, when Plaintiffs' counsel asked Misalmani,

whether "some of the members in your group [were] working for Force 17," Misalmani testified:

"We worked according to instructions which we thought up, as Palestinians; we did not get

instructions from Force 17 or from anyone." Exh. 4 at 5:3-5. Misalmani also denied any

knowledge of the Gilmore shooting attack. *See id.* at 3:1-11.

Thus, even in the unlikely event Plaintiffs could establish that the shooting of a security

guard at a social security office -- an act for which no organization took credit or otherwise

ascribed to a political cause -- qualifies as an "act of international terrorism" for purposes of the

Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333(a), Plaintiffs cannot articulate any plausible

basis for subjecting the PA and PLO to ATA liability for Mr. Gilmore's death.  There is no

recognized theory of secondary liability that would make the PA and PLO liable for the actions

of a third party simply because that individual is associated with a group formed by some

individuals who happen to be PA employees and by others opposed to the PA.

---

2 A certified translation was not available as of the time of the filing, but will be made available on
request by either the Court or the Plaintiffs.

Plaintiffs attempt to deflect attention from the absence of any facts indicating that actions of the PA or PLO caused Mr. Gilmore's death by arguing that Defendants have not denied liability to Plaintiffs' satisfaction. First, Plaintiffs fault the PA/PLO for not raising factual defenses in their motion to dismiss. *See* Dkt. No. 147 at 7-8. But, of course, in moving to dismiss, Defendants had to treat the Complaint's factual allegations as true. Second, Plaintiffs assert that general denials of liability in the motion to vacate do not constitute a meritorious defense. *Id.* at 37. But Defendants' seven-page discussion regarding their meritorious defenses can hardly be dismissed as a "general denial." *See* Dkt. No. 107 at 34-41. Moreover, Defendants proffered a verified answer that specifically denies allegations related to the PA and PLO. *See* Dkt. No. 107, Exh. G ¶¶ 20-26, 28. In the proffered answer, contrary to Plaintiffs' assertions, *see* Dkt. No. 147 at 40, the PA/PLO did in fact repeatedly deny that they gave "authorization, instructions and directives" to any of the individuals Plaintiffs have identified as being responsible for Mr. Gilmore's death. *See* Dkt. No. 107, Exh. G ¶¶ 25, 26, 28, 30.[3]

In order to satisfy the meritorious defense prong of Rule 55(c), "the movant is not required to prove a defense, but only to assert a defense that it may prove at trial." *Whelan v. Abell*, 48 F.3d 1247, 1259 (D.C. Cir. 1995); *Capital Yacht Club v. Vessel Aviva*, 228 F.R.D. 228 F.R.D. 389, 394 (D.D.C. 2005). Thus, the operative question is not whether the defendant will ultimately carry the day but whether a defendant's proffered defense "give[s] the factfinder some determination to make." *Am. Alliance Ins. Co. v. Eagle Ins. Co.*, 92 F.3d 57, 61 (2d Cir. 1996). Here, that standard is easily met. Plaintiffs' claims rest on statements an Israeli Defense Force spokesman made to justify a rocket attack that killed three Palestinians and injured another two.

---

3 Plaintiffs' position that the proffered verified answer should not be "credited" based on Plaintiffs' rank speculation about the verifier should be rejected out of hand. *See* Dkt. No. 147 at 41-42 n.25.

1011183.1

And, even as to their IDF sources, Plaintiffs have failed to alert the Court that, according to the

IDF, the terrorist cell alleged to be responsible for the Gilmore shooting included members of

organizations opposed to the PA.  Moreover, one of the members of the alleged terrorist cell

testified in a deposition in this case that the cell did not operate under the instruction or authority

of Force 17.  Plaintiffs cannot identify any admissible evidence linking the PA or PLO to Mr.

Gilmore's shooting.  This is a case that cries out for merits litigation.

**B.      The Lack of Cognizable Prejudice Warrants Vacatur.**

Vacatur is all the more appropriate here because Plaintiffs cannot identify any legally

cognizable prejudice arising from setting aside the default, let alone sufficient prejudice to

outweigh the PA/PLO's meritorious defenses and the strong public and foreign policy factors

weighing in favor of vacatur.

As discussed in the motion to vacate, delay in and of itself does not create prejudice for

purposes of Rule 55(c).  *See* Dkt. No. 107 at 30 (citing *Capital Yacht Club v. Vessel AVIVA,* 228

F.R.D. 389, 393-94 (D.D.C. 2005); *Keegel v. Key West & Caribbean Trading Co.,* 627 F.2d 372,

374 (D.C. Cir. 1982).  Instead, a plaintiff must demonstrate tangible harm from the delay created

by setting aside the default, such as loss of evidence, increased difficulties of discovery, or an

enhanced opportunity for fraud or collusion.  *Captial Yacht Club*, 228 F.R.D. at 394; *accord*

*Acree v. Republic of Iraq*, 2009 U.S. Dist. LEXIS 90229, at *9-10 (D.D.C. Sept. 30, 2009).

Faced with this clear authority, Plaintiffs here offer none of the tangible harms recognized in the

decided cases.

In their opposition, Plaintiffs contend that vactur would cause them "irreparable prejudice

in at least three respects."  Dkt. No. 147 at 29.  Specifically, Plaintiffs argue the following:  (1)

supposed "crucial witness" Mahmoud Damara is now in jail and therefore allegedly

1011183.1

"unavailable"; (2) the "PA is merely a temporary entity and is scheduled to be superseded by a 'State of Palestine' in the near future; and (3) "Plaintiffs will need to present their damages testimony again or rely on stale testimony." *Id.* at 29, 32, 36.  None of these contentions establishes legally cognizable prejudice.

As to Plaintiffs' first asserted claim of prejudice, Mahmoud Damara's alleged unavailability, Mahmoud Damara was arrested on September 5, 2006, well ***before*** the entry of the January 29, 2007 default. *See* Exh. 5 (attaching several contemporaneous news reports of the arrest).   Indeed, Damara was arrested the very day for which Plaintiffs had noticed his deposition. *See* Dkt. No. 147-9 at 4 (Notice of Deposition).  Thus, Plaintiffs cannot attribute any prejudice from Damara's alleged unavailability to the setting aside of the default.

In any event, Mr. Damara's imprisonment does not automatically render him unavailable for a deposition in this case.  In December 2001, Plaintiffs' counsel obtained deposition testimony from three individual defendants in this case, all three of whom were imprisoned in Shikma Prison at the time of the depositions.[4] *See* Exh. 4 at 1; *see also* Dkt. No. 15 (Letter of Request Pursuant to Hague Convention for depositions of Mustafa Mahmud Misalmani, Mahmoud Matar, and Ziad Wahadan).

In a rather fanciful flight of speculation, Plaintiffs also assert that "if defendants' motion is granted and a Palestinian state is then established and the PA ceases to exist -- this year, next year, or even the year after -- the plaintiffs will be severely prejudiced." Dkt. No. 147 at 35. Plaintiffs claim they would be "severely prejudiced" because their action "against the PA would be pointless at best, and very possibly summarily extinguished for lack of a defendant." *Id.* at 35.  Thus, Plaintiffs ask the Court to deny Defendants' request for vacatur because (1) a State of

---

[4] The Court dismissed the individual defendants for lack of personal jurisdiction. *See* Dkt. No. 73.

1011183.1

Palestine *may* be established at some unspecified date; (2) such a State *may* be created in such a way that the Palestinian Authority is dissolved; and (3) *assuming (1) and (2) happen*, Plaintiffs' claims *may* be extinguished.  A vacatur motion cannot, however, be defeated simply because Plaintiffs are able to imagine a hypothetical scenario which leaves them disadvantaged, especially where that scenario is based on a series of unfounded assumptions.  Indeed, if Plaintiffs had not dallied in filing their opposition, two years would not have passed, during which -- it might be pointed out -- the PA has not been dissolved.

Plaintiffs' third asserted claim of prejudice is equally specious.  Here, Plaintiffs argue that they are prejudiced -- solely as to the damages portion of the case -- by their own delay in filing their opposition to the motion to vacate.  Plaintiffs complain that Magistrate Judge Robinson's Report and Recommendation on damages has been stayed pending the Court's resolution of the motion to vacate.  Dkt. No. 147 at 36-37.  Plaintiffs note that their damages "testimony is already two years old" and contend that this testimony will be "useless" in the event of vacatur "since the Magistrate Judge's memory thereof will be long faded" and "it is impossible to know whether Magistrate Judge Robinson will still be on the bench at that time." *Id.* at 37.  Plaintiffs, of course, have created this two-year delay by waiting two years to file an opposition to Defendants' motion to vacate.  They cannot, therefore, rely on any prejudice created by their own actions as a basis for denial of the vacaturs.  In any event, the sort of prejudice Plaintiffs allege is not legally cognizable for purposes of Rule 55(c).  In the event of vacatur, Plaintiffs have two choices:  (1) present their testimony again to a jury, or (2) as Defendants have offered, the jury could review the transcript of Plaintiffs' earlier testimony.  In either event, there has been no loss of evidence.

1011183.1

C.     **The Alleged Willfulness of the Default Is Not Dispositive.**

Plaintiffs' Opposition argues that Defendants' default was willful and that Rule 55(c)

relief is therefore unavailable. *See* Dkt. No. 147 at 12-26.  Both contentions should be rejected.

1.     *The PA/PLO's Conduct in This Litigation Does Not Warrant a Finding of Willfulness.*

With respect to the alleged willfulness of the default, Plaintiffs assert that Defendants

"stalled the case for *four years* by seeking repeated extensions." *Id.* at 8.  This allegation also is

unsupported by the record.  The PA/PLO filed their revised motion to dismiss in 2002. Dkt. No.

21.  By May 2003, it was fully briefed.  *See* Dkt. No. 40.  Due to the complexity of the issues

presented in the motion and the Court's calendar, the Court was unable to rule on the motion to

dismiss until March 2006. Dkt. No. 73.  No one was "stalling."

In their brief supporting the motion to vacate, Defendants reviewed the procedural history

of the case and the context in which the default occurred, and argued that the default should not

be deemed willful for purposes of Rule 55(c).  *See* Dkt. No. 107 at 3-10, 23-33.  Defendants will

not repeat those arguments here, other than to emphasize that the default in this case was entered

just after President Abbas sought advice from then Secretary of State Rice on responding to the

U.S. litigation. Dkt. No. 107, Exh. B (January 12, 2007, letter from Rice to Abbas, referencing

November 28, 2006 letter from Abbas to Rice).  After Secretary of State Rice encouraged

President Abbas "to respond to [the] U.S. legal proceedings in good faith and a timely manner"

(*id.*), President Abbas promptly took steps to put that advice into action, which ultimately led to

the retention of the undersigned in mid-2007 and the filing later that year of the motion to vacate.

*See* Dkt. No. 107, Exh. C (Fayyad Declaration) ¶¶ 9-13.  The Plaintiffs obtained the January 29,

2007 default at issue here (Dkt. No. 93) just as President Abbas was awaiting guidance from

Secretary of State Rice.  Thus, there is a real question as to whether the default in the instant case

1011183.1

was as "willful" as those in *Saperstein, Knox,* or *Biton.*  But, even if the Court concludes that the

default here was willful, the other Rule 55(c) factors and the unique public and foreign policy

factors present here weigh strongly in favor of vacaturs, just as the courts found in *Knox* and

*Saperstein.*

> 2.  *Even If the Court Finds the Default Was Willful, the Court Has Ample*
>     *Discretion to Vacate the Default Under Rule 55(c) Based on the Other*
>     *Relevant Factors.*

After arguing at length that the default was willful, Plaintiffs then contend that "[i]t is

well established that relief should not be granted from willful defaults."  Dkt. No. 147 at 12.

With the exception of *Biton v. Palestinian Interim Self-Government Auth.*, 252 F.R.D. 1 (D.D.C.

2008), the cases on which Plaintiffs rely (Dkt. No. 147 at 12), do not support the assertion that

willfulness is the dispositive factor in the Rule 55(c) analysis.  For example, *Jackson*, 636 F.2d at

836, identifies willfulness only as "[t]he first factor to be considered," not the sole or dispositive

factor, and *Int'l Painters & Allied Trades Union & Indus. Pension Fund v. H.W. Ellis Painting*

*Co.*, 288 F. Supp. 2d 22, 26 (D.D.C. 2003), provides only that a "deliberate decision to default"

is "generally" not excusable.

Oddly, as part of this discussion, Plaintiffs rely on the portion of the *Knox* decision in

which the district court concluded that "defendants willfully defaulted in the instant case, which

was not an isolated occurrence but rather, part of Defendants' legal strategy."  Dkt. No. 147 at 16

(*citing Knox v. PLO*, 248 F.R.D 420, 432 (S.D.N.Y. 2008)).  Plaintiffs fail to acknowledge,

however, that *after finding willfulness*, the district court in *Knox* went on to consider all of the

other factors relied on by Defendants here, finding that, on balance, those factors warranted

vacatur.  *Knox*, 248 F.R.D. at 427-32.  *See also Saperstein*, 2008 WL 4467535, at *12 (granting

motion to vacate despite finding that the default was willful).

1011183.1

The approach of the *Knox* and *Saperstein* courts was undoubtedly correct even viewed through the lens of the law of this jurisdiction. *See Keegel*, 627 F.2d at 374 (reversing in part because district court failed to consider all three "listed criteria" in considering motion to vacate); *United States v. Schofield*, 197 F.R.D. 6, 8 (D.D.C. 2000) (vacating despite indications of initial willfulness based on subsequently stated representations of intent to litigate going forward); *Owens v. Republic of Sudan*, 374 F. Supp. 2d 1, 9-10 (D.D.C. 2005) (vacatur of "somewhat willful" default based on absence of prejudice and potentially meritorious defense).

Plaintiffs' position that Rule 55(c) relief cannot be granted for willful defaults also is inconsistent with two decisions issued this year by Judge Roberts. In the first case, *Strong-Fisher v. Lahood,* 611 F. Supp. 2d 49, 52 (D.D.C. 2009), the court granted the defendant's motion to vacate even though the defendant had "repeatedly missed filing deadlines, despite notice from the court that failure to timely respond could result in default." *Id.* at 51. Judge Roberts concluded: "On balance, although [plaintiff] has made some showing regarding willfulness, [because] there has been no prejudice caused by the [defendant's] delay in responding to the amended complaint and the [defendant] has raised a meritorious defense, he has shown good cause to set aside entry of default." *Id.* at 52. Similarly, in *Acree v. Republic of Iraq*, 2009 U.S. Dist. LEXIS 90229, at *14 (D.D.C. Sept. 30, 2009), the court granted Iraq's motion to vacate a default even "accepting plaintiffs' contention that Iraq's default was willful" because "the *Jackson* factors on balance nonetheless favor setting aside entry of default."

Significant for purposes of the instant motion to vacate, the court in *Acree* noted that "where, as here, the defendant is a foreign sovereign, default judgment is especially disfavored because '[i]ntolerant adherence to default judgments against foreign states could adversely affect [the United States'] relations with other nations and undermine the State Department's

1011183.1

continuing efforts to encourage foreign sovereigns generally to resolve disputes within the United States' legal framework." *Acree*, 2009 U.S. Dist. LEXIS 90229, at *5 (quoting *Practical Concepts, Inc. v. Republic of Bolivia*, 811 F.2d 1543, 1551 n.19, 1552 (D.C. Cir. 1987)). *Acree* thus flatly contradicts Plaintiffs' assertion that there is no "special rule of leniency for foreign states." *See* Dkt. No. 147 at 21-23.

In their motion to vacate, Defendants relied on *Practical Concepts* and similar cases to show that courts go to great lengths to protect foreign governments from even willful default judgments, a position confirmed by *Acree*. *See* Dkt. No. 107 at 14, 16-19.  Plaintiffs attempt to distinguish these cases on two grounds.  First, Plaintiffs assert that these cases "do not involve governmental entities, but rather full-blown **foreign states** generally entitled to immunity." Dkt. No. 147 at 21.  The cases, however, reflect a concern about the foreign policy impact of default judgments against foreign governments.  The cases do not purport to limit their application to cases involving sovereign nations or defenses of sovereign immunity.  The rationale supporting vacatur in those cases applies with equal force to the Palestinian Authority.

Second, Plaintiffs argue that *Practical Concepts* and related cases are distinguishable because, "in almost all" of these cases, "the foreign defendant did not even appear in the case until *after* default judgment had [been] entered." Dkt. No. 147 at 25.  Plaintiffs never explain how a defendant who contests the court's jurisdiction and then defaults should be in a worse posture for Rule 55(c) purposes than a defendant who entirely ignored the U.S. court.

**III.    The Extraordinary Circumstances Presented by This Case Warrant Vacatur**

   **A.    Foreign and Public Policy Concerns Favor Vacatur.**

As discussed in the Motion to Vacate brief, a number of courts have cited potential foreign policy repercussions when vacating defaults and default judgments entered against

1011183.1

foreign governments.  Dkt. No. 107 at 14-19.  Here, Anti-Terrorism Act defaults and default

judgments against the PA and PLO have been a recurring issue in the PA's and PLO's

interaction with the U.S. Department of State.  *See id.*, Exh. B (January 12, 2007, letter from

Secretary of State Rice to President Abbas, referencing President Abbas's letter setting forth

concerns about the U.S. litigation); Exh. C (June 18, 2005, letter from Finance Minister Fayyad

to Secretary of State Rice).

Moreover, the PA and PLO are integral to the Israeli-Palestinian peace process.  Actions

of the U.S. courts that impact them and their relationship with the U.S. Government should not

be taken lightly.  As Secretary of State Clinton explained earlier this year, "[f]inding a peaceful

solution to the Israeli-Palestinian conflict . . . has been a priority for the President and me from

the very beginning of the Administration."  Exh. 6 at 1 (Remarks of Secretary of State Hillary

Rodham Clinton) (July 24, 2009).  Secretary of State Clinton further emphasized that "[t]his

shared goal depends on strengthening the Palestinian Authority and its ability to meet the needs

of its people."  *Id.  See also* Dkt. No. 107, Exh. F (July 16, 2007 Statement of President Bush).

Plaintiffs assert that the case lacks "foreign policy implications" because the United

States has not filed a Statement of Interest.  Dkt. No. 147 at 20.  But this Court is free to consider

the foreign policy implications of a default judgment issued by the Court without input from the

Executive Branch.  The *Knox* and *Saperstein* courts did not feel constrained by the absence of a

Statement of Interest to consider policy concerns arising from the defaults at issue in those cases,

and this Court should not either.  In *Knox*, the court found the allegations against the PA and

PLO "are all weighty matters with far-reaching implications," "touch upon interests beyond

those of the immediate parties to this litigation," and "warrant[] more reliable, concrete

substantiation than a default judgment provides."  *Knox v. PLO*, 248 F.R.D. 420, 431 (S.D.N.Y.

2008).  The court cited the U.S. Government's stated concern about the "impact that a sizable judgment in this action may have on the financial viability of Defendants," the Palestinian people's right to know whether their government has abused their authority, the international community's interest in ensuring that the donor funds they provide to the Palestinian Authority were used for their intended purposes, and the interests of "many other persons who for various personal or professional reasons may have some valid stake in the truth of the historical record . . . including the general public's right to know the facts relating to matters of great moment that may affect their own public or private interests."  *Id.*

Similarly, the court in *Saperstein* noted that "[t]here is a strong public interest in learning the truth of the Plaintiff's allegations" regarding whether the PA and PLO "contributed to terrorist activities" and concluded that "[t]hese important issues warrant a decision on the merits rather than a resolution by default."  *Saperstein v. PA*, No. 1:04-cv-20225, 2008 WL 4467535, at *15 (S.D. Fla. Sept. 29, 2008).

The historical and public policy concerns that resulted in the vacaturs in *Saperstein* and *Knox* apply with equal force here.  Here, the Gilmores allege that the PA and PLO "operated and controlled" terrorist cells during the Second Intifada.  *See* Dkt. No. 147 at 2.  As Judge Marrero observed in *Knox*, "[g]iven the transcendental scope of these issues . . . , a judgment concerning such questions, involving liability assessed in hundreds of millions of dollars, ordinarily should not be decided by default."  *Knox*, 248 F.R.D. at 431.

**B.      Recognition of the Changing PA/PLO Political Dynamics Favor Vacatur.**

Both the *Knox* and *Saperstein* courts took into account the commitment of the new leadership of the PA and PLO to cooperate with the U.S. courts and defend the U.S. lawsuits on the merits.  The "principal defaulting officials are no longer on the scene and their litigation

strategies have been rejected by successors." *Knox*, 248 F.R.D. at 431.  In *Knox*, this

development militated in favor of giving the PA/PLO another opportunity to "set the record

straight."  *Id.* at 431-32.  Similarly, the court in *Saperstein*, after noting the *sui generis* nature of

the PA and the "changing political dynamics and volatility in the area," concluded that the new

leadership's "desire to proceed with merits litigation in good faith" provided a counterbalance to

the earlier willful failure to participate.  2008 WL 4467535, at *12.

     Here, the PA/PLO's motion to vacate was supported by a sworn declaration from Prime

Minister Fayyad in which he expressed the PA/PLO's commitment to "participate fully in this

and other litigation in a cooperative manner, including complete participation in the discovery

process." Dkt. No. 107, Exh. C ¶ 13.  Prime Minister Fayyad's declaration deserves the Court's

serious consideration, particularly in light of his representations concerning the manner in which

the litigation will be conducted going forward, representations that have been borne out by the

actual conduct of litigation in the related cases.  *See United States v. Schofield*, 197 F.R.D. 6, 8

(D.D.C. 2000) (vacating default largely because Defendant was "now vigorously mounting a

defense," explaining that "[s]uch an act cuts strongly against any willfulness of the defendant's

previous delay"); *Lawton v. Republic of Iraq*, No. 02-0474, 2006 U.S. Dist. LEXIS 94335, at *7

(D.D.C. Dec. 6, 2006) (vacating entry of default and refusing to find willfulness in a case

alleging that Iraq should be held responsible for the 1995 bombing of a federal building in

Oklahoma City in light of political turmoil and based on representations that new leadership was

"committed to defending fully against Plaintiffs' alleged claims, on all available grounds, in

accordance with the laws, procedures and Court directives applicable to this litigation").

     Here, the PA/PLO are now fully committed to defending the cases, as they have

demonstrated for the past two years.  Their actions are consistent with other reform efforts and

1011183.1

institution-building they have undertaken in the past two years. *See* Exh. 6 at 1 (Secretary of State Clinton: "In just over two years, President Abbas and Prime Minister Fayyad have put in place the foundations of a responsible, transparent, accountable government."); *see also* Exh. 7 (Joint PA - European Commission press release announcing European Union assistance to the PA 2009 budget to support PA reform efforts) (Aug. 10, 2009).

**C.      The Potential Size of the Judgment and Its Impact on the PA/PLO Favor Vacatur.**

Courts have been particularly sensitive to the need to reopen default judgments where significant amounts of money are at stake and where judgments require payments from public funds. *Sony Corp. v. Elm State Elecs., Inc.*, 800 F.2d 317, 320 (2d Cir. 1986); *see also Hester Int'l Corp. v. Fed. Republic of Nigeria*, 879 F.2d 170, 175 (5th Cir. 1989). As one district court explained in a case involving only a $325,000 judgment, "[t]he large amount of money at stake must be considered 'since relief under rule 60(b) is essentially equitable in nature and is to be administered on equitable principles.'" *First Nat'l Bank v. Ryder Truck Rental Inc.*, Civ. No. 82-0045-B, 1985 U.S. Dist. LEXIS 21565, at *16 (D. Me. 1985) (quoting *C.K.S. Engineers, Inc. v. White Mountain Gypsum*, 726 F.2d 1202, 1208 (7th Cir. 1984); *Hutton v. Fisher*, 359 F.2d 913, 916 (3d Cir. 1966)).

Both the *Knox* and *Saperstein* courts identified the treble damages awarded in Anti-Terrorism Act cases (*see* 18 U.S.C. § 2333(a)) and the size of the default judgments or, in the case of *Saperstein*, potential default judgment, as a factor weighing in favor of vacating the default. *Knox*, 248 F.R.D. at 430; *Saperstein* 2008 WL 4467535, at *15.

The discussion at pages 42-46 of Plaintiffs' Opposition regarding the financial impact of the U.S. litigation, particularly the judgment in the *Ungar* case, establishes only that the U.S.

1011183.1

litigation efforts have not yet succeeded in putting the PA "out of business."[5]  Despite Plaintiffs'

efforts to downplay the financial exposure created by the U.S. lawsuits, the United States

Government has expressed concern "about the potentially significant impact that these cases may

have on the *financial* and political viability of the [PA and PLO]."  Exh. 8 (Feb. 29, 2008, letter

from U.S. Department of Justice to Judge Marrero in *Knox*).  Moreover, in the *Knox* case, after

extensive discovery on the PA's and PLO's financial condition in connection with the setting of

the bond amount, Magistrate Judge Katz provided this stark assessment:  "[I]t is apparent that the

economic situation in the Palestinian territories is dire. . . . Reports of the International Monetary

Fund, the World Bank, and the PA itself confirm that the PA is deeply in debt and reliant on the

international donor community to fund basic operations." *Knox v. PLO*, No. 1:03-cv-4466, 2009

U.S. Dist. LEXIS 52610, at *29 (S.D.N.Y. Mar. 26, 2009).  Defendants submit that these

assessments are considerably more credible and reliable than those of Plaintiffs.

## IV.      THE MOTION TO VACATE WAS FILED WITHIN A REASONABLE TIME.

Plaintiffs' last gambit is to assert that the Court should deny the motion to vacate because

it is "egregiously untimely."  Dkt. No. 147 at 27.  According to Plaintiffs, "defendants waited

***eleven months***" after the clerk entered the default to file the motion to vacate.  *Id.* at 28.  And,

"astoundingly and unforgivably," even after they hired new counsel in May 2007, took no action

whatsoever to vacate the default for half a year.  The hypocrisy of their position is evidently lost

on Plaintiffs.  They waited two years to file their opposition to the motion to vacate.

Although rich in drama and hypocrisy, Plaintiffs' timeliness argument is wanting in

merit.  As Plaintiffs acknowledge, no time limit exists for Rule 55(c) motions, so long as they are

---

[5] Much of the U.S. litigation receives legal and/or financial support from the Israel Law Center, who has made a mission of litigating against the PA, and whose motto is "Bankrupting Terrorism -- One Lawsuit at a Time."  *See* www.israellawcenter.org, last visited Nov. 24, 2009.  *See also* Dkt. No. 107, Exh. H.

1011183.1

brought within a "reasonable time." *Id.* Defendants filed their motion less than one year after the default, which would be timely even under the one-year time limit imposed by Rule 60(c)(1) for certain motions seeking relief from final judgments.

In their motion to vacate, the PA/PLO explained the sequence of events leading to the motion to vacate -- President Abbas's request for guidance from the United States Government and then tasking of Prime Minister Fayyad to direct the U.S. litigation, the retention of new U.S. litigation counsel in mid-2007, and new counsel's entry into the nine Anti-Terrorism Act lawsuits against the PA and PLO, six of which had entered the default or default judgment stage. Dkt. No. 107 at 9-10, 24, Exhs. B, C. After being retained in mid-2007, new counsel immediately began the task of moving to vacate defaults and default judgments in various courts around the country. At the same time, counsel was required to defend on-going damages proceedings, respond to discovery in these cases, and investigate the availability of meritorious defenses. Given the substantial effort entailed in filing six vacatur motions, all of which required extensive research into often complex procedural histories and the investigation of meritorious defenses, it is not unreasonable that it took counsel the remainder of 2007 to file all of the vacatur motions. Plaintiffs' two-year delay in filing their opposition to the motion to vacate is considerably less justifiable.

### Conclusion

For the foregoing reasons, the Court should grant the PA/PLO's motion to vacate so they can defend the case on the merits.

1011183.1

Respectfully submitted,

Dated:  November 24, 2009

/s/ *Laura G. Ferguson*
Laura G. Ferguson (D.C. Bar #433648)
Email:  lferguson@milchev.com
Mark J. Rochon (D.C. Bar #376042)
Richard A. Hibey (D.C. Bar #74823)
Miller & Chevalier Chartered
655 Fifteenth Street, N.W., Suite 900
Washington, DC  20005-5701
Tel. (202) 626-5800
Fax. (202) 628-0858

*Attorneys for the Palestinian Authority and*
*Palestine Liberation Organization*

1011183.1

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 24th day of November, 2009, a true and genuine copy of the foregoing was filed with the Court by ECF, which automatically provided notice to the following:

David J. Strachman
McIntyre, Tate & Lynch, LLP
321 South Main Street, Suite 400
Providence, RI 02903
djs@mtlhlaw.com
*Attorney for Plaintiffs*

　　／s／ *Laura G. Ferguson*
Laura G. Ferguson

1011183.1