UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| REUVEN GILMORE, *et al.*, )<br>)<br>     Plaintiffs, )<br>)<br>  v. )<br>)<br>PALESTINIAN INTERIM SELF- )<br>GOVERNMENT AUTHORITY, *et. al.*,)<br>)<br>     Defendants. ) | Civil Action No. 01-853 (GK) |

## MEMORANDUM OPINION

Plaintiffs, who are various family members of Esh Kodesh Gilmore, the deceased victim of an alleged terrorist shooting in Jerusalem, Israel on October 30, 2000, bring this action against Defendants Palestinian Interim Self-Government Authority ("PA") and Palestinian Liberation Organization ("PLO") under the Anti-Terrorism Act of 1991 ("ATA"), 18 U.S.C. § 2331, et seq. On January 29, 2007, after Defendants failed for nearly ten months to file an Answer to Plaintiffs' Complaint, this Court granted Plaintiffs' Motion to Enter Default against Defendants PA and PLO [Dkt. No. 92]. This matter is presently before the Court on Defendants' Motion to Vacate Clerk's Entry of Default [Dkt. No. 107] under Federal Rule of Civil Procedure 55(c). Upon consideration of the Motions, Oppositions, Replies, and the entire record herein, and for the reasons set forth below, the Motion to Vacate is **granted**.

## I.     BACKGROUND

This action was filed on April 18, 2001 by various family members and the estate of U.S. citizen Esh Kodesh Gilmore. Mr. Gilmore was killed on October 30, 2000 in a shooting at the National Insurance Institute--the equivalent of the United States' Social Security Administration--in East Jerusalem. At the time of his death, Mr. Gilmore was twenty-five years old, married, and the father of an infant daughter. Plaintiffs allege that the shooting was planned and carried out by a terrorist cell consisting of officers in a PA security unit known as "Force 17" and members of the armed PLO faction known as "Tanzim." Plaintiffs also allege that the cell was operated and controlled by Defendants PA and PLO. See Complaint ¶¶ 17-30.

The instant Motion follows years of protracted filings in this case. The first default was entered against Defendants PA and PLO on December 20, 2001 [Dkt. No. 18], after Defendants failed to file a timely Answer. On January 29, 2002, more than five months after service and forty days after entry of the default, Defendants filed a Motion to Vacate Default, which was granted "in light of the strong preference in this jurisdiction for rulings on the merits, and in the absence of any prejudice suffered by Plaintiffs." April 17, 2002 Order [Dkt. No. 28]. Defendants had also filed a Motion to Dismiss with their Motion to Vacate, which--due in part to the many requests made by both parties for leave to file additional

briefs and for extensions of time,[1] and due in part to the demands of the Court's calendar--was not decided until March of 2006. March 7, 2006 Order [Dkt. No. 73]. The Motion to Dismiss was granted as to certain individual Defendants no longer named in this case, and denied as to Defendants PA and PLO.

On April 24, 2006, after the Motion to Dismiss was denied, Defendants filed an Answer through their attorney, Maher Hanania. At a December 5, 2006 status conference, Defendants' other counsel, Ramsey Clark, then informed the Court that Mr. Hanania had filed the Answer without proper authorization from Defendants, that he had since been fired by Defendants, and that Defendants intended to proceed without responding to the Complaint, but would raise post-judgment challenges on jurisdictional grounds. Defs.' Mot. to Vacate at 8-9 [Dkt. No. 107]. After Mr. Hanania confirmed that he lacked the proper authority to file an Answer, Plaintiffs' Motion to Strike the Answer from the record was granted. Minute Order of January 7, 2007. Thus, by January 2007--ten months after the Motion to Dismiss was denied with respect to Defendants PA and PLO--no Answer had been filed and none was expected.

---

[1] It is worth noting that, after being granted leave to file a supplemental memorandum in support of their Motion to Dismiss in September 2004 [Dkt. No. 59], Defendants filed successive motions for extension of time that delayed briefing for another three months. In addition, at the close of the extended time granted Defendants, they failed to file their supplemental memorandum.

In light of these facts, a second default was entered against Defendants PA and PLO on January 29, 2007. January 29, 2007 Order [Dkt. No. 92]. The case was then referred to Magistrate Judge Robinson for a hearing on damages. [Dkt. No. 92]. The hearing, which was spread out between June and December 2007, lasted a total of six days, and Defendants fully participated in it.

Defendants represent that, about the same time that the second default was entered, Defendant PA--under the authority of President Mahmoud Abbas and then-Finance Minister Salam Fayyad (who is currently the Prime Minister)--consulted with the U.S. Department of State on whether to appear in U.S. courts to defend against suits such as this one. After being encouraged by U.S. Secretary of State Condoleezza Rice to participate in legal proceedings, Defendants committed to litigating the claims against them and obtained new counsel in May 2007. Mot. to Vacate at 9. Prime Minister Fayyad issued a declaration to that effect, noting that "the importance of [litigating these cases] was not fully appreciated by the PA government, as a whole, until recently." Declaration of Prime Minister Salam Fayyad at 3-4, Ex. C to Defs.' Mot. to Vacate.

Six months later, in November 2007, after five of the six days spent on the damages hearing but before Magistrate Judge Robinson had reached any decision, Defendants filed the present Motion to Vacate Clerk's Entry of Default. The Court then requested the

United States file a statement of interest regarding the issues presented in Defendants' Motion. The Government to declined to file such a statement, and cautioned that no inference should be drawn from its decision not to participate. Notice of the United States [Dkt. No. 151].

**II. STANDARD OF REVIEW**

Under Federal Rule of Civil Procedure 55(c), a court "may set aside an entry of default for good cause." Fed. R. Civ. P. 55(c) ("Rule 55(c)"). The court must balance three factors in evaluating whether a party has demonstrated good cause: (1) whether the default was willful; (2) whether a decision to set aside the default would prejudice the plaintiffs; and (3) whether the defendant has presented a meritorious defense. Keegel v. Key West & Caribbean Trading Co., Inc., 627 F.2d 372, 373 (D.C. Cir. 1980), Capital Yacht Club v. Vessel Aviva, 228 F.R.D. 389, 393 (D.D.C. 2005); see also Jackson v. Beech, 636 F.2d 831, 836 (D.C. Cir. 1980) (describing approach as requiring balancing of factors). In applying this standard, all doubts shall be resolved in favor of the party moving to set aside the default. Capital Yacht Club, 228 F.R.D. at 393.

While the decision to set aside an entry of default falls within the Court's sound discretion, in this Circuit there are "strong policies favoring the resolution of genuine disputes on their merits." Jackson, 636 F.2d at 835. When the defendant is a

foreign sovereign,[2] default is especially disfavored because "[i]ntolerant adherence to default judgments against foreign states could adversely affect [the United States'] relations with other nations and undermine the State Department's continuing efforts to encourage foreign sovereigns generally to resolve disputes within the United States' legal framework." Practical Concepts, Inc. v. Republic of Bolivia, 811 F.2d 1543, 1551 n. 19 (D.C. Cir. 1987).

**III. ANALYSIS**

First, the Court will consider, pursuant to Rule 55(c), the Defendants' willfulness, any prejudice resulting to Plaintiffs from an order vacating the default, and any meritorious defenses asserted by Defendants. Second, the Court will weigh the significant public interest and foreign policy issues presented in this case.

**A.   Defendants' Default Was Willful**

The first factor to be considered in determining whether there is "good cause" for vacating a default is whether the defendant's conduct was willful. Because "[d]efault judgments were not designed as a means of disciplining the bar at the expense of the

---

[2] Although the United States does not recognize the Palestinian Authority as a foreign sovereign, it continues to maintain diplomatic relations with it and has actively encouraged it to resolve disputes within the United States' legal framework. See Letter from Condoleezza Rice, U.S. Secretary of State, to Mahmoud Abbas, President of the Palestinian Authority (Jan. 12, 2007), attached as Exhibit B to Defs.' Mot. to Vacate. The reasoning in Practical Concepts thus applies in this case.

litigants' day in court," a finding of willfulness requires that defendants, and not just their attorneys, were responsible for the default.  Jackson, 636 F.2d at 837.

Defendants argue that the political turmoil in the PA from 2004-2006 "directly impeded Defendants' ability to act in as timely and responsive a manner as the Court otherwise has a right to expect." Defs.' Mot. to Vacate at 24.  However, this explanation is flatly contradicted by the record.  As Defendants themselves note in their Motion to Vacate, their counsel represented at the December 5, 2006 status conference that Defendants had chosen not to file an answer, and to file post-judgment jurisdictional challenges; Defendants said nothing about political turmoil preventing a decision from being made.[3]  Defendants offer no support for their statement that "at crucial stages of the litigation, defense counsel were unable to obtain clear instructions about whether to limit the defense to jurisdictional challenges or to defend on the merits." Id. at 25.

Moreover, Defendants did not challenge the default in a timely manner.  The Motion to Vacate was filed eleven months after Secretary Rice's letter to Defendants, and six months after

---

[3] Defendants' counsel stated at the December 5, 2006 status conference that, pursuant to the instructions he had received from the PA and PLO, "we are not to appear or participate in any further proceedings in the case. We will appeal on the decisions of the court on jurisdiction when the case is over." Pls.' Opp'n at 8 (quoting Tr. 12/05/06 at 4).

Defendants obtained new counsel.  Defendants also waited until the damages hearing--in which their new counsel fully participated--had nearly concluded before raising this issue in their Motion to Vacate.

Thus, this is not a case of mere delay, but a case where Defendants' deliberate litigation strategy was to refuse to defend on the merits.  Without deciding the broader issue of whether the failure to file an answer in this case reflected a global legal strategy, as Plaintiffs argue, it is clear that, at a minimum, Defendants' default in this case was willful.  See Biton v. Palestinian Interim Self-Government Authority, 252 F.R.D. 1, 2 (D.D.C. 2008) (finding that Defendants PA and PLO were willful in second default because of earlier "deliberate choices," despite subsequent correspondence with Secretary Rice concerning decision to litigate proceedings in U.S. courts).

### B.   Plaintiffs Will Be Prejudiced if the Motion to Vacate Is Granted

Any prejudice to Plaintiffs resulting from vacatur of the default must be considered as well.  Delay in and of itself does not constitute prejudice.  Keegel, 627 F.2d at 374; KPS & Assocs., Inc. v. Designs By FMC, Inc., 318 F.3d 1, 15 (1st Cir. 2003).  Instead, "[t]he issue is . . . its accompanying dangers: loss of evidence, increased difficulties of discovery, or an enhanced opportunity for fraud or collusion." Federal Deposit Ins. Corp. v. Francisco Inv. Corp., 873 F.2d 474, 479 (1st Cir. 1989).

In an effort to mitigate any prejudice to Plaintiffs, Defendants have stipulated that the testimony from the damages hearing can and should be utilized if the default is vacated, that Plaintiffs will be reimbursed for "reasonable costs unnecessarily incurred in the damages hearing," and that Defendants will post a $1 million bond, payable to Plaintiffs, if "after the Court vacates the January 29, 2007 entry of default . . . the Defendants again default."  Defs.' Mot. to Vacate at 30-33.

Plaintiffs respond that prejudice will still result because (1) a "crucial" witness--Force 17 commander Mahmoud Damara--has become unavailable for deposition; (2) Defendant PA is only a temporary governing authority incapable of binding a future Palestinian state; and (3) the testimony given at the damages hearing will become stale as a result of any further delay.  Pls.' Opp'n at 12-37.

Mr. Damara is currently in Israeli custody, although Plaintiffs concede he could be made available for deposition. Pls.' Opp'n at 31.  However, Plaintiffs argue that any deposition testimony would be "utterly useless" at trial because it could not be attributed to Defendants.  Id.  They offer no support for this statement, or why the fact of his incarceration would affect attribution of his testimony to Defendants.  In sum, they fail to explain why the deposition testimony of a man they claim to have led the terrorist cell that shot and killed Mr. Gilmore would be

"utterly useless" at trial. Given Plaintiffs' close ties to legal advocacy groups in Israel[4] and their admission that a deposition is possible, the Court very much doubts that Mr. Damara will prove unavailable for such a deposition, and so finds no prejudice stemming from his incarceration.

Plaintiffs also argue that, because Defendant PA is an interim authority, it could cease to exist in the time it would take to complete discovery and trial. Plaintiffs argue that the action against Defendant PA would then be "pointless at best, and very possibly summarily extinguished for lack of a defendant." Id. at 35. This argument is totally speculative, especially since the details of the relationship between the PA and any hypothetical successor state are unknown, and so does not support a finding of prejudice.[5]

---

[4]  Defs.' Mot. to Vacate at 15-16.

[5]  Whether an independent Palestinian state would succeed to the debts and obligations of the PA is a complicated question under international law. Still, as a general rule, a successor state's liability for the debts and obligations of the predecessor state is controlled by agreement between the two states or, in cases where territory secedes from a state to form a new state, the debt of the predecessor state is passed to the successor state in equitable proportion. See Report of the International Law Commission to the General Assembly, reprinted in [1981] 2 Y.B. Int'l L. Comm'n 2, (Draft Articles on Succession of States in Respect of State Property, Archives and Debts). Thus, it is far from clear that the existence of an independent Palestinian state would foreclose the possibility of Plaintiffs collecting any judgment against Defendants PA and PLO.

However, Plaintiffs' last argument--that they will be prejudiced because the testimony presented at the damages hearing will become stale if proceedings are further delayed--is far more persuasive. Findings of fact must be made "while the testimony is fresh in the judge's mind." Advance Business Systems & Supply Co. v. SCM Corp., 287 F.Supp. 143, 163 (D.Md. 1968). Defendants trivialize the injury to Plaintiffs by assuming that the cold written record made before the Magistrate Judge will have the same meaning and impact to a fact-finder when read years later. Defendants also ignore the enormous emotional cost to Plaintiffs should they be forced "to undergo the excruciating process of testifying about their loss all over again." Pls.' Opp'n at 37. In light of the serious prejudice to Plaintiffs that would result from their proceeding with stale testimony or undergoing the wrenching process of testifying again, the Court concludes that vacating the Motion to Default will prejudice Plaintiffs.

**C. Defendants Have Raised Defenses Which, if Proven, Are "Meritorious" within the Meaning of Rule 55(c)**

A defense is meritorious if it "contain[s] even a hint of a suggestion which, proven at trial, would constitute a complete defense." Keegel, 627 F.2d at 317; Candido v. District of Columbia, 242 F.R.D. 151, 157 (D.D.C. 2007). Defendants deny that they were responsible for the October 2000 shooting, and argue that there is no reliable evidence linking them to this murder. Defendants also argue that the shooting was not an act of

-11-

"international terrorism" under the ATA, and so jurisdiction is lacking.

Plaintiffs' response goes to the merits of these defenses. However, the actual merits are not at issue in a motion to vacate; instead, they will be fully examined at trial. In any event, "[w]hen moving to set aside a default, defendant is not required to prove a defense, but only to assert a meritorious defense that it may prove at trial." Whelan v. Abell, 48 F.3d 1247, 1259 (D.C. Cir. 1995). Defendants' asserted defenses, if proven at trial, would constitute a complete defense, and therefore are "meritorious" within the meaning of Rule 55(c).

### D. Foreign Policy and Public Interest Concerns

In addition to the three factors which have already been discussed, the Court may, under Rule 55(c), also consider any other "good cause" for setting aside a default. In this case, Defendants argue that there are foreign policy concerns which weigh in favor of granting them relief. Defs.' Mot. at 3, 18-30. While the Court is not convinced that Defendants have provided sufficient evidence to support their claims that denial of their Motion would significantly, and negatively, impact foreign policy in the Middle East,[6] there is an issue which is of great public concern, and is

---

[6] It is fair to say that making any predictions about developments in the Middle East is a risky and speculative undertaking, far beyond the competence of federal judges.

-12-

more concrete and far-reaching than speculation about an immediate impact on events in that troubled area.[7]

The Middle East is now and has long been an area in which deep hostilities and tensions exist between nations, ethnic groups, and religions. Despite patient and prolonged efforts by many governments (including our own), prominent individuals, and international institutions, it has not proved possible to bring peace and prosperity to the area as a whole. While those efforts to achieve peace are quiescent at this time, negotiations have by no means been abandoned. Given the long and violent history in this area of the world, the Court is reluctant to take any action that might hinder the progress of such negotiations, tedious and drawn out as they have been, or to exacerbate existing tensions between adversaries in the region who may now desire to defuse those tensions.

---

[7] The Executive Branch of the United States has been particularly unhelpful in resolving this difficult Motion. The Court requested that the State Department file a Statement of Interest in order to understand the international ramifications of any order it might enter, and to be apprised of our Government's position about such ramifications. In this case, as in Knox v. The Palestinian Liberation Organization, 2009 U.S. Dist. LEXIS 56210, *29 (S.D.N.Y. Mar. 26, 2009), the State Department declined to do so. Instead it filed the identical mealy-mouthed Notice there as it did in this case. That Notice, for all practical purposes, said nothing and certainly provided no substantive guidance whatsoever to the Court regarding the Government's position or concerns about any impact a decision might have on the delicate situation in the Middle East.

For example, Defendants claim that any large default judgment against them will worsen their existing economic plight, with consequences for the region as a whole. Plaintiffs claim that there is no merit to Defendants' description of their economic crisis.[8] This is simply untrue. Defendant PA relies heavily on foreign aid, and "the economic situation in the Palestinian territories is dire." See Notice of the United States (noting concern about "the potentially significant impact that these default cases may have on the defendants' financial and political viability"); U.S. Dep't of State, Press Conference with Palestinian Authority Prime Minister Salam Fayyad, available at http://www.state.gov/secretary/rm/2009a/july/126444.htm (Ex. 6 to Defs.' Reply) (describing budget support as "the very type of external assistance [the PA] need[s] most"); European Commission, European Union Assistance to the Palestinian Authority 2009 Budget Reaches €207 Million (Oct. 8, 2009) (Ex. 7 to Defs.' Reply) (stating that "budget support from donors was equivalent to roughly 30% of [the PA's] GDP in 2008"). Imposing a judgment on Defendants which might well be for millions of U.S. dollars would only worsen the existing economic situation, and might well heighten tensions and animosities in the region.

---

[8] According to Defendants, Plaintiffs are seeking well over $4 billion in damages. That figure seems to be highly exaggerated.

Plaintiffs allege that the PA and PLO are directly responsible for the killing of Esh Kodesh Gilmore, and that his murder was part of an official policy of terrorism and murder. Defendants vigorously deny that they played any part in his killing, that they provided any support to those responsible for it, or that they knew anything about its planning. Both parties have presented evidence in their Motion papers to support their contentions. None of this evidence has been subjected to presentation in open court or the glare of cross-examination. Given the far-reaching implications of a public airing of the evidence, the Court concludes that it will serve the interest of many segments of the public "to reach the truth and set the record straight," and that "such a course would better comport with the ends of justice that reflect the greater range of relevant concerns." Knox v. The Palestine Liberation Organization, 248 F.R.D. 420, 431-32 (S.D.N.Y. 2008).

In Knox, Judge Marrero identified those segments of the public with an interest in learning the truth: "the interests of the people whose welfare Defendants supposedly serve as empowered representatives," i.e., their constituents and "members of the international community--including this country--which have recognized Defendants as legitimate leaders of a governmental entity." Id. at 431. Judge Marrero noted that they "would be interested in knowing whether the public institutions and officials they have accorded their recognition and have dealt with at arms

length are what they purport to be, and that any funds they provided Defendants to support valid public purposes in the areas within Defendants' authority have been employed solely for the intended use, and not, as Plaintiffs' allegations suggest to finance terrorism." Id.

Finally and most significantly, Judge Marrero concluded that "there are many other persons who for various personal or professional reasons may have some valid stake in the truth of the historical record as regards the issues raised by Plaintiffs' allegations in this case, including the general public's right to know the facts relating to matters of great moment that may affect their own public or private interests." Id.  This Court is in total agreement.  Given "the transcendental scope of these issues and interests, a judgment concerning such questions . . . ordinarily should not be decided by default." Id.

For all these reasons, the Court concludes that there is a strong public interest in permitting the parties' claims to see the light of day and face the oft-time harsh light of trial. Therefore, on balance, vacatur is warranted under Rule 55(c), and the Motion to Vacate Clerk's Entry of Default is **granted**.[9]

---

[9] Plaintiffs rely on a case in which the district court, faced with a strikingly similar factual background, denied the defendants' motion to vacate. Biton v. Palestinian Interim Self Government Authority, 252 F.R.D. 1 (D.D.C. 2008). While there are indeed great similarities between these cases, the decision to vacate an entry of default can be difficult and complex. District
(continued...)

### E. Minimizing Prejudice to Plaintiffs

Plaintiffs argue that if the default is set aside, this case will drag on without end. Because Defendants have demonstrated a commitment to bringing an end to litigation in other, similar cases, this argument does not change the decision to grant Defendants' Motion. See Knox v. PLO, No. 1:03-cv-4466 (S.D.N.Y. Oct. 22, 2009) (order noting that settlement agreement was reached); Bucheit v. PLO, No. 1:00-cv-1455 (D.D.C. filed June 5, 2008) (giving notice that judgment against Defendants PLO and PA has, finally, been fully satisfied).

Still, Plaintiffs' concerns are not to be taken lightly--the Court is keenly aware that they will suffer prejudice as a result of this decision and the attendant delay. In addition, those cases that have been resolved reached that point only after considerable delay. See, e.g. Knox, 248 F.R.D. at 432-33 (discussing delays in satisfying Bucheit judgment). Thus, there is some question as to Defendants' commitment to resolving this dispute.

Defendants have offered to reimburse the Plaintiffs for reasonable costs, i.e., court costs and attorney fees, incurred as a result of the default. Payment of such costs will be required as a condition of granting the Motion.

---

[9](...continued)
Courts may reasonably disagree as to the correct outcome, as is evidenced by other district court decisions which are in accord with this Court's analysis. See Saperstein v. Palestinian Authority, 2008 WL 4467535 (S.D. Fla. Sept. 29, 2008).

Defendants have also agreed that Plaintiffs need not testify again and that their testimony from the damages hearing may be read into the trial record.  This too will be required as a condition of granting the Motion.

Finally, Defendants have stated that they "do not believe that any bond is necessary in this case for purposes of security," Defs.' Mot. at 32, but "would agree to post a $1 million bond, payable to the Plaintiffs if--after the Court vacates the January 29, 2007 entry of default so that the Defendants can litigate on the merits--the Defendants again default."  The Court rejects both parts of Defendants "offer" as flatly ridiculous.[10]

First, given the precariousness of Defendants' economy and finances, what may be the difficulties of collecting any judgment if it is obtained, and the prejudice and delay that Plaintiffs will suffer from the granting of Defendants' Motion, there is absolutely no question that Plaintiffs are entitled to posting of a substantial bond.

Second, it is hard to believe that Defendants are suggesting that this Court should wait until they default a third time before imposing a bond.  The preposterousness of this suggestion cannot help but cast doubt upon the many pages Defendants spent in their Motion and Reply assuring the Court that they had truly "changed

---

[10]   The Court is sorely tempted to describe Defendants' "offer" as unmitigated "chutzpah," but will refrain from doing so in the interests of judicial formality.

their spots" and would be litigating in an efficient, professional, and good faith manner.

Parties acknowledge that the Court has "inherent power to impose a reasonable condition on the vacatur in order to avoid undue prejudice to the opposing party." Capital Yacht Club, 228 F.R.D. at 395 (quoting Powerserve Int'l Inc. v. Lavi, 239 F.3d 508, 515-16 (2d Cir. 2001)); see also Thorpe v. Thorpe, 364 F.2d 692, 694 (D.C. Cir. 1966); Knox v. PLO, 2009 U.S. Dist. LEXIS 52610 (S.D.N.Y. Mar. 26, 2009) (upholding magistrate judge's decision to require that Defendants post bond in similar case).

Given the past history of this case and the willfulness of Defendants' prior conduct, as well as the difficulties of collecting any judgment if collection is fought, Defendants are hereby **ordered** to post a bond in the amount of $1 million **no later than February 1, 2010**, to demonstrate their good faith and to protect Plaintiffs' rights. An Initial Scheduling Conference will be held on **February 16, 2010, at 10:30 a.m.; Rule 16 Statements are due at noon on February 11, 2010.**

Third, and finally, the Court advises all parties that this case will now proceed apace, that frivolous motions and "Rambo tactics" will not be tolerated, that counsel will cooperate on logistical and procedural matters, and that a firm trial date will be set at the time of the Initial Scheduling Conference on February 16, 2010.

**IV.  CONCLUSION**

For the reasons set forth above, and subject to the posting of a bond of $1 million, no later than February 1, 2010, Defendants' Motion to Vacate Clerk's Entry of Default is **granted**.

An Order will accompany this Memorandum Opinion.


December 28, 2009
/s/
Gladys Kessler
United States District Judge

Copies to: attorneys on record via ECF