UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

REVEN GILMORE, *et al.*,

                              Plaintiffs,

                                                No. 1:01cv853(GK)

            vs.

PALESTINIAN INTERIM SELF-
GOVERNMENT AUTHORITY,
*et al.*,

                              Defendants.


# MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS FOR LACK OF PERSONAL JURISDICTION


s/ *Robert J. Tolchin*
Robert J. Tolchin
D.C. Bar No. NY0088
111 Livingston Street, Suite 1928
Brooklyn, New York 11201
(718) 855-3627
rtolchin@berkmanlaw.com

HEIDEMAN NUDELMAN
  & KALIK, P.C.
1146 19th Street, N.W., Fifth Floor
Washington, DC  20036
Telephone:  202-463-1818
Telefax:  202-463-2999

*Counsel for Plaintiffs*

In February 2002, defendants made a Rule 12(b) motion, but omitted a personal jurisdiction defense in that motion. In 2006, this Court dismissed the individual defendants (represented by defendants' counsel) on the ground that the Court lacked personal jurisdiction over them but otherwise denied defendants' motion. Defendants have now moved to dismiss for lack of personal jurisdiction. They claim that a new Supreme Court case, *Daimler AG v. Bauman*, 134 S. Ct. 746 (2014), constitutes an "intervening change in controlling law," curing their earlier waiver. DE 359-1 at 1. This Court should deny the motion for five independent reasons. *First*, defendants expressly submitted to the jurisdiction of this Court and repeatedly waived any personal jurisdiction defense. *Second*, defendants are not "persons" protected by the Due Process Clause of the Fifth Amendment and, thus, are not entitled to invoke its "minimum contacts" test. *Third*, defendants are incorrect that *Daimler* constitutes a change in "controlling law" in this case. *Fourth*, the uncontroverted evidence establishes that defendants have far more than the minimum contacts necessary for specific jurisdiction. *Fifth*, the jurisdictional issue and the merits are intertwined, so any factual dispute about jurisdiction must be presented to the jury.

## I.   DEFENDANTS REPEATEDLY WAIVED ANY OBJECTION TO PERSONAL JURISDICTION

"Personal jurisdiction, unlike subject-matter jurisdiction, can … be purposely waived or inadvertently forfeited. 'Because the requirement of personal jurisdiction represents first of all an individual right, it can, like other such rights, be waived.'" *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 133 (2nd Cir. 2011) (quoting *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703 (1982)). Accordingly, "[t]he actions of the defendant may amount to a legal submission to the jurisdiction of the court, whether voluntary or not." *Ins. Corp. of Ireland*, 456 U.S. at 704-05. As the D.C. Circuit has explained, once a defendant has elected

not to timely contest personal jurisdiction, its waiver is irrevocable—even when it is certain that

the defendant otherwise could successfully challenge personal jurisdiction:

> In the case before us, it is *evident* that the District Court would not have personal jurisdiction over the warden at the Lewisburg FCI … But this *need not detain us*, inasmuch as the government failed in its answer to interpose as defenses either improper venue or lack of personal jurisdiction over the warden. It is, of course, elementary that a defense of improper venue or lack of personal (as opposed to subject matter) jurisdiction is waived unless the defense is asserted by a pre-answer motion (i.e., Rule 12(b)) or in a responsive pleading, i.e., the answer or a timely amendment thereto.

*Chatman-Bey v. Thornburgh*, 864 F.2d 804, 813 (D.C. Cir. 1988) (emphasis added); *accord*

*Kabbani v. International Total Services*, 1991 WL 251863 at *1 (D.D.C. 1991) ("Even if the

Court assumes, *arguendo*, that defendant's objection to personal jurisdiction has merit, it cannot

grant defendant's motion because it was not timely made under Rule 12(h)").

Moreover, because limits on personal jurisdiction are an "individual right" belonging to

the defendant, rather than inherent limitations on the court's power, "the court is powerless to

dismiss the suit for lack of personal jurisdiction" once the defendant has submitted to the court's

jurisdiction by failing timely to contest it. *O'Brien v. R.J. O'Brien & Associates*, 998 F.2d 1394,

1399 (7th Cir. 1993); *accord Pardazi v. Cullman Medical Center*, 896 F.2d 1313, 1317 (11th Cir.

1990) ("[W]hen a defendant has waived his objection to insufficient service of process (or any

other defect in personal jurisdiction) by failing timely to object as required under Rule 12(g) and

(h), and has thus consented to litigate the action in that court, the court may not, either upon the

defendant's motion or its own initiative, dismiss the suit for lack of personal jurisdiction."); "[A]

party's waiver operates not only to cut off his right to raise the defense, but the court's power to

invoke it." *Pusey v. Dallas Corp.*, 938 F.2d 498, 501 n.4 (4th Cir. 1991) ("[A] party's waiver

operates not only to cut off his right to raise the defense, but the court's power to invoke it.").

### A. Defendants Permanently Waived Any Personal Jurisdiction Defense By Omitting It From their Original Rule 12(b) Motion

Rule 12(h)(1)(A) of the Federal Rules of Civil Procedure provides that a party "waives any defense listed in Rule 12(b)(2)-(5)" by omitting it from a 12(b) motion. The defense of lack of personal jurisdiction is listed in Rule 12(b)(2), and so is waived if omitted from a Rule 12(b) motion. "Failure to raise in the initial response results in permanent waiver of the defense, leading Rule 12(h) to be dubbed the 'raise or waive' rule." *Plunkett v. Valhalla Investment Services, Inc.*, 409 F.Supp.2d 39, 41 (D.Mass. 2006); *Carter v. City of Thibodaux*, 2013 WL 5673570 at *2 (E.D.La. Oct. 15, 2013) ("Under Rule 12(h)(1), a party automatically waives a defense [enumerated in Rule 12(b)(2)-(5)] if the defense is not included in a responsive pleading or a motion to dismiss filed before the responsive pleading."); *Flory v. United States*, 79 F.3d 24, 25 (5th Cir. 1996) (noting that Rule 12(h)(1) is an "automatic waiver provision.").

In February 2002 defendants filed a Rule 12(b) motion to dismiss this action on multiple grounds, but omitted from that motion a request to dismiss the action against the PA and PLO for lack of personal jurisdiction. "Defendants did not move to dismiss the PLO and PA from this action for lack of personal jurisdiction." *Gilmore*, 422 F.Supp.2d at 102 n. 4. By omitting from that motion a challenge to the exercise of personal jurisdiction over them, defendants waived any personal jurisdiction defense pursuant to Rule 12(h)(1)(A). The defense is waived immediately even if omitted from the defendant's *opening* Rule 12(b) motion papers. *See Ramer v. U.S.*, 620 F.Supp.2d 90, 102 (D.D.C. 2009) ("[D]efendant did not raise the defense of insufficient service of process in its motion to dismiss but waited to raise the issue for the first time in its reply. … Therefore, this Court must deny the defendant's motion to dismiss for lack of personal jurisdiction because the defendant has waived its right to move to dismiss the complaint on such grounds."); *Softwareworks v. IHosting*, 2006 WL 2850026 (N.D.Cal. Oct. 4, 2006) (same).

Defendants' motion is also barred under Rule 12(g)(2), which provides in relevant part that "a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion." Rule 12(g) is intended "to prevent piecemeal litigation in which a defendant moves to dismiss on one ground, loses, then files a second motion on another ground." *Ennenga v. Starns*, 677 F.3d 766, 773 (7th Cir. 2012).

Defendants' omission of any challenge to the exercise of personal jurisdiction over them from their 2002 Rule 12(b) motion is especially significant given that in their 2002 motion, defendants *did* successfully move to dismiss the individual defendants for lack of personal jurisdiction. *See Gilmore*, 422 F.Supp.2d at 102-04 (granting defendants' motion to dismiss the individual defendants for lack of personal jurisdiction). Defendants' original motion to dismiss, followed by their change in position, puts this case on all fours with *Seretse-Khama v. Ashcroft*:

> The government has taken this Court and petitioner on a very troubling procedural ride, changing its position on a critical issue at the eleventh hour. The issue is whether respondents have waived the right to assert a lack of personal jurisdiction over respondent Warren Lewis …
>
> The Court finds that respondents waived the right to challenge personal jurisdiction over respondent Lewis in this case. … ***On June 20, 2002, respondents filed a motion to dismiss asserting that there was no personal jurisdiction over Crosley. But respondents did not raise, and thus "omitted," the defense that the Court did not have personal jurisdiction over respondent Lewis***. Rule 12(g) unequivocally states that respondents cannot make a second motion—whether written or oral—to raise the omitted defense of lack of personal jurisdiction over Lewis.

215 F.Supp.2d 37, 39-40 (D.D.C. 2002) (emphasis added) (footnotes omitted).

Exactly so here: by moving to dismiss the individual defendants for lack of personal jurisdiction, without contesting the Court's personal jurisdiction over *them*, defendants PA and PLO waived any such defense. Just as it in *Seretse-Khama*, since the "Federal Rules of Civil Procedure…do not countenance the maneuvering in which [defendants] have engaged." *Id*. at 40.

Defendants attempt to evade this conclusion by pointing out that they purported to include a personal jurisdiction defense in their Answer. *See* DE 359 at 3-4 ("[T]he defense of Lack of Personal Jurisdiction is presently before the Court as the Third Affirmative Defense in the operative Answer."). This argument is meritless. Waiver of a personal jurisdiction defense by omission from a pre-answer Rule 12(b) motion cannot be cured in an answer:

> The question has arisen whether an omitted defense which cannot be made the basis of a second motion may nevertheless be pleaded in the answer ... Amended subdivision h(1)(A) eliminates the ambiguity and states that certain specified defenses which were available to a party when he made a preanswer motion, but which he omitted from the motion, are waived.

Fed.R.Civ.P. 12, Advisory Committee's Note of 1966. The courts have repeatedly and uniformly rejected the argument—made here by defendants—that a personal jurisdiction defense may be revived in an answer though it was omitted it from the pre-answer Rule 12(b) motion:

> Because [defendant]'s first significant defensive move in this case was a pre-answer motion under Rule 12(b)(6), a motion that said only that all claims against [defendant] were barred by the relevant statute of limitations, the Court finds that [defendant] waived any challenge to the Court's personal jurisdiction. … [Defendant] says that it properly preserved its personal jurisdiction defense in its Answer, "as allowed by the Rules." The Rules allow no such thing. Rule 12(h) was amended in 1966 to remove any confusion on this point.

*Erie Indem. v. Keurig*, 2011 WL 5361096 at *2 (N.D.Ohio Oct. 31, 2011); *see Radici Plastics v. Fischbach*, 2012 WL 1854741 at *2 (N.D.Ohio May 21, 2012) ("Rules 12(g) and 12(h) provide that Rule 12(b) defenses must be raised, if they are ever to be raised, in the first motion filed, or, if there is no pre-answer motion, in the answer."); *General Design Sign v. American General Design*, 2003 WL 251931 at *1 (N.D.Tex. Jan. 31, 2003) (same); 5C Wright & Miller, *Federal Practice & Procedure* § 1391 ("[A]ny time a defendant makes a pre-answer Rule 12 motion, he or she must include, on penalty of waiver, the defenses set forth in subdivisions (2) through (5) of

– 5 –

Rule 12(b). Not only is the defendant prevented from making it the subject of a second preliminary motion, but ... the defendant may not even assert the defense in the answer.").

Defendants' attempts to avoid this rule are unavailing. *First*, defendants incorrectly rely on *Foremost-McKesson v. Islamic Republic of Iran*, 1988 WL 122568 (D.D.C. Nov. 8, 1988). In that case, Iran's initial filing stated only that "no response to plaintiff's complaint is required." The Court held that such a paper did ***not*** constitute an "answer" within the meaning of Rule 8. *See id*. at *2-3 ("This was no answer, responding to the specific allegations of the plaintiff's complaint."). Here in contrast, defendants filed a full-blown Rule 12(b) motion within the meaning of Rules 12(g)-(h). *Second*, defendants claim that the Court's one-line order denying plaintiffs' Motion to Strike Affirmative Defenses "is law of the case." DE 362 at 12. This argument bespeaks desperation. "The 'law of the case' doctrine …does not apply when the order does not reach the merits of a claim." *National Traffic Service, Inc. v. Fiberweb, Inc.*, 2012 WL 3822165 at *2 (W.D.N.Y. Sept. 4, 2012); *see also e.g. Burrows v. BAC Home Loans Servicing*, 2010 WL 308720 at *2 (E.D.Cal. Jan. 12, 2010) (When grounds for the court's prior order are "unclear … the 'law of the case doctrine' is not applicable"); *Mudron v. Brown & Brown*, 2005 WL 645927 at *2 (N.D.Ill. Mar. 17, 2005) (order denying relief for alleged improper conduct does not imply that the conduct was legitimate, much less create "the law of the case."). In addition, "a court must affirmatively decide an issue, explicitly or by necessary implication, to establish law of the case." *Sherley v. Sebelius*, 689 F.3d 776, 783 (D.C. Cir. 2012) (brackets and quotation marks omitted). That did not happen here.[1]

*Third*, defendants claim that no personal jurisdiction defense was "available" to them until *Daimler* was handed down in January 2014. DE 362 at 9-12. But a defense is "available" within

---

[1] In any event, "[i]nterlocutory orders are not subject to the law of the case doctrine." *Langevine v. Dist. of Columbia*, 106 F.3d 1018, 1023 (D.C.Cir. 1997).

the meaning of Rule 12(g)(2) unless "it was for all practical purposes impossible for the defendants to interpose" it. *Chatman-Bey v. Thornburgh*, 864 F.2d 804, 813 n.9 (D.C. Cir. 1988) (citing cases). Put another way, the defense is deemed "available" if the defendant was "aware" that the relevant element of the plaintiff's case is "at least questionable." *Zelman v. U.S.*, 893 F.Supp. 78, 81-82 (D.Me. 1995). Defendants cannot meet this standard. Both before and after they made their Rule 12(b) motion in this case, the PA and PLO actually challenged the exercise of personal jurisdiction over them by other federal courts. *See e.g. Klinghoffer v. S.N.C. Achille Lauro*, 739 F.Supp. 854, 86-865 (S.D.N.Y. 1990) (denying PLO's motion to dismiss for lack of personal jurisdiction); *reversed and remanded* 937 F.2d 44, 50-52 (2nd Cir. 1991) (holding that only the PLO's non-UN-related contacts could be considered as jurisdictional contacts, and remanding for a new jurisdictional analysis on that basis), *on remand*, 795 F.Supp. 112, 113-115 (S.D.N.Y. 1992) (finding upon remand that the PLO's non-UN-related contacts varied over time, and dismissing some but not all actions for lack of personal jurisdiction, in light of the respective scope of the PLO's non-UN activities at the time when each of the actions was filed); *Ungar v. Palestinian Authority*, 153 F.Supp.2d 76, 86-91 (D.R.I. 2001) (denying motion filed by the PA and PLO in 2000 to dismiss for lack of personal jurisdiction); *Biton v. Palestinian Authority*, 310 F.Supp.2d 172, 179-180 (D.D.C. 2004); (denying motion filed by the PA to dismiss for lack of personal jurisdiction); *Ungar v. Palestinian Authority*, 325 F.Supp.2d 15, 47-59 (D.R.I. 2004) (rejecting renewed challenge by the PA and PLO to personal jurisdiction); *Sokolow v. PLO*, 2011 WL 1345086 at *2-7 (S.D.N.Y. Mar. 30, 2011) (denying motion by the PA and PLO to dismiss for lack of personal jurisdiction).

Having repeatedly moved to dismiss similar actions against them for lack of personal jurisdiction, defendants cannot credibly argue that they were unaware that such a defense was "available" to them. Defendants simply *elected* not to make that challenge in *this* case.[2]

Furthermore, the PA and PLO have been contesting the personal jurisdiction of the U.S. federal courts on two grounds that are wholly *irrelevant* to the scope of their jurisdictional contacts, or to the scope of contacts required for due process by the Supreme Court:

*First*, defendants have been asserting for decades that even if the *quantum* of their contacts is sufficient to permit the exercise of personal jurisdiction, those contacts must all be disregarded for jurisdictional purposes, because they are "governmental contacts" with the UN in New York and/or with the United States government in Washington, D.C.. *See e.g. Klinghoffer*, 937 F.2d at 50-52; *Ungar*, 325 F.Supp.2d at 53; *Sokolow*, 2011 WL 1345086 at *5-6.

*Second*, defendants have repeatedly argued that even if they have "minimum contacts," the exercise of jurisdiction over them would nonetheless be unreasonable in the circumstances, and violate "fair play and substantial justice." *See e.g. Sokolow*, 2011 WL 1345086 at *6-7. Since the validity *vel non* of these two jurisdictional arguments is independent of the *extent* of the contacts required by the due process clause, they were fully "available" to the defendants when they filed their Rule 12(b) motion (in addition, of course, to their argument that their quantum of contacts fell short of "minimum contacts"), regardless of changes in Supreme Court jurisprudence on the *scope* of contacts. Thus, the issuance of *Daimler* in 2014 is irrelevant to these two arguments, which defendants have made (sometimes successfully) since 1990.

---

[2] Moreover, as discussed in Part D below, defendants' current motion is based on the "essentially at home" jurisdictional standard which was not established in *Daimler* in 2014, but rather in 2011, in *Goodyear v. Brown*; thus, this argument would have been available to defendants (if they had not previously waived the defense) in 2011. Their attempt to raise it now is thus too late, since previously "unavailable" defenses must be raised "as soon as their cognizability is made apparent" to avoid waiver. *Holzsager v. Valley Hospital*, 646 F.2d 792, 796 (2nd Cir. 1981).

In any case, a defense that existed all along cannot be deemed retroactively "unavailable" within the meaning of Rule 12(g), even if a later change in its legal contours makes it *easier* to prevail on.

In light of the above it is clear that defendants submitted to the jurisdiction of this Court by waiving any personal jurisdiction defense under Rule 12(h) in 2002, and that their Motion for Judgment on the Pleadings is barred by Rule 12(g) and must be summarily denied.

**B. Defendants Waived Personal Jurisdiction by Engaging in Post-Default Litigation**

Defendants also waived personal jurisdiction by engaging in extensive post-default litigation (after having defaulted twice) before re-challenging this Court's jurisdiction. Such conduct constitutes an independent waiver and submission to jurisdiction. *See Democratic Republic of Congo v. FG Hemisphere Associates, LLC*, 508 F.3d 1062, 1064 (D.C. Cir. 2007) ("[T]he defense of lack of personal jurisdiction…is waived…where a defendant has engaged in extensive post-default litigation without suggesting an infirmity in personal jurisdiction."). That is exactly what these defendants did:

- On May 25, 2007, following their second default in this case, defendants filed motions to postpone the imminent and long-scheduled damages hearing and to shorten plaintiffs' time to respond to the postponement motion until the next business day after the holiday weekend. DE 96-97. The Court granted defendants' motion to shorten. DE 98. While defendants' motion to adjourn was ultimately denied, this "fire drill" invoked the authority of the Court.

- On June 4, 5, and 6, 2007, and on August 1-2, 2007, defendants participated in the post-default damages hearing. Each of the plaintiffs testified, describing their terrible grief and anguish, and how the brutal murder of Mr. Gilmore (their husband, father, son or brother) has shattered their lives. Defendants aggressively examined the plaintiffs themselves and their expert witnesses, interposed objections, opposed the qualification of plaintiffs' expert, and overall vigorously litigated and contested at every turn plaintiffs' efforts to prove their damages.

- On November 15, 2007, following the hearing, defendants filed a lengthy post-

hearing brief on damages. DE 108.

- Also on November 15, 2007, defendants filed a motion to vacate their default, in which they did not invoke personal jurisdiction as a reason to vacate the default. To the contrary, they said: "Defendants have come to appreciate that they need to address these cases head on *rather than continue to rely on jurisdictional defenses*," and suggested that they deserved to be relieved of their default because they fell into the category of "an initially-reluctant foreign entity, which eventually *agrees to submit to the jurisdiction* of the United States Courts." DE 107 at pp. 11, 21 (emphasis added).

Thus, defendants "engaged in extensive post-default litigation without suggesting an infirmity in personal jurisdiction" (*Democratic Republic of the Congo*, 508 F.3d at 1064) – including five days of testimony and hearings, between the time of their default and their first attempt to re-assert a personal jurisdiction defense (in the proposed answer attached to their motion to vacate). Both the scope and the substance of defendants' post-default activities far exceed those of the defendant in *Democratic Republic of the Congo*.[3]

Defendants rely on *Mwani v. Bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005) for the rule that "a court should satisfy itself that it has personal jurisdiction before entering judgment against an absent defendant," to support their argument that the Court would have had to decide the personal jurisdiction issue if Defendants had not moved to vacate the default. DE 362 at 16. This argument

---

[3] Defendants' attempt to distinguish *Democratic Republic* based on the quantitative amount of time spent on post-default litigation in that case (13 months) misses the point. DE 362 at 13-14. A bald comparison of time periods is a pointless exercise; waiver of and submission to personal jurisdiction depend on the nature of the defendant's conduct following examination of the substance and scope of defendants' post-default actions. Such an examination in this case readily shows that defendants' post-default litigation conduct was broader and deeper than that of the defendant in *Democratic Republic*. Defendants' motives for participating in post-default litigation are also irrelevant. DE 362 at 14. Courts do not inquire into a defendant's subjective motives for waiving a defense; what matters is objective conduct. *Gibbs v. U.S.*, 865 F.Supp.2d 1127, 1338 n.8 (M.D.Fla. 2012) ("Here, *for whatever reason*, Defendants have chosen not to raise the issue of venue in their motion, and the Court declines to do so in the face of this apparent waiver.") (emphasis added).

is baseless. *Mwani*'s rule that a plaintiff cannot obtain default judgment without first showing the court that it has personal jurisdiction over the defaulting defendant applies *only* when the defendant did not appear and *waive* its personal jurisdiction defense.

Thus, for example, in *e360 Insight v. Spamhaus Project*, 500 F.3d 594 (7th Cir. 2007), the foreign defendant, Spamhaus, initially appeared in the earlier stages of the litigation, waived a personal jurisdiction defense through its conduct, and then intentionally defaulted. After default judgment was entered Spamhaus appealed, arguing that the judgment was void because the district court "enter[ed] judgment without *first* conducting an affirmative inquiry into whether it had personal jurisdiction over Spamhaus." *Id*. at 598. The Seventh Circuit rejected this argument, finding that the district court had reasonably "interpreted [Spamhous'] conduct preceding default as a waiver" of a personal jurisdiction defense, and that:

> The cases on which Spamhaus relies involve foreign defendants **who had not appeared in the action**. *See Dennis Garberg & Assocs., Inc. v. Pack–Tech Int'l Corp*., 115 F.3d 767, 772 (10th Cir.1997) ("[A] district court must determine whether it has jurisdiction over the defendant before entering judgment by default against a party *who has not appeared* in the case." (emphasis added)). We need not decide whether we would impose the same rule on district courts in this circuit if faced with that situation because it is not the one we face here …

*e360 Insight*, 500 F.3d at 599-600 (bold emphasis added); *accord Broadcast Music v. M.T.S. Enterprises*, 811 F.2d 278, 280-281 (5th Cir. 1987) (rejecting defendants' claim that default judgment was void for lack of personal jurisdiction, after finding that prior to defaulting the defendants had waived any such a defense by operation of Rule 12(h)(1)).

Defendants also claim, in the same vein, that "[i]t would make no sense to hold that, by participating in the post-default damages hearing, the Defendants thereby forfeited the right to have the Court make a determination on personal jurisdiction that they would have had if they remained in default." DE 362 at 16. But that is exactly what happened in *Democratic Republic of*

*the Congo*. Even stronger here, defendants urged the Court to vacate the default on the premise that that they would "submit to the jurisdiction" of the Court.

### C. Defendants Waived Any Personal Jurisdiction Defense by Litigating the Case for Years Without Raising It

After the Court vacated their second intentional default in late 2009, defendants sought and invoked the Court's authority to compel discovery from plaintiffs, vigorously fought plaintiffs' efforts to obtain discovery from defendants or even from third parties, and otherwise intensively litigated this case on the merits for four years without moving to dismiss for lack of personal jurisdiction. It is well established that "Rule 12(h)(1) specifies the minimum steps that a party must take in order to preserve a defense. It does not follow, however, that a party's failure to satisfy those minimum steps constitutes the only circumstance under which the party will be deemed to have waived a defense. Most defenses, including the defense of lack of personal jurisdiction, may be waived as a result of the course of conduct pursued by a party during litigation." *Peterson v. Highland Music, Inc.*, 140 F.3d 1313, 1318 (9th Cir. 1998); *accord Altman v. Liberty Equities Corp.*, 322 F.Supp. 377, 378-79 (S.D.N.Y. 1977) ("[T]he Rules are not inclusive of the circumstances in which a defense will be deemed waived. Rule 12(h) simply defines the outer and absolute limits of timeliness. It does not preclude waiver by implication.").

In other words, "[i]f a party merely pleads a personal jurisdiction defense and then permits it to lie dormant while subjecting an opponent to burdensome litigation on the merits, the dormant defense may be waived." *In re School Asbestos Litig.*, 1993 WL 298301 at * 2 (E.D.Pa. Aug. 2, 1993). The contours of this rule were detailed by the very recent decision in *Citizens Community Federal v. Silver, Freedman & Taff*, 2014 WL 345261 (W.D.Wis. Jan. 30, 2014):

> Although parties may object to subject matter jurisdiction at any time, they do not have the same leeway when it comes to personal jurisdiction. They waive the defense when their ***conduct might lead the plaintiff to believe that defendants have given up the defense and submitted to jurisdiction***,

> *Continental Bank, N.A. v. Meyer*, 10 F.3d 1293, 1297 (7th Cir. 1993), or when they ***allow or encourage the court to expend resources*** that would go to waste if the case is dismissed. *American Patriot Insurance Agency, Inc. v. Mutual Risk Management, Ltd.*, 364 F.3d 884, 887–88 (7th Cir. 2004). Misleading or wasteful conduct may include ***serious delay in urging the defense of personal jurisdiction or participation in the litigation by participating in discovery, hearings or scheduling***. *Blockowicz v. Williams*, 630 F.3d 563, 566 (7th Cir. 2010) (defendant waived personal jurisdiction "by participating in the district court proceedings, which included both briefing and oral arguments addressing the merits of the plaintiff's claim."); *Mobile Anesthesiologists Chicago, LLC v. Anesthesia Associates of Houston Metroplex, P.A.*, 623 F.3d 440, 443 (7th Cir. 2010) ("To waive or forfeit a personal jurisdiction defense, a defendant must give a plaintiff a reasonable expectation that it will defend the suit on the merits or must cause the court to go to some effort that would be wasted if personal jurisdiction is later found lacking.").

*Id*. at *3-4 (emphases added).

That is precisely what happened here. Even assuming *arguendo* that defendants' improper inclusion of their previously-waived personal jurisdiction defense in their answer revived the defense, defendants allowed their putative defense "to lie dormant while subjecting [the Gilmores] to burdensome litigation on the merits" for years. *In re School Asbestos*, 1993 WL 298301 at * 2; *see also Ear v. Empire Collection Authorities, Inc.*, 2012 WL 3249514, *3 (N.D.Cal. Aug. 7, 2012) (merely invoking a Rule 12(b)(2) defense is not sufficient; defendant must do something to test the defense sooner rather than later).

Indeed, as the Court is well aware, and as the docket reflects, defendants aggressively and intensively litigated this case on the merits for many years, including "participat[ing] in discovery, hearings [and] scheduling" and "allow[ing] [and] encourage[ing] the court to expend resources" without ever pressing the personal jurisdiction defense they purported to assert in their answer, thereby "lead[ing] the plaintiff[s] to believe that defendants have given up the defense

and submitted to jurisdiction." *Citizens Community*, 2014 WL 345261 at *3-4.[4] ; *cf. Kyocera Wireless v. International Trade Com'n*, 545 F.3d 1340, 1352 (Fed. Cir. 2008) (A party "cannot invoke intervening Supreme Court case law to correct its own procedural misstep.").

### D. Defendants' Jurisdictional Argument Is Also Untimely Because It Is Based on the 2011 *Goodyear v. Brown* Decision

Defendants claim that the "essentially at home" test for general personal jurisdiction, which is the gravamen of their motion, was created "[j]ust last month, in *Daimler*." DE 359 at 1. *See also id*. at 2 ("The Court's continuing exercise of personal jurisdiction over the PA and PLO is irreconcilable with the test for general jurisdiction set forth by the Supreme Court in *Daimler*. Neither the PA nor the PLO is 'at home' in the United States.").

Defendants misstate the law. The Supreme Court established the "essentially at home" standard 2½ years ago in *Goodyear Dunlop Tires Operations v. Brown*, 131 S.Ct. 2846 (2011):

> A court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the State are so "continuous and systematic" as to render them *essentially at home* in the forum State.

*Id*. at 2851 (emphasis added); *See also id*. at 2853-54 ("the paradigm forum for the exercise of general jurisdiction is … one in which the corporation is fairly regarded as at home.").

*Goodyear* was a "noticeable shift," because the Court "significantly altered its viewpoint regarding the importance of where a corporation is 'at home,' referencing domicile, state of incorporation, and principal place[] of business." *CML-NV Civic Ctr., LLC v. Gowan Indus., LLC,* 2011 WL 6752406, at *6 (D. Nev. Dec. 23, 2011).

---

[4] Plaintiffs will not burden the Court with a summary of the proceedings in this action, which are reflected on the docket and known to the Court. But it bears noting that defendants have been anything but passive objects of this litigation since their default was vacated; for example, they aggressively filed motions seeking to block and delay plaintiffs' efforts to obtain discovery even from third parties (DE 186 and 237) and both propounded extensive discovery requests and invoked the authority of this Court to compel plaintiffs to comply with that discovery (DE 238). And of course, they moved for summary judgment on the merits (DE 285) as discussed further below.

Courts and commentators quickly recognized *Goodyear*'s "essentially at home" test as new. *See, e.g.*, Allan R. Stein, "*The Meaning of 'Essentially at Home' in Goodyear Dunlop*," 63 S.C. L. Rev. 527, 532 (2012) ("[T]he essentially at home standard does not appear in any prior federal or state judicial decision").[5] As the Seventh Circuit explained, "[a] corporation is 'essentially at home' both where it is incorporated and where its principal place of business is located." *Abelesz v. OTP Bank*, 692 F.3d 638, 654 (7th Cir. 2012). Recognizing the change in law, many litigants took prompt steps to obtain the benefit of the new standard.[6]

Defendants (represented by the same counsel) themselves cited *Goodyear* and its holding in a brief to the U.S. Supreme Court on August 19, 2011. *Mohamad v. Rajoub*, 2011 WL 3664462, at *17 (Aug. 19, 2011) (quoting *Goodyear*: "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home.").

Again, in June 2013, the PA and its same counsel repeatedly invoked *Goodyear*'s "essentially at home" standard in a motion to dismiss a terrorism action brought against the PA in a Virginia federal court. *See Livnat v. Palestinian Authority*, Civ. No. 13-498 (E.D.Va.), DE 6

_____

[5] *Monistere v. Losauro*, 2013 WL 6383886, at *3 (E.D. La. Dec. 4, 2013) ("[Defendants] are both incorporated in Florida and both have their principal place of business in Florida. It is clear that Defendants are not subject to general personal jurisdiction in Louisiana based on their domicile, incorporation, or principal places of business."); *Hershman v. Muhlenberg College*, 2013 WL 5929849, at *2 (D. Conn. Nov. 4, 2013) ("[Muhlenberg] is not 'essentially at home' anywhere except Pennsylvania, its state of incorporation, principal place of business, and site of its only campus."); *Chavez v. Dole Food*, 947 F. Supp. 2d 438, 443 (D. Del. 2013) ("Chiquita's activity in Delaware does not come close to rising to the level of the principal place of business, that 'quintessential paradigm' for general jurisdiction. Indeed, while Chiquita's contacts with Delaware are regular, and may be economically substantial, they are not of the 'at home' variety.") (citation omitted); *Eastman Chem. v. Alphabet*, 2011 WL 6004079, at *14 n.16 (D. Del. Nov. 4, 2011) ("[T]he U.S. Supreme Court recently clarified that general jurisdiction over foreign corporations is proper if and only if 'their affiliations with the State are so 'continuous and systematic' as to render them *essentially at home in the forum* State.'") (emphasis in original).

[6] *See Lindsey v. Cargotec USA, Inc.*, 2011 WL 4587583, at *1 (W.D. Ky. Sept. 30, 2011) (requesting supplemental briefing on personal jurisdiction in light of *Goodyear*); *Holocaust Victims of Bank Theft v. Magyar Nemzeti Bank*, 807 F. Supp. 2d 699, 704 (N.D. Ill. 2011) (citing *Goodyear* in argument that court should reconsider prior personal jurisdiction ruling); *Russell v. SNFA*, 987 N.E.2d 778, 783-84 (Ill. 2013) (directing reconsideration of earlier jurisdictional decision in light of *Goodyear*).

(Exhibit A) at 19 ("In *Goodyear*, the … Court explained that general jurisdiction permits a court to hear any and all claims against a foreign entity 'when their affiliations with the State are so 'continuous and systematic' as to render them **essentially at home** in the forum state.'"); at 20 ("Applying the *Goodyear* standard here, Plaintiffs must allege that the PA has sufficient contacts with the United States so that the PA is 'fairly regarded **as at home**.'"); and at 22 ("Plaintiffs' conclusory statements regarding the PLO's office in the Washington D.C. are clearly insufficient to establish the PA as '**at home'** in the United States.") (all emphases added).[7]

Contrary to defendants' claims, *Daimler* did not articulate a new rule. DE 362 at 3-9. Rather, the eight justice *Daimler* majority explained that *Goodyear* "made plain" the "essentially at home standard," 134 S. Ct. at 758 n.11, said that its decision was "[i]nstructed by *Goodyear*," *id*. at 751, and expressly rejected the concurrence's critique that it was departing from prior cases by assessing "nationwide and worldwide" activities. *See id*. at 762 n.20. Thus, defendants cannot justify their 2½-year delay in raising this defense. *See e.g. Freeman v. Gerber Products*, 396 F.Supp.2d 1260, 1262 (D.Kan. 2005) (belated motion for reconsideration not justified by recent court decision where such decision did not represent change in controlling law).

### E.  Defendants Waived Personal Jurisdiction by Moving for Summary Judgment

Defendants filed a motion for summary judgment, seeking to dismiss this case on the merits with prejudice, in August 2012. DE 285. That motion remains pending. While defendants' summary judgment motion is of course another example of their active litigation of this case, through which they waived any personal jurisdiction defense (as discussed in Part C above), it is qualitatively more than just one additional step in the litigation. Courts have consistently held that by moving for summary judgment, which perforce invokes the judicial power of the court for a binding ruling on the merits, a defendant submits to the personal jurisdiction of the court. *See e.g.*

---

[7] The *Livnat* action was voluntarily dismissed without prejudice by the plaintiffs.

*George Washington University v. DIAD, Inc.*, 1996 WL 470363 at *1 (D.D.C. Aug. 9, 1996) ("If a party enters a case, makes no objection to personal jurisdiction, and asks the court to act on its behalf in some substantive way, it will be held to have waived further objection.") (quoting *Barnstead Broadcasting Corp. v. Offshore Broadcasting Corp.*, 869 F.Supp. 35, 38 (D.D.C. 1994)) (brackets omitted);  *Epperson v. Entertainment Express, Inc.*, 338 F.Supp.2d 328, 334 (D.Conn. 2004) (An objecting party's request that the court take action in its favor, without contemporaneously asserting the personal jurisdiction defense, may result in a forfeiture of the defense."); *Roll v. Tracor*, 26 F.Supp.2d 482, 484-485 (W.D.N.Y. 1998) ("The defense of personal jurisdiction was waived when defendants filed their 'first' motion for summary judgment" even though that defense was raised in their answer filed only eight weeks earlier); *Robbins Motor v. Translink*, 2009 WL 3147853 at *1 (E.D.Pa. Sept. 30, 2009) (defendant "included the defense of personal jurisdiction in its answer, but … it subsequently filed a motion for summary judgment and thereby asked this court to consider the merits of the controversy" and thereby waived the defense) (quotation marks, brackets and ellipses omitted); *Marshall v. Park Plaza Condominium*, 1999 WL 689735 at *2 (E.D.Pa. Sept. 3, 1999) ("[Defendant] waived any objection to improper service by moving for summary judgment. When [defendant] … request[ed] this court to address the merits, it was calling upon the court to exercise jurisdiction over this action and itself."); *Central States, Southeast and Southwest Areas Pension Fund v. Wiseway Motor Freight*, 2000 WL 1409825 at *4 (N.D.Ill. Sept. 26, 2000) ("[T]he defendant's challenge on the merits of the case [via a summary judgment motion] operates as a waiver of its objections" to personal jurisdiction and venue). Defendants repeated this waiver by consenting to the Court deciding their Summary Judgment Motion prior to deciding the instant motion:

> Defendants respectfully contend that the Court should dismiss for lack of personal jurisdiction in light of *Daimler*. **Defendants, however, have no wish to delay the Court's resolution of the motion for summary**

**judgment. The grant of either motion disposes of the case. Defendants
defer to the Court as to which motion to take up first**.

DE 362 at 25 (emphasis added). It is elementary that the Court could not grant defendants'
motion for summary judgment unless it has personal jurisdiction over defendants, as defendants
know well. Indeed, in their Motion for Judgment on the Pleadings, defendants themselves noted
that "*jurisdiction is a condition precedent* to any decision on the substantive merits." DE 359 at 2
(emphasis added). Thus, this invitation to the Court to rule on the summary judgment motion and
dismiss the case without reaching the personal jurisdiction motion must be construed as a further
waiver of any challenge to personal jurisdiction and an additional act of submission to the
jurisdiction of this Court since, as defendants themselves correctly insist, "jurisdiction is a
condition precedent to any decision on the substantive merits." *Id.*

## II.   DEFENDANTS DO NOT HAVE DUE PROCESS RIGHTS

As foreign governmental and political bodies, defendants have no due process rights. For
an entity that has no constitutional due process rights, *Daimler* is utterly irrelevant. *Daimler* did
not and could not speak to the availability of general jurisdiction, only to its *constitutionality*. Put
another way, defendants' sole challenge is that their *constitutional* due process rights are being
violated. But defendants do not have constitutional due process rights.

### A.  Governments Do Not Have Constitutional Due Process Rights

Foreign states do not have due process rights under the Constitution that would protect
them from a federal court's assertion of personal jurisdiction. *See Price v. Socialist People's
Libyan Arab Jamahiriya*, 294 F.3d 82, 96 (D.C. Cir. 2002) ("[F]oreign states are not 'persons'
protected by the Fifth Amendment."); *Pugh v. Socialist People's Libyan Arab Jamahiriya*, 290 F.
Supp. 2d 54, 57 (D.D.C. 2003) (same); *see also Frontera Resources Azerbaijan Corp. v. State Oil
Co. of Azerbaijan Republic*, 582 F.3d 393, 399 (2nd Cir. 2009) (describing a foreign State as lying

"outside the structure of the Union;" therefore foreign states and their instrumentalities are not entitled to due process jurisdictional protections).[8]

These cases are consistent with a line of cases holding that States of the Union, executive agencies, foreign governments, political subdivisions, and municipalities have no due process rights. *See, e.g.*, *South Carolina v. Katzenbach*, 383 U.S. 301, 323-24 (1966) (stating that States of the Union are not "persons" within the ambit of the Fifth Amendment), *abrogated on other grounds by Shelby Cnty., Ala. v. Holder*, 133 S. Ct. 2612 (2013); *City of E. St. Louis v. Circuit Ct. for Twentieth Judicial Circuit, St. Clair Cnty., Ill.*, 986 F.2d 1142, 1144 (7th Cir. 1993) ("Municipalities cannot challenge state action on federal constitutional grounds because they are not 'persons' within the meaning of the Due Process Clause."); *In re Scott Cable Commc'ns, Inc.*, 259 B.R. 536, 543 (D. Conn. 2001) ("Government entities have no right to due process under the Fifth Amendment's due process clause."); *El Paso Cnty. Water Imp. Dist. No. 1 v. Int'l Boundary and Water Comm'n*, 701 F. Supp. 121, 123-24 (W.D. Tex. 1988) (dismissing plaintiff's constitutional claim because the Fifth Amendment was "inapplicable" to it); *City of Sault Ste. Marie, Mich. v. Andrus*, 532 F. Supp. 157, 167-68 (D.D.C. 1980) (rejecting argument that municipality could assert due process rights under Fifth Amendment because "a state cannot confer a constitutional status…which the state does not itself enjoy").

Notably, this rule applies as well to governmental entities that are neither foreign sovereign states, nor part of the States of the Union, such as Puerto Rico and the Virgin Islands. *See Puerto Rico Pub. Hous. Admin. v. U.S. Dep't of Hous. & Urban Dev.*, 59 F. Supp. 2d 310, 325 (D.P.R. 1999) (Puerto Rico instrumentalities not "persons" entitled to Due Process); *Virgin*

---

[8] Defendants say that all prior cases to address personal jurisdiction over them applied a Due Process analysis. DE 362 at 20. This statement is incomplete. No court has ever *addressed* whether the PA is entitled to "Due Process" as a threshold matter. As for the PLO, the only courts to have addressed the issue have concluded that the PLO is *not* entitled to Due Process. *See* Part B.1 below.

*Islands v. Miller*, 2010 WL 1790213, at \*5 (V.I. Super. May 4, 2010) ("[T]he Government [of the

Virgin islands] is not a person for purposes of [having] due process [protections]….").

### B.  Defendants Are Outside the Structure of the Union

While every court that has examined the sovereignty of the PA and PLO has correctly

held that defendants are not foreign sovereigns, undoubtedly they are the kind of entities that

stand "outside the structure of the Union." *See Frontera*, 582 F.3d at 399 (quoting *Principality of*

*Monaco*, 292 U.S. at 330). The PLO holds itself out as "the embodiment of the Palestinian

national movement."[9] The PLO Constitution provides for an elected National Assembly (Art. 5),

an Executive Committee headquartered in Jerusalem (Art. 17), a Palestine Liberation Army (Art.

22), a Palestine National Fund (Art. 18), and Departments, such as the Department for Political

and Information Affairs. **Exhibit 1**. In 1974, the "United Nations General Assembly recognized

the PLO as 'the principal party to the question of Palestine,' and the PLO has since participated

in the United Nations General Assembly as a permanent observer." *Knox v. Palestine*

*Liberation Org*., 306 F. Supp. 2d 424, 432 (S.D.N.Y. 2004) (quotations and citation omitted).

In 1993, Israel recognized the PLO "as the representative of the Palestinian people" and

commenced negotiations with the PLO. Israel and the PLO have since entered into a series of

bilateral agreements. *Id*. at 433 (citation omitted). These facts make the PLO the kind of entity

that stands "outside the structure of the Union." In fact, two cases have so held specifically. In

*Palestine Inf. Office v. Shultz*, 674 F. Supp. 910, 919 (D.D.C. 1987), *aff'd*, 853 F.2d 932 (D.C.

Cir. 1988), this Court held that a "foreign political entity" such as the PLO "has no due process

---

[9] *See* **Exhibit 2**, "About the Palestinian Liberation Organization," at website of Permanent Observer Mission of the State of Palestine to the United Nations, *available at* http://palestineun.org/about-palestine/palestine-liberation-organization/.

rights under our Constitution."[10] Similarly, in *Mendelsohn v. Meese*, 695 F. Supp. 1474, 1480-81 (S.D.N.Y. 1988), the court agreed with the United States' argument that the PLO is "a foreign power with no constitutional rights." The court explained: "A 'foreign state lies outside the structure of the Union.' The same is true of the PLO, an organization whose status, while uncertain, lies outside the constitutional system. It has never undertaken to abide by United States law or to 'accept the constitutional plan.' No foreign entity of its nature could be expected to do so." *Id.* at 1481 (quoting *Principality of Monaco*, 292 U.S. at 330).

The PA is a non-sovereign government created by an agreement between the PLO and Israel, entered into on May 4, 1994. *Knox,* 306 F. Supp. 2d at 433. Its powers are currently defined by the Israeli-Palestinian Interim Agreement on the West Bank and the Gaza Strip (the "Interim Agreement"), entered into September 28, 1995. *Id. See also* 36 I.L.M. 551, 558. The Interim Agreement established executive, legislative and judicial functions for the PA and transferred specified "powers and responsibilities" from the Israeli military government to the PA. Art. 1.1. Among its powers and responsibilities, the PA can "sue and be sued and conclude contracts." Art. 9.2; 36 I.L.M. at 561. Under the Interim Agreement, the PA provides many government services, including local policing and civil authority over matters such as agriculture, banking, employment, environmental protection, unclaimed property, health, labor, zoning, postal services, social welfare, telecommunications, transportation, water and sewage. Interim Agreement, Annex III; 36 I.L.M. at 603.

### III.     DAIMLER AND GOODYEAR DID NOT CHANGE "CONTROLLING LAW"

---

[10] On appeal, the D.C. Circuit affirmed, holding that the appellants—a group of U.S. citizens and resident aliens—had no constitutional right "to represent the PLO." 853 F.2d at 941. It allowed that as "American citizens," appellants had limited due process rights (which were not violated), *id.* at 942, but it did not disturb the District Court's holding that a foreign political entity has no constitutional rights.

*Daimler* and *Goodyear* do not control this case. Defendants' brief simply *assumes* that *Daimler* and *Goodyear* apply here. They do not, however, for at least two reasons. *First*, *Daimler* and *Goodyear* applied the Fourteenth Amendment, not the Fifth Amendment, which imposes fewer limits on the United States than the Fourteenth Amendment imposes on the States. *Second*, *Daimler* and *Goodyear* concerned a factually distinct situation from this case—international commerce, rather than international terrorism. In reality, defendants are asking this Court to make new law by extending *Daimler* and *Goodyear* to a very different situation.

### 1. *Daimler* and *Goodyear* Concerned Fourteenth Amendment Rights, Not Fifth Amendment Rights

Even if defendants had Due Process protections, *Daimler* would not control the personal jurisdiction analysis before this Court. *Daimler* and *Goodyear* were decided under the Fourteenth Amendment, not the Fifth Amendment, which controls here. The Fifth Amendment allows for exercise of personal jurisdiction over a foreign defendant that repeatedly commits acts of international terrorism against U.S. citizens. "[A]n inquiry into fairness under the Due Process Clause of the Fifth Amendment tends to focus on the same factors considered under the minimum contacts test, but is often applied with more flexibility than under the Fourteenth Amendment analysis." Wright & Miller, *Federal Practice and Procedure* § 1068.1 (3d ed.).

In the terrorism context, the federal courts have upheld the exercise of personal jurisdiction over defendants with even fewer contacts with the United States than the defendants have in this case. "'[S]o long as [an] actor's efforts are 'purposefully directed' towards residents of another [forum],' the Supreme Court has 'consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there.'" *Mwani v. Osama Bin Laden*, 417 F.3d 1m 12-13 (D.C. Cir. 2005) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985)). In *United States v. Yousef*, the court upheld, against a Fifth Amendment due process challenge,

the prosecution of individuals who bombed a Philippine Airlines flight en route from Manila to Japan— even though no U.S. national was injured—because it was a "test-run" in furtherance of a larger conspiracy to "inflict injury on [the United States] and its people and influence American foreign policy[.]" 327 F.3d 56, 112 (2d Cir. 2003); accord *U.S. v. Al Kassar*, 660 F.3d 108, 118 (2d Cir. 2011) (rejecting Fifth Amendment due process challenge to prosecution of individuals who conspired to sell arms "with the understanding that they would be used to kill Americans and destroy U.S. property," because "the aim therefore was to harm U.S. citizens and interests and to threaten the security of the United States," and the fact that the "sting operation" took place "entirely outside the United States and involv[ed] solely foreign citizens" did not violate due process because "a jurisdictional nexus exists when the aim of that activity is to cause harm inside the United States or to U.S. citizens or interests."). [11]

Courts apply a more expansive approach to jurisdiction under the Fifth Amendment than under the Fourteenth because the latter "'ensure[s] that the States, through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system.'" *Handley v. Ind. & Mich. Elec. Co.*, 732 F.2d 1265, 1271 (6th Cir. 1984) (quoting *World-Wide Volkswagen v. Woodson*, 444 U.S. 286, 291-92 (1980)); *accord Max Daetwyler Corp. v. R. Meyer*, 762 F.2d 290, 294 (3d Cir. 1985) (Fourteenth Amendment "reflects territorial limitations on the power of an individual state. Those strictures of [F]ourteenth [A]mendment due process analysis which attempt to prevent encroachment by one state upon the sovereignty of another do not apply with equal force to the adjudication of a federal claim in a federal court."); Wright & Miller, *Federal Practice and Procedure* § 1068.1 ("When a federal court adjudicates a federal question claim, it exercises the sovereign power of the United States and no federalism problem is

---

[11] *See also In re Terrorist Attacks on Sept. 11, 2001*, 538 F.3d 71, 93-94 (2d Cir. 2008) ("primary participants" in "terrorist attacks on citizens of the United States" have been held repeatedly to have engaged in "purposeful direction" at the United States).

presented. The Fourteenth Amendment function of protecting the several states' status as coequal sovereigns seemingly ought to be of no relevance to the parallel analysis under the Due Process Clause of the Fifth Amendment…."). However, the Fifth Amendment is concerned with the exercise of "sovereign power of the United States" and the Due Process clause is interpreted to protect against any resulting encroachments by the United States.

The federal government's interests stretch broadly in many areas that are off-limits to the States, including foreign policy, national security, and international law enforcement. All of these paramount interests are present in any case brought under the Anti-Terrorism Act ("ATA"), such as this one. "Congress has the authority to enforce its laws beyond the territorial boundaries of the United States." *EEOC v. Arabian Am. Oil Co*., 499 U.S. 244, 248 (1991 (*citing Foley Bros., Inc. v. Filardo*, 336 U.S. 281, 284-5 (1949); *Benz v. Compania Naviera Hidalgo, S.A*., 353 U.S. 138, 147 (1957)). "Congress, however, clearly intended the ATA have extraterritorial applications; 18 U.S.C. § 2333 provides civil remedies for victims of 'international terrorism' and 18 U.S.C. § 2331 explicitly defines that term to include acts that occur primarily outside the territorial jurisdiction of the United States." Pub. L. No. 104-132 § 301(a)(1)&(7), 110 Stat. 1250 (1996), reprinted in 18 U.S.C. § 2339B, note.[12] The personal jurisdiction analysis relevant to the foreign commercial corporations in *Daimler* and *Goodyear* is not relevant in this case.

---

[12] Indeed, the legislative history of the ATA indicates that it was supported by the State Department and the Department of Justice and that it was directed specifically at the jurisdictional hurdles faced by the *Klinghoffer* plaintiffs in suing the PLO. See, e.g., H.R. Rep. 102-1040 at 5; Hrg. Before the Subcomm. on Courts and Admin. Practice of the Comm. on the Judiciary, United States Senate, 101st Congress, Second Session on S. 2465, 3 (1990) (statement of Sen. Grassley); *id*. at 18-20, 35-38 (State and Justice Dep't officials suggest revisions incorporated in the final legislation); *id*.at 25 (Dep't of Justice "strongly supports the fundamental objectives of Senate bill 2465."); Hrg. Before the Subcomm. on Courts and Admin. Practice of the Comm. on the Judiciary, United States Senate, 101st Congress, Second Session on S. 2465 at 12-13, 16-17 (July 25, 1990) (State Department official's statement on the proposed legislation discussing the *Klinghoffer* case against the PLO and stating "we support this legislation as a useful addition to the arsenal of legal tools for the fight against terrorism"); *id*. at 25, 30-31 (Dep't of Justice official discussing the *Klinghoffer* case); Hrg. Before the Subcomm. on Intellectual Prop. and Judicial Admin. of the Comm. on the Judiciary, House of Representatives, 102d Congress, Second Session on H.R. 2222, Antiterrorism Act

Blindly extending Fourteenth Amendment rules to cases arising under the Fifth Amendment could have grave, unintended consequences for prosecutions of international terrorists. Many of the terrorists on the FBI's most-wanted terrorists list committed their crimes outside the territory of the United States, but otherwise within the jurisdiction of the United States, because they hurt U.S. citizens or U.S. interests. *See* FBI's Most Wanted Terrorists (www.fbi.gov/wanted/wanted_terrorists) (Last viewed March 30, 2014), **Exhibit 3**. If the narrower concepts embodied in the Fourteenth Amendment applied to the Fifth Amendment, these and similar prosecutions would be called into question. In *Pugh v. Socialist People's Libyan Arab Jamahiriya*, the court observed that many federal criminal statutes contemplate "the assertion by a United States court of jurisdiction over a foreign national for terrorist activities committed abroad, irrespective of the number and nature of that individual's other 'contacts' with the United States. It logically follows that if federal courts may constitutionally exercise criminal jurisdiction over such individuals, the Constitution should be no bar to those same federal courts, in a civil action for damages, exercising civil *in personam* jurisdiction over those same individuals for the same acts." 290 F. Supp. 2d 54, 59 (D.D.C. 2003).

### 2.    *Daimler* Arose in a Different Factual Context, and the Difference Matters

Important factual differences separate this case from *Daimler*. Daimler is a corporation engaged in international commerce. *Daimler*, 134 S. Ct. at 750-51. This was important to the *Daimler* Court, which wanted to ensure "greater predictability" in suits against "corporations" through "[s]imple jurisdictional rules." *Id.* at 750 (quoting *Hertz Corp. v. Friend*, 559 U.S. 77, 94 (2010)). The Court explained that other nations do not approve of general jurisdiction over

---

of 1991, 10 (1992) (letter from Sen. Chuck Grassley). Thus, the ATA was aimed at providing jurisdiction over terrorists in general and the PLO in particular and the Executive Branch supported that aim.

"corporations" outside their "principal place of business," that "unpredictable applications of general jurisdiction based on activities of U.S. based subsidiaries could discourage foreign investors," and that such differences between U.S. and foreign law had led to "international friction," according to the branch of government responsible for foreign relations. *Id.* at 762-63.

This reasoning has no place in deciding whether to exercise jurisdiction over entities engaged in terrorism rather than commerce. *Daimler* did not seek to provide "greater predictability" to terrorists, and creating "simple jurisdictional rules" for terrorist organizations is not practicable, since terrorists do not often form corporations or announce their principal places of business.[13] The national security concerns in this case take it in the opposite direction from the one taken in *Daimler. See Strauss v. Credit Lyonnais*, 249 F.R.D. 429, 443-44 (E.D.N.Y. 2008) ("The legislative history of the ATA, Executive Orders signed by two United States Presidents, and the participation by the United States in international treaties and an international task force, establish this country's profound and compelling interest in combating terrorism at every level."); *Wultz v. Bank of China*, 910 F. Supp. 2d 548, 559 (S.D.N.Y. 2012) ("When the U.S. interest in fully and fairly adjudicating matters before its courts is combined with its interest in combating terrorism, the U.S. interest is elevated to nearly its highest point....").

The PLO exemplifies this idea as there is no one venue in which the PLO was headquartered (much less "incorporated") at the relevant time; rather the PLO's main organizational components were located in Gaza, Ramallah, Jordan, Tunisia and the PLO's many offices around the world. The PLO's Political Department was located in Tunisia at the relevant time, while the Palestine National Fund, the Palestine National Council (the highest decision-making body in the PLO) and other

---

[13] Even after *Daimler* courts must still examine the scope of the foreign defendant's contacts even if the forum is not the place of incorporation or headquarters of the defendant. *See Alkanani v. Aegis Defense Services, LLC*, --- F.Supp.2d ----, 2014 WL 1234901 (D.D.C. March 26, 2014).

governmental elements of the PLO are still located in Amman and the PLO Executive Committee usually meets in Ramallah.[14] Accordingly, *Daimler* is factually and legally inapplicable to the PLO, because there is no one venue in which the PLO is or was "at home."

## IV.    THIS COURT HAS SPECIFIC PERSONAL JURISDICTION OVER DEFENDANTS UNDER THE FIFTH AMENDMENT

Even if defendants had due process rights the exercise of specific jurisdiction over them would easily pass Constitutional muster. Below, we set out the relevant facts relating to specific jurisdiction and then discuss the constitutional test for evaluating specific jurisdiction.

### A.  Facts Relating to Specific Jurisdiction

Plaintiffs were injured by reason of defendants' violent criminal actions in Israel, which were intended to influence, by intimidation and coercion, U.S. and Israeli policy concerning Israel's control of the West Bank and Gaza. In conjunction with their terrorist activities, and in order to influence government policy, defendants conducted a media relations campaign in the United States publicizing their argument that, in order to end the violence in Israel, the United States must pressure the government of Israel to "end the occupation."

#### 1.  Background to Palestinian Terrorism Against United States Citizens Prior to 2000 and to the U.S. Involvement in the Conflict

The PLO's long and bloody history of violence against civilians is well documented. In December 1987, Congress made—and the President signed—statutory findings "that the PLO

---

[14] See 09/12/12/ Deposition testimony of Yasser Shaqbua from the *Shatsky* case (Palestine National Fund is headquartered in Amman) at 29:14-17; 31:4-5; Declaration of Mohamed Zuhdi Nashashibi submitted in Saperstein (PNF located in Amman); www.palestinepnc.org (Palestine National Council - highest decision making body in the PLO - is headquartered in Amman); U.S. department of State Profile for Tunisia (PLO's Political Department was located in Tunisia at the time the Gilmore lawsuit was commenced); Palestine Permanent Mission to the UN (PLO Political Department is largest PLO department which supervises work of Palestinian embassies, missions and offices worldwide); 09/12/12 Deposition testimony of Yasser Shaqbua in Shatsky at 20:25-21:-2 (PLO Executive Committee Meetings take place in Ramallah; 09/05/12 Deposition testimony of Abdel Rahim Malouh in Shatsky at 72:6-7 (same); 09/05/12 Deposition testimony of Abdel Rahim Malouh in Shatsky at 59:11-15; 60:5-6 (PLO leadership based in Jordan). **Exhibits 4, 5, 6, 7, 8, 9, 10 and 11**.

and its affiliates are a terrorist organization and a threat to the interests of the United States, its allies, and to international law." Pub. L. 100-204, § 1002 (codified at 22 U.S.C. § 5201).

By the 1990s, the United States government had become deeply involved in the relationship between the PLO and Israel. During President Clinton's two terms in office, Yasser Arafat visited the White House more than any other world leader. *See* **Exhibit 12**. The most important of the bilateral agreements between Israel and the PLO were signed at White House ceremonies, including the 1993 "Declaration of Principles" for further negotiations, and the 1995 "Interim Agreement," witnessed personally by President Clinton. Upon the signing of the 1995 Interim Agreement, President Clinton gave a speech at the White House with Arafat and Yitzhak Rabin at his side. Addressing them, he said "The United States is proud to stand with [you]. Much remains to be done. But we will continue to walk each step of the way with those who work and risk for peace." **Exhibit 13 at 2**.

Despite these agreements, during the period between the signing of the Oslo Accords and the Gilmore shooting, Palestinian violence continued. During that period, Palestinian terrorists murdered (at least) the following U.S citizens: Nachshon Wachsman (October 14, 1994); Alisa Flatow (April 9, 1995); Joan Davenny (August 21, 1995); Sara Duker, Matthew Eisenfeld, Ira Weinstein (all on February 25 1996); David Boim (May 13, 1996); Yaron Ungar (June 9, 1996); Leah Stern (July 30, 1997) and Yael Botwin (September 4, 1997) *see* statement of Sen. Ashcroft, "U.S. Citizens Killed in Acts of Terrorism," Cong. Rec. June 22, 1999, p. S7449.

In the face of these murders the U.S. continued to put political pressure on the defendants by repeatedly warning them and demanding they cease involvement in terrorism. For example:

- On February 26, 1996, the Senate passed Resolution 228 "Condemning Terror Attacks In Israel," demanding that the PA and PLO "cease harboring, financing and arming terror groups in all territories under their control." Cong. Rec. p. S1462.

- On March 5, 1996, Senate Majority Leader Dole publicly warned the PA and PLO, and defendant Arafat, that "unless and until serious anti-terrorist actions are implemented by Chairman Arafat, it is difficult to justify continued U.S. assistance to the Palestinian Authority." *New York Times*, March 5, 1996.

- On March 12, 1996, the House passed Concurrent Resolution 149 ("Condemn Bombings In Israel"), calling upon Arafat and the PA "to ban the existence and operations of all terrorist organizations resident in the Palestinian autonomous areas" and "to cease harboring, financing, and arming terror groups in all territories under their control." This resolution made clear that defendants' failure to comply would have serious consequences, stating that Congress "expresses its intent to reconsider United States assistance to the Palestinian Authority, in consultation with the Administration, in light of the steps that must be taken by the Palestinian Authority against terrorist infrastructures and operations." Cong. Rec. p. H2070.[15]

Finally, in 1999, the United States Congress passed P.L. 106-113, (codified at 22 U.S.C. §2656f note), which requires the Secretary of State to provide the Congress every six months with a report including lists of United States citizens injured in Palestinian terrorist attacks, and a "list of any terrorist suspects in these cases who are members of Palestinian police or security forces, the Palestine Liberation Organization, or any Palestinian governing body." Thus, prior to the Gilmore shooting, defendants clearly were on notice that American citizens were being harmed by Palestinian terrorism.

---

[15] Additional U.S. demands to defendants to halt involvement in terrorism were also made *inter alia*, on: April 13, 1994 (Rep. Deutsch "The PLO Has Yet to Condemn Recent Attacks on Innocent People" Cong. Rec. p. H2228 and Rep. Kyle "A Call For the PLO to Demonstrate Its Commitment," Cong. Rec. H2229); April 15, 1994 (Rep. Ackerman "Terrorist Attacks In Israel" Cong. Rec. p. E683); January 24, 1995 (Senate Resolution 69 "Condemning Terrorist Attacks In Israel," Cong. Rec. p. S1457); March 6, 1996 ("Violence by Terrorists in Israel" Senate, Cong. Rec. p. S1567); March 7, 1996 ("The PLO Must Take Action" Rep. Andrews, Cong. Rec. p. E315).

By July 2000, the PLO had failed to conclude a comprehensive agreement with Israel, and President Clinton invited Arafat and Israel's Prime Minister, Ehud Barak, to Camp David to continue their negotiations. The negotiations failed. *See* Declaration of Alon Eviatar ("Eviatar Decl."), DE 342-3 at ¶ 71. Before leaving Camp David, the parties issued a "trilateral statement" in which the PLO and Israel agreed "that the United States remains a vital partner in the search for peace and will continue to consult closely with President Clinton and Secretary Albright in the period ahead." **Exhibit 14**.

Beginning in September 2000, the PA and PLO attempted to coerce the government of Israel to cede control of the West Bank and Gaza. Defendants sought to do this by: (1) conducting a campaign via media outlets in the United States (and elsewhere) to publicize defendants' thesis that in order to end the violence in Israel, the United States must pressure the government of Israel to "end the occupation" and (2) conducting a relentless campaign of violent attacks on the civilian population in Israel, including the attack from which this case arises, in order to make credible their claim that such violence was caused by Israeli control of the West Bank and Gaza, and to intimidate and coerce Israelis and Americans into accepting the defendants' political goal of ending "the occupation."

## 2.  Jurisdictional Contacts of Defendants' DC Office and Staff

Members of this Court have previously held that defendants were "present" in the U.S. and used their Washington, DC offices to pursue primarily their propaganda and political interests and that the offices served both the PA and the PLO simultaneously. *Klieman v. PA*, 547 F. Supp. 2d 8 (D.D.C. 2008); *Biton v. PA*, 310 F.Supp.2d 172, 180 (D.D.C. 2004). Every other federal court to have considered the issue has reached a similar conclusion. *See, e.g., Sokolow v. PLO*, 2011 WL 1345086, *4-5 (S.D.N.Y. June 2, 2011); and *Ungar v. PA*, 325 F. Supp. 2d 15,

58-59 (D.R.I. 2004).[16] Indeed, Hasan Abdel Rahman, Defendants' Chief Representative in the U.S. during the relevant time repeatedly represented himself as being the representative of both the PA and the PLO. **Exhibits 15** (Rahman Business Card), **16** (Rahman Letter to Congress dated 11/20/00), **17** (Letter from Department of State to Rahman dated 7/16/02)**, 18 (Rahman CV 10/19/00), 19 (Rahman statement to Senate Appropriates Committee 3/25/99), 20** (3/25/99 Transcript from Senate Appropriations Subcommittee), **21** (Letter to Rahman from US Conference of Catholic Bishops 12/4/01), **22** (Middle East Forum 9/5/01); *See also* **Exhibit 23**, Affidavit of David Strachman dated May 28, 2010.

Defendants' citation to *Ungar v. PA*, 153 F. Supp. 2d 76, 88-91 (D.R.I. 2001) is misleading. DE 359-2 at 12. That decision was a concise, interlocutory ruling concerning the application of the *prima facie* standard to personal jurisdiction. A later *Ungar* decision concluded that plaintiffs had demonstrated minimum contacts by a preponderance of the evidence and made the following specific findings:

- Notwithstanding defendants' claims to the contrary, the so-called "PLO Mission" office in Washington, D.C. serves as the office of both the PLO and the PA;

- Notwithstanding defendants' claims to the contrary, Hassan Abdel Rahman, the head of defendants' D.C. office in Washington, D.C. was the Chief Representative of both the PLO and the PA in the United States;

- Notwithstanding defendants' claims to the contrary, Abdel Rahman's deputy, Khalil Foutah, also acted on behalf of both the PLO and the PA;

- Notwithstanding defendants' claims to the contrary, the PA and PLO each had constitutionally sufficient contacts with the United States, even if their governmental contacts were excluded from the jurisdictional analysis.

*Ungar*, 325 F.Supp. 2d at 47-59.

---

[16] In Part III of their Motion, defendants wrongly claim that these prior decisions "attributed to the PA the activities of the Washington, DC office of the PLO Mission to the United States...through undefined agency theories." DE 359-1 at 11-12. In fact, these decision did not invoke agency theories at all, but found as a matter of fact that the D.C. office and staff operate on behalf of the PA as well.

Defendants' Washington, DC office is fully functional with employees. *See e.g. Sokolow v. PLO*, 2011 WL 1345086, at *3 (S.D.N.Y. March 30, 2011); PLO Delegation website, http://plodelegation.us (last visited March 30, 2014). The PLO office represents the PLO and the PA in the United States, and both the PLO and the PA have paid the expenses of the office and the salaries of the employees. **Exhibit 24**; Exhibit C to the Affidavit of David J. Strachman submitted in *Ungar* Case No. 00-105L (DRI October 10, 2004)("Strachman Aff. In Ungar"). The Strachman Aff. with relevant exhibits is attached hereto as **Exhibit 25** ("Reflecting the Palestinian Viewpoint in a World of Images," NYT 10/16/00); **Exhibit 26**, Ungar Plaintiffs' Revised Notice of Evidence Concealed by Defendants dated 2/17/04.

Further, the PLO has maintained bank accounts and account balances in Washington, DC. *See* **Exhibits 27 and 28**. It also appears that as of July 2002, the PA had millions of dollars on deposit in the New York branches of Citibank and Arab Bank and a brokerage account at Salomon Smith Barney. *See Ungar ex. rel. Strachman v. Palestinian Auth.*, 325 F. Supp.2d 15, 51 (D.R.I. 2004). *See also* Strachman Aff. in Ungar, **Exhibit 25** at Ex. I, *Int'l Techs, Integration, Inc. v. Palestinian Liberation Organization*, 98-00756 (CKK) order of July 2, 1999 (revealing that the PA and PLO maintain several bank accounts in New York at three U.S. banks with deposits totaling approximately $18 million dollars.) The PA and PLO also have given numerous lectures and interviews at high schools, colleges and clubs in the U.S., and to U.S. media outlets, in order to further their agenda. *See id.* at 51; **Exhibit 26**, Ungar Plaintiffs' Revised Notice of Evidence Concealed by Defendants dated 2/17/04; **Exhibit 29** at Sched. 1. The PA and PLO have reported spending as much as $500,000 a year on these and other lobbying related appearances. *See* **Exhibit 30,** Foreign Agents Registrations Reports 1997-2002.

Defendants have entered into numerous commercial contacts with U.S. companies. *See, e.g., Int'l Technologies Integration, Inc. v. PLO*, 66 F. Supp. 2d 3 (D.D.C. 1999) (dispute

involving the PLO and PNA's contract with a Virginia company to develop domestic and international communications and telecommunications in the West Bank, Jericho and the Gaza Strip); *Sokolow*, 2011 WL 1345086 at *4 (cataloging the PLO and PA's commercial contracts). In addition, the PA entered into a multi-year contract with a consulting and lobbying firm, paying a very substantial retainer, which gave rise to a substantial promotional presence in the United States. *See Sokolow*, 2100 WL 1345806, at *4; **Exhibits 31-35**; **Exhibit 25,** Strachman Aff. In Ungar, at Ex. F and G (Washington Post 1/20/00; Forward 1/2000); **Exhibit 26**, Ungar Plaintiffs' Revised Notice of Evidence Concealed by Defendants dated 2/17/04 at Ex. MM.

> ### 3.    Defendants' Public Relations Campaign to Alter U.S. Public Opinion and Policy

Defendants used their U.S. office, U.S. lobbying firm, and U.S.-based officers and employees to repeat a scripted refrain that violence against civilians in Israel was "caused" by the "occupation" of Gaza and the West Bank, and that such violence would end only if the U.S. government could successfully pressure the government of Israel to withdraw from those territories. A few examples (out of hundreds) of statements made by PLO and PA representatives between 2000 and 2004 suffice to show the substance of the message:

| <u>Date</u> | <u>Outlet</u> | <u>Statement by PA/PLO Official</u> |
|---|---|---|
| October 12, 2000 | Washington Post | Israel is responsible for the violence, and not the Palestinians. Why am I saying this? Israel is firing at Palestinians….Palestinians are not attacking Israelis in Israeli towns or villages. Here is a clear cut aggressor and clearcut victim. Therefore Yassar Arafat cannot ask the Palestinian people not to defend themselves or protest Israeli aggression… |
| | | The United States is a very important broker but the United States is not impartial or objective because the United States is an ally of Israel. So the United States, by definition, is not impartial. It is an important broker and we recognize the importance of its role. **Exhibit 25** Strachman Aff in Ungar. At Ex. D |
| October 17, 2000 | CNN | I tell you how we end all of this.  The Palestinian people have been living under Israeli military occupation for 33 years….As long as Israel continues to occupy them and to want to impose its will on the Palestinian people by |

sheer force, I don't think that peace the possible. **Exhibit 36** at 260

| May 29, 2001 | Forum of the Center for Policy Analysis | Again, the original sin is the occupation. Occupation is not normal, and therefore occupation provokes resistance, provokes protest, and no one can expect the Palestinians to remain silent when their freedom and their land is being raped and confiscated. **Exhibit 37** at 192. |
| --- | --- | --- |

| **Date** | **Outlet** | **Statement by PA/PLO Official** |
| --- | --- | --- |
| December 3, 2001 | CNN | [O]ur problem with Israel is over the 35 years of military occupation forced on the Palestinian people by Israel, denied the Palestinians, I mean, denied their very basic human and political rights and robbed of their dignity, freedom, right of self-determination and their livelihood through the process of building Jewish settlements in Palestinian territories….This is the cause of all the troubles. **Exhibit 38** at 143. |
| January 29, 2002 | CNN | [I]t is difficult to succeed in combatant violence, unless there is a commitment and change of behavior by the Israeli military forces of occupation. Ex. **Exhibit 39** at 71-72. |
| February 3, 2002 | CNN | The Jewish settlements…have to be removed in order for us to be able to establish the kind of peace that we want to establish with Israel. **Exhibit 40** at 60. |
| February 25, 2002 | MSNBC | But in order to achieve peace in our region, there needs to be an end to Israel's 35 years of military occupation of the Palestinians….if the Israeli government continues to want to control the lives of the Palestinians…I don't think that we can expect any peace in the near future. **Exhibit 41** H.132 |
| March 18, 2002 | MSNBC | Let's also not forget that the origin of all the problems is the existence of the occupation. And what we are looking for is ending this occupation and reaching a settlement between Palestine and Israel. **Exhibit 42** at 451-52. |
| March 18, 2002 | CNBC | We said that if Israel complies with the requirements—and that is to withdraw its troops from the Palestinian cities that it occupied in the last two weeks, yes we are ready to engage in a cease-fire. **Exhibit 43** at 336. |
| March 21, 2002 | MSNBC | Thirty-five years of occupation, illegal military occupation….You turned our people into suicide bombers, Mr. Gissin, by the way you behaved towards them. You have to take responsibility for your actions. **Exhibit 44** 135 |
| March 28, 2002 | CNN | If the Israelis move out of our territories and leave us alone, to live in peace, then I assure you that they will have peace. **Exhibit 45** at 277. |
| April 3, 2002 | CNN | I'm saying that the cusp of the need for peace is an end of occupation, establishment of a state for security given to Israeli. **E x h i b i t  4 6** at 388. |
| April 7, 2002 | NBC | Can't we defend our country and our nation from an illegal, brutal foreign occupation like the Israeli brutal occupation of our people, who has denied us our very basic liberties and freedoms? **Exhibit 47** at 131. |

| April 12, 2002 | CNN | What takes Palestinians to the situation we are in is 36 years of one of the most brutal occupations in modern history.  That's what turns people into suicide bombers. **Exhibit 48** at 8. |
| April 15, 2002 | Fox | You get the Israelis out of the West Bank and Gaza, and you will have a peace agreement. **Exhibit 49** at 37. |

| **Date** | **Outlet** | **Statement by PA/PLO Official** |
| --- | --- | --- |
| May 3, 2002 | Fox | The day the Israelis accept to withdraw their army from the Palestinian territories and take away their Taliban Jewish settlers from the Palestinian territories, we will have peace. **E x h i b i t   5 0**  at 273. |
| May 8, 2002 | CNBC | Occupation is the infrastructure of terrorism, and if Mr. Pinkas and his government are true to what they preach, they have to dismantle the occupation…otherwise we will have violence because occupation is the systematic violence and a system of violence. **Exhibit 51** at 251. |
| May 9, 2002 | National Press Club | So occupation generates resistance. And if we [are] to deal with the whole situation of violence in the region, occupation must end. With all that it entails including, of course, the construction of illegal Jewish settlements in the Palestinian territories. **E x h i b i t   5 2** at 203. |
| May 19, 2002 | CNN | The shortest way to peace and security, to us and to the Israelis is to end the Israeli occupation and to establish a Palestinian state, next to the state of Israel. I believe this is the only way out. **Exhibit 53** at 193. |
| June 18, 2002 | Fox | I think that the only way to really reduce the level of violence is to try something that has not been tried, and that is to withdraw its troops from the Palestinian territories, stop illegal occupation, stop illegal construction of Jewish settlements. **Exhibit 54** at 161. |
| November 24, 2002 | CNN | Israel is an occupying power. And the only issue that it has to do is to end its occupation, as the United States by the way repeatedly called for, and allow the existence of a Palestinian state—a real one, with full sovereignty over its land and its people. **E x h i b i t   5 5**  at 280. |
| March 5, 2003 | MSNBC | You know how you control it?  By getting the hell out of the Palestinian territories and let the Palestinians live free because you cannot have occupation and peace together. **E x h i b i t   5 6**  at 82. |
| September 15, 2003 | CNBC | Well, let me first say before that, it is not only about ending terror. It's about ending terror and ending occupation as well. **Exhibit 57** at 131. |
| September 19, 2003 | CNN | [Y]ou have always to remember that the essence of the whole thing is the existence of the Israeli occupation.…For this peace to be achieved, we need to have a different Israeli position, one that says, yes, we want to end this occupation, that says yes, we want to end the colonization of the Palestinian land. Only this could bring hope, and will then open the door for any practical steps on the ground. **Exhibit 58** at 226. |

*See also* **Exhibits 88 and 89**, submitted by the Sokolow plaintiffs as Exhibits 13 and 14 to the

May 28, 2010 Strachman Affidavit, Exhibit 23 hereto.

During this period, Arafat met repeatedly with U.S. envoys, including Senator George

Mitchell, General Anthony Zinni, and Secretary of State Colin Powell, to press the defendants'

political agenda. Indeed, in public statements, defendants' representatives repeatedly advanced

the claim that the U.S. government needed to take a greater role in pressuring Israel to accept

their goal of ending the occupation.

| <u>Date</u> | <u>Outlet</u> | <u>Statement by PA/PLO Official</u> |
|---|---|---|
| March 19, 2002 | CNN | We are saying yes, we welcome the efforts of the United States, the engagement of the United States, and we are hopeful that with the efforts of General Zinni and the engagement of Vice President Cheney and the engagement of President Bush that they will lead us into a political horizon that will end Israel's occupation of the Palestinian territories…. **Exhibit 59** at 323. |
| March 29, 2002 | PBS | Mr. Colin Powell is missing the point. He should point fingers to Mr. Sharon to move his soldiers, his army, his settlers, from the Palestinian territories….Peace can be achieved only when those guys leave us alone and leave us as a free people. If the situation continues, if the occupation continues…no one can stop the Palestinians.  The only way to stop the violence is to eliminate the causes of violence and the cause of violence is the illegal military occupation. **Exhibit 60** at 260. |
| April 15, 2002 | CNN | Yasser Arafat essentially told Colin Powell over the weekend that we're not going to talk about any kind of ceasefire until the Israelis pull out of the occupied territories. **Exhibit 61** at 333. |
| April 14, 2002 | CNN | I think the involvement of the United States on the site would be very, very helpful because obviously the two parties trust the United States and they want the United States to be involved….We feel that 35 years of foreign, illegal occupation is more than enough. **Exhibit 62** at 47. |
| May 9, 2002 | National Press Club | Mr. Bush and Colin Powell both believe that President Arafat is essential for any progress to be made on the Palestinian-Israel track and that his role is very very important to move the process forward. **Exhibit 63** at 204. |
| May 9, 2002 | National Press Club | So the United States can and has the possibilities to pressure Sharon. Sharon cannot defy the whole international community. **Exhibit 64**. |

### 4.    Overview of Defendants' Terrorist Campaign

Defendants' publicity and media activities in the United States connecting violence to the "occupation" were accompanied by relentless violence against civilians in Israel. Thus, in conjunction with their media campaign, the defendants incited, supported, and directly participated in a continuous string of violent attacks intended to give substance to their assertion that Israel's control of the West Bank and Gaza was causing violence. The evidence shows that defendants' terrorist campaign began before Gilmore's murder and continued for several years.

Yasser Arafat was the terrorist in chief. Arafat controlled the PA and the PLO, as well as Fatah, the PLO's dominant faction. *See* DE 342-3 at ¶ 21. In late 2000, Fatah operatives, "many of whom were employed in the Palestinian Authority's security apparatus" established the al-Aqsa Martyrs Brigades ("AAMB"), "which were intended to serve as the Fatah's military wing for carrying out terrorist attacks against Israel." **Exhibit 65** at 8-9; *see also* **Exhibits 66-69.** Many of the senior terrorism operatives of the AAMB were members of the PA security forces, including the Gilmore shooter, Muhanad Abu Halawa who was a member of Arafat's Presidential Security Service – Force 17. DE 342-3 at ¶¶ 25-26; DE 332-6 (Ex. 30B to Tolchin Decl.); *see also* **Exhibit 65** at 9. Marwan Barghouti, the AAMB leader responsible for all of the "military operations" of Fatah in the West Bank, reported directly to Arafat. DE 332-6 (Ex. 30B to Tolchin Decl.). When Abu Halawa was finally killed on March 5, 2002, Barghouti eulogized him as one of the leaders and founders of the AAMB – "one of the outstanding warriors who carried out heroic attacks that shook the Israeli army and the Israelis settlers." DE 342-3 at ¶ 30.

The AAMB initially focused its attacks on Israelis in the West Bank (including East Jerusalem). *See* Exs. DE 332-6 (Ex. 30B to Tolchin Decl.); **Exhibit 65**. Beginning in January 2002, the AAMB expanded its violence to include suicide bombings and shootings of civilians in Jerusalem and other cities in Israel, causing the United States to designate the AAMB a Foreign

Terrorist Organization and a Specially Designated Global Terrorist Entity. *See* **Exhibits 66-67.** According to a Human Rights Watch report, the attacks created "widespread fear among the civilian population—as they were intended to do." **Exhibit 70.**

### a. Defendants' Incitement of Terrorism

Defendants incited acts of violence at every level of Palestinian society. Even as they worked assiduously to promote to Americans the notion that violence in Israel was the result of the Israeli "occupation," the defendants were articulating a very different message in their own media outlets. *See* DE 342-3 at ¶¶ 67-76. A few examples suffice here:

- A call ... A call ... A call ..., from our negotiating delegation headed by our emblematic Commander Abu 'Ammar [Yasser 'Arafat] to our heroic Palestinian people, [exhorting], "Get ready, for the battle of Jerusalem has begun." This is what the return of the Palestinian delegation to the territory of the homeland indicates is coming next … DE 333-4, Ex. 46 to the Declaration of Robert Rolchin (the "Tolchin Decl.")

- "Have no mercy on the Jews anywhere in any country: 'Fight them wherever you are, wherever you meet them—kill them.' Wherever you are—kill those Jews and those Americans who are like them and those who stand with them. They are all together against the Arabs and the Muslims." **Exhibit 71** (see DVD).

- "The latent Palestinian stored potential remains totally prepared for confronting the American-Israeli projects, and remains able to incite the Arab political street, to restore its absent and subjugated role....And this will only happen with the rock and the brave intifada and the continuation of Palestinian sacrifice." DE 333-11 (Ex. 53 to Original Tolchin Decl.).

- "[A]ction and greater pressure, letting the United States of America know that the continuation of their flagrant bias toward the interests of the Zionist entity and against the rights of our people, will be an incentive for our Nation's masses to move in earnest to threaten U.S. inter- ests in the region in all their economic, political and security forms. The battle is open, bloody and fierce and nobody can escape its fire except by engaging in it side by side with our inalienable national rights…." **Exhibit 72.**

- "The [September 11] martyrdom seekers are the finest successors of the finest predecessors. These martyrdom seekers are the salt of the earth and the engines of history….They are more honorable than us all…." **Exhibit 73.**

- "The Prophet succeeded, through Muslim unity and arousing faith, in overcoming the America of then, just as we will defeat America, as long as it supports our enemy, as long as it adheres to its positions against our people, our issue and our

holy places, and against our people and its leadership, as long as it adheres to these wicked positions. We will defeat her, may it be the will of Allah." **Exhibit 74** (see DVD).

- "A divine blow will be dealt soon to the US and Israel, Allah willing. The believers will rejoice with Allah's victory." **Exhibit 75** (DVD).

Defendants even co-opted the most odious symbols of anti-U.S. terrorism in their call to violence. For example, on September 11, 2002, Al-Hayat Al-Jadida printed a political cartoon depicting "September 11" as two legs chasing Uncle Sam, running in terror. **Exhibit 76.** Another political cartoon in that newspaper depicted Osama Bin Laden smiling and making a "V for Victory" sign on his right hand—with the "V" depicting the smoking twin towers. **Exhibit 77**.

Defendants also glorified the acts of terrorists by portraying them as national heroes through state-sponsored funerals and television programs honoring their "sacrifices."

### b.  Defendants' Direct Involvement in Terrorism

In addition to inciting violence, defendants also directly participated in the terrorist acts. As noted, Abu Halawa was a member of Arafat's Force 17. DE 342-3 at ¶ 25. In that position, Abu Halawa spent most of his time carrying out terrorist attacks with a mix of other PA and Fatah officers, leaders and operatives, all of whom were convicted for their terrorist activities during that period. DE 342-3 at ¶ 28. This was not an isolated case. As of November 21, 2012, the PA police force's website proudly listed *ninety-seven* members of its own ranks as being held in custody by Israeli authorities for homicide. **Exhibit 78**. At the time of the Gilmore shooting, Arafat controlled the security forces; according to Glenn Robinson, an expert often relied upon by the defendants, Arafat "maintained a firm grip on the authority's security forces until his dying day." **Exhibit 79** at 19. As one PA official stated during a broadcast on PA state-owned TV: "Without a doubt, the master of the [armed] resistance is the *shahid* martyr, Yasir Arafat....The greatest number of prisoners [came] from the security forces. They are the ones who bore arms

and carried out the greatest and most important operations against the Israeli occupation…." **Exhibit 80** (See DVD). Defendants also freed terrorists from PA jails: "Arafat and the PA pursued a policy whereby suspects, when they were detained [by the PA], were not investigated or prosecuted, but typically were soon let out onto the street again." **Exhibit 70** at 3. Indeed, "the PA routinely failed to investigate, arrest and prosecute persons believed to be responsible for these attacks, and did not take credible steps to reprimand, discipline, or bring to justice those members of its own security services who, in violation of declared PA policy, participated in such attacks." **Exhibit 70** at 109. Notably here, in the fall of 2000 Arafat himself issued an order to Force 17 to carry out an attack in Jerusalem. DE 342-3 at ¶¶ 78-79.

Defendants furthered the campaign of violence by ratifying the actions of the perpetrators. Defendants continued to employ, and routinely awarded promotions to, perpetrators of terrorist attacks after they were convicted of participating in the attacks. Defendants paid other individuals convicted of terrorist acts detained in Israeli prisons as well. Defendants even designated as honored "martyrs" perpetrators who were killed, including suicide bombers who died in the attacks, and provided the families of so-called "martyrs" with monthly payments because of these terrorists' supposedly heroic service.

### c.  Defendants' Provision of Material Support to Terrorists

Defendants also provided personnel, weapons, bomb-making equipment, funds, uniforms, safe houses, and other material support to terrorist groups. *See* **Exhibits 81-82.** "Arafat and other senior PA officials, as well as many rank-and-file Fatah members, ha[d] overlapping identities as employees or officials of the PA, on the one hand, and as members of Fatah on the other…appear[] to have facilitated the use of PA resources to fund Fatah activities directly and indirectly, including payments to individual al-Aqsa Brigades activists." **Exhibit 70** at 95.

Terrorist operatives "directed their requests for financial assistance for the purchase of weapons and the perpetration of terrorist attacks to [Marwan Barghouti], who would subsequently approach the chairman of the Palestinian Authority and leader of the Fatah, Yasser Arafat, in their name and on their behalf." DE 332-6 at ¶10 (Ex. 30B to Tolchin Decl.*); see also* **Exhibit 70 at 83** ("Barghouti functioned as a patron on behalf of several al-Aqsa Brigades groups, referring requests for individual financial assistance to Yassir Arafat."). Another close Arafat advisor, Fuad Shubaki ("Shubaki"), the head of the PA's Finance Office and a senior member of Fatah, received requests for money from Marwan Barghouti for the purpose of acquiring weapons for, and paying salaries to, members of the AAMB. Shubaki would forward the requests to Arafat and, at Arafat's direction, paid the money from the PA's Ministry of Finance. **Exhibit 83** at 46. Documents produced in this case show that Arafat personally authorized payments to terrorists. *See* **Exhibits 84-86.** Defendants also controlled the terrorists' activities by managing a supply of weapons given to terrorists. **Exhibit 83** at 43. ("Yasser Arafat gave an instruction that all of the [secretly procured] weapons would be purchased by the Palestinian Authority…so that he himself would be able to control everything that happened. In this way, Yasser Arafat would be able to control the strength of the intifada.").

**B.   Analysis: Defendants Have Minimum Contacts with the United States**

The facts described above make plain that defendants' numerous contacts with, and conduct directed at, the United States are sufficient to support the assertion of specific personal jurisdiction over the defendants in this case. In determining whether minimum contacts exist, the courts consider "the relationship among the defendant, the forum, and the litigation." *Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014) (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775 (1984), quoting, in turn, *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977)). Specific jurisdiction thus may be exercised where a claim "arises out of *or relates to* defendants' contacts" with the

United States. *Chew*, 143 F.3d at 28 (quoting *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 414 (1984) (emphasis added)). "The question is whether a defendant has followed a course of conduct directed at the society or economy existing within the jurisdiction of a given sovereign, so that the sovereign has the power to subject the defendant to judgment concerning that conduct." *J. McIntyre Mach.*, 131 S. Ct. at 2789. The courts have identified at least two "independent, if conceptually overlapping, methods" of demonstrating minimum contacts": (1) the defendant's "overall activity" *within* the jurisdiction (here, the United States as a whole); and (2) the "in-state effects" of extraterritorial activity. *Best Van Lines,v. Walker*, 490 F.3d 239, 243 (2d Cir. 2007). Either one of the two suffices, but defendants' conduct meets both tests.

### 1. The Relationship Between Defendants' "Overall Activity" Within the United States and the ATA Claim Satisfies Minimum Contacts

Where, as here, a defendant's contacts with the jurisdiction are substantial, a defendant may be subject to specific personal jurisdiction even if its conduct within the forum is merely "related to" the claim. *See, e.g.*, *Helicopteros Nacionales de Columbia v. Hall*, 466 U.S. 408, 414 n. 8 (1984); *accord Mwani*, 417 F.3d at 13 (court exercised personal jurisdiction over defendants who orchestrated a terrorist bombing that took place entirely in Kenya, because the bombing was one component of an ongoing conspiracy to attack the United States; plaintiffs' injuries arose out of or related to the defendants' overall campaign of terror) (citation omitted).

Defendants had numerous contacts with the United States, all relating to Defendants' overall joint objective of operating and supporting a campaign that used acts of public relations in tandem with acts of terror to influence American policy with respect to the Middle East. The relationship between these activities and the litigation is plain. An element of any claim under the Anti-Terrorism Act ("ATA") is that the defendants' conduct "appear to be intended….to influence the policy of a government by intimidation or coercion." 18 U.S.C. § 2331(1)(B)(ii).

Plaintiffs have argued on summary judgment that this element is satisfied. *See* DE 336-1 at 7-8. In tandem with their campaign of terror and violence in Israel described above, defendants' extensive public relations activities in the United States appeared to be, and were, intended to pressure the United States into persuading Israel to "end the occupation" of Gaza and the West Bank, based upon the coercive threat that absent withdrawal from those territories, violence against civilians would continue. That intent is obvious from defendants' public statements in the United States—a sampling of which are quoted above—in which defendants claimed (and threatened) that the violence would not end absent withdrawal by Israel from Gaza and the West Bank, and that the United States should pressure Israel to withdraw. That the Gilmore shooting actually did impact U.S. interests is evident from the fact that Martin Indyk, the United States Ambassador to Israel at the time visited the family during the traditional seven-day mourning period. **Exhibit 87**, June 4, 2007 Trial Tr. at p 54:11-55:15.

To be sure, the violence occurred in Israel. But this is not a case about random violence or street crime; it is about terrorism aimed at achieving specific goals. Defendants' U.S. conduct was important to achieving those goals. However horrific a terrorist attack might be, it can achieve its political goals only if those goals are communicated to the governments and democratic populations that it is meant to influence. *Cf. Walden*, 134 S. Ct. at 1123-24 (describing relationship between libel and the target jurisdiction).[17] The record leaves no doubt that defendants did just that, conducting a U.S.-based publicity campaign to communicate their political goals to the U.S. government and the U.S. populace.

In short, an element of the ATA claim is that defendants' terrorist campaign appeared to be intended to influence U.S. and Israeli policy by intimidation and coercion. Here, defendants'

---

[17] As one scholar has explained, terrorist attacks like those at issue in this case "occur in clusters as part of a larger campaign by an organized group to achieve a specific political goal."  Ex. H.75 at 21.

publicity and lobbying within the United States were inextricably linked with their campaign of violence abroad, as they were intended to channel the reactions of the American public and government to the violence in Israel, to advance the defendants' own objectives.

### 2. Defendants' Extraterritorial Actions Satisfy Minimum Contacts Under the "Effects Test"

It is well established that "a nonresident's physical presence within the territorial jurisdiction of the court is not required" to satisfy minimum contacts, so long as the "effects" of the terrorism campaign connected the defendants to the United States. *See Walden*, 134 S. Ct. at 1121. Defendants' conduct easily meets this effects test. In accordance with this doctrine, the Supreme Court and numerous courts within the D.C. and Second Circuits, among others, have upheld the exercise of personal jurisdiction in the face of Fifth Amendment challenges in cases where defendants "expressly aimed" their conduct at U.S. citizens or U.S. interests. *See, e.g., Sisso v. Islamic Republic of Iran*, 448 F. Supp. 2d 76, 79 (D.D.C. 2006) (plaintiffs injured in Tel Aviv bombing sued Hamas and Court "had no difficulty concluding that conduct plaintiffs attribute to Hamas, if proven, was calculated to cause injury to U.S. citizens…" and that such injury was foreseeable); *Calder v. Jones*, 465 U.S. at 789; *In re Magnetic Audiotape Antitrust Litig.*, 334 F.3d 204, 208 (2nd Cir. 2003) (defendant's presence at Korea meeting during which price-fixing activities that would affect the U.S. market were conducted "satisf[ies] the 'effects' test frequently used in the analysis of specific personal jurisdiction"); *Daliberti v. Iraq*, 97 F.Supp. 2d 38, 54 (D.D.C. 2000) finding personal jurisdiction over Iraqi defendants who kidnapped Americans in Iraq in order to prompt certain actions by the U.S. government); *Mwani*, 417 F.3d at 13 (engaging in multiple previous plots against the U.S. contributed to a finding that the attack at issue, although committed in Lebanon, was directed at the U.S., with the intent that the effects would be felt in the U.S.).

Under the Fourteenth Amendment, the Supreme Court has said that "the plaintiff cannot be the only link between the defendant and the forum" to satisfy the effects test. *Walden*, 134 S. Ct. at 1122. Here, plaintiffs are *not* the only link between the defendants and the United States. As shown above, plaintiffs' claims arise out of a terrorism campaign that killed and injured U.S. citizens, *and* was intended to influence U.S. policy. In any event, the holding in *Walden* cannot be extended indiscriminately to all cases under the Fifth Amendment without jeopardizing the effectiveness of U.S. law enforcement. As the Supreme Court put it in *J. McIntyre Machinery*, defendants "followed a course of conduct directed at the society…existing within the jurisdiction of [the United States]."  131 S. Ct. at 2789. It is fair to ask them to answer for that conduct in a U.S. court of law.[18]

## V.  IF THE COURT DOES NOT REJECT THE JURISDICTIONAL CHALLENGE, IT MUST DEFER THE FACT ISSUES TO TRIAL

Because facts relating to the defendants' efforts to influence U.S. government policy are intertwined with the merits of the case, including the statutory "apparent intent" element of plaintiffs' ATA claims, the Seventh Amendment entitles plaintiffs to present such facts to a jury. "When the jurisdictional facts are intertwined [with the facts as to merits issues], it is usually preferable that…jurisdictional determination be made at trial, so that a plaintiff may present the case in a coherent, orderly fashion and without the risk of prejudicing the case on the merits." 2 Moore's *Federal Practice* 12.31[5] & n.14.2 (2013 ed.); cf 5C Wright & Miller *Federal Practice and Procedure* § 1350 (3d ed. 2010) ("If…a decision of the jurisdictional issue requires a ruling on the underlying substantive merits of the case, the decision should await a determination of the merits either by the district court on summary judgment motion or by the fact finder at the trial.")

---

[18] Defendants' failure to pursue this defense for 13 years obviated any need to discover jurisdictional facts. In the event that the Court does not deny defendants' motion for one of the reasons above, plaintiffs should be permitted jurisdictional discovery, which "is available when a party has 'at least a good faith belief' that the court has personal jurisdiction." *Delta Sigma Theta Soroity v. LaMith Designs*, 275 F.R.D. 20, 30 (D.D.C. 2011).

**WHEREFORE**, defendants' motion should be denied.


Dated: April 2, 2014                          Respectfully Submitted,


                                              By: _/s/ Robert J. Tolchin_____

                                              Robert J. Tolchin
                                              D.C. Bar No. NY0088
                                              111 Livingston Street, Suite 1928
                                              Brooklyn, New York 11201
                                              (718) 855-3627
                                              Fax: (718) 504-4943
                                              RJT@tolchinlaw.com

                                              HEIDEMAN NUDELMAN
                                                & KALIK, P.C.
                                              1146 19th Street, N.W., Fifth Floor
                                              Washington, DC  20036
                                              Telephone:  202-463-1818
                                              Telefax:  202-463-2999