UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

REUVEN GILMORE, et al.                :
                                      :
            Plaintiffs,               :
                                      :
      v.                              :     Civil Action No. 1-853 (GK)
                                      :
PALESTINIAN INTERIM SELF-             :
GOVERNMENT AUTHORITY, et al.,         :
                                      :
            Defendants.               :
                                      :

### MEMORANDUM OPINION

Plaintiffs are family members and the estate of Esh Kodesh Gilmore, a United States national killed in a shooting attack in East Jerusalem on October 30, 2000. They bring this case against Defendants, the Palestinian Interim Self-Government Authority ("PA") and the Palestine Liberation Organization ("PLO") (collectively, "Defendants") pursuant to the Anti-Terrorism Act of 1991 ("ATA"), 18 U.S.C. § 2331, et seq., and related common law theories.

This matter is before the Court on Defendants' Motion for Summary Judgment [Dkt. No. 285]. Upon consideration of the Motion, Opposition [Dkt No. 336-1], and Reply [Dkt. No. 341], the entire record herein, and for the reasons stated below, Defendants' Motion for Summary Judgment shall be **granted**.

## I.   BACKGROUND[1]

### A.   Factual Background

Plaintiffs' family member Esh Kodesh Gilmore ("Gilmore") was a United States national who made his home in Mevo Modi'im, an Israeli neighborhood near the West Bank.  See SOMF at 1 ¶¶ 1-2.  He was killed on October 30, 2000, in a shooting attack at a branch office of the National Insurance Institute ("NII") in East Jerusalem, where he worked as a security guard.  Id. at 2 ¶ 3.

The attack occurred at the beginning of the Second Intifada, a period of sustained violence and unrest in Israel and Palestine.[2]  According to an informational release issued by

---

[1] The facts are drawn from the Plaintiffs' Counter-Statement of Material Facts to Which There Are Genuine Issues ("SOMF") [Dkt. No. 335-4] and accompanying exhibits.  Resolution of this Motion turns entirely on whether certain items of evidence are admissible under the Federal Rules of Evidence, which is a matter to be determined solely by the Court and does not present any questions that would otherwise be submitted to a jury.  See Fed. R. Evid. 104.  Consequently, the Court includes facts that provide the basis for its evidentiary rulings, even if disputed.  Other than the date, location, and fact of Gilmore's death, the facts are disputed unless otherwise stated.

[2] According to a Report issued by the United States State Department, the "sustained violence between Israelis and Palestinians . . . broke out" on September 28, 2000, and by the end of July, 2001, more than 6,000 serious incidents of violence in the West Bank, Gaza, and Israel had been reported.  See Second Corrected Declaration of Robert J. Tolchin ("Tolchin Decl."), Ex. 64 (United States State Department Report on the

the Israel Ministry of Foreign Affairs ("IMFA"), the shooting was perpetrated by a sole gunman who entered the NII shortly after noon, fired a number of shots at close range at the two security guards in the waiting room, and fled on foot. See Second Corrected Decl. of Robert J. Tolchin ("Tolchin Decl."), Ex. 62 (IMFA webpage dated Sept. 23, 2013) [Dkt. No. 333-21]. Gilmore died upon arrival at the hospital. Id.

Although it is undisputed that the State of Israel never prosecuted or convicted anyone in connection with the attack, SOMF ¶ 4, Plaintiffs believe the attack was planned and carried out by a terrorist cell consisting of officers in a PA security unit known as the Presidential Security Services, or "Force 17," and members of an armed PLO faction called "Tanzim." See Complaint ("Compl.") ¶¶ 17-30 [Dkt. No. 1]. Specifically, they allege that the gunman who shot Gilmore was a Force 17 officer named Muhanad Abu Halawa. Id. ¶¶ 26, 27, 28.[3] Abu Halawa was killed by Israeli Defense Forces (IDF) on or about March 5, 2002. SOMF ¶ 6.

---

Status of the PLO Commitments Compliance Act ("PLOCCA"), dated Dec. 15, 2000 – June 15, 2001) at 2 [Dkt. No. 334-1 at 3].

[3]  Due to the transliteration of his name from Arabic to English, the name Abu Halawa is sometimes written as "Muhannad Abu Halaweh" and "Muhand Abu Haliwa."  He was also known as "Muhannad Sa'eed Munib Deireia."

Plaintiffs claim that "[b]etween September 2000 and his death in March 2002, a time period during which he was employed full-time in Presidential Security/Force 17, Abu Halawa spent much if not most of his time executing terrorist attacks together with a mix of other PA and Fatah officers, leaders and operatives . . . all of whom were convicted of carrying out numerous violent terrorist attacks[.]" SOMF at 8 ¶ 16. They further allege that, in carrying out the attack at the NII, Abu Halawa acted under a direct order of Force 17 regional commander Mahmoud Damara and pursuant to a broad directive issued by former Palestinian leader Yasser Arafat "to organize, plan and execute widespread acts of terrorism against civilians in Israel, Gaza and the West Bank." Compl. ¶¶ 23, 25, 28, 29.

Plaintiffs' theory that Abu Halawa perpetrated the attack is based in large part on two sets of custodial statements allegedly given to Israeli police by his associates.[4] The first is a January 18, 2001, written statement of Tanzim member Mustafa Maslamani ("Maslamani")[5] describing a conversation he had

---

[4] Plaintiffs also rely on a passage from the book The Seventh War, How We Won and Why We Lost the War with the Palestinians (2004) ("The Seventh War") by Avi Issacharoff and Amos Harel and reports issued by the Israeli government, which are discussed in more detail infra.

[5] Maslamani is sometimes referred to as "Misalmani."

with Abu Halawa in a cafe in Ramallah on December 30, 2000. According to this statement, Abu Halawa told Maslamani "that there were organizations that said that they had carried out . . . attacks at [the] French Hill [area of Jerusalem] and at the National Insurance Institute and that [it] is not true, because the one who did it was he himself, Muhannad Abu Halawa." See Tolchin Decl., Ex. 8 (custodial statement of Maslamani, dated Jan. 18, 2001) at 1 [Dkt. No. 331-8].

At his deposition in December 2001, however, Maslamani repudiated this statement, and testified repeatedly that he knew "nothing" about the NII attack and that Abu Halawa "never told me about that subject." See Tolchin Decl., Ex. 30 (deposition tr. of Maslamani, dated Dec. 30, 2001) ("Maslamani Tr.") at 19, 20, 22, 27 [Dkt. No. 342-1]. He further testified that, although his name was on the January 2001 custodial statement, he hadn't signed it, id. at 11; what was written in it was incorrect, id. at 22; and that he "didn't say anything to the police about" the NII attack. Id. at 23.

Maslamani was prosecuted for and convicted of involvement in other attacks against Israelis but was never prosecuted for or convicted of any involvement in the NII attack. See SOMF ¶ 18-19.

The second set of custodial statements on which Plaintiffs rely consists of four separate written statements made by Force 17 officer Bashar Al Khatib ("Al Khatib") to Israeli police in April 2002. Each of these statements is different. In the first statement, given April 11, 2002, Al Khatib confessed involvement in the previously mentioned French Hill shooting and three other shooting incidents but did not mention any participation in the NII attack. See Tolchin Decl., Ex. 9 (custodial statement of Al Khatib, dated April 11, 2002) [Dkt No. 331-9].

In the second statement, given a day later on April 12, 2002, Al Khatib stated that he was "prepared to tell you what I did not say yesterday," and went on to say that, on a direct order from Damara, he had accompanied Abu Halawa and another individual named Omar Karan to East Jerusalem where the NII was located and served as a lookout while Abu Halawa carried out the attack on the NII. Tolchin Decl., Ex. 10 (custodial statement of Al Khatib, dated April 12, 2002) at 1-3 [Dkt. No. 331-10].

In his third statement, given April 23, 2002, Al Khatib recanted the April 12 statement in its entirety as it related to the NII shooting and denied any connection to that attack. See Tolchin Decl., Ex. 11 (custodial statement of Al Khatib, dated

April 23, 2002) [Dkt. No. 331-11] at 4 ("In my previous statement to the police I said that I participated in the shooting attack at the national insurance office in East Jerusalem, but this is not correct, I did not participate in this attack and I just stated this and I have no connection to this attack.").

Finally, in his fourth statement, on April 24, 2002, Al Khatib again disclaimed all prior statements regarding the NII attack and gave yet another version of his connection to the attack. In this version, he wrote that Abu Halawa phoned him on October 30, 2000, to ask for assistance transporting a vehicle through an Israeli checkpoint. He stated further that when he met with Abu Halawa later that day, Abu Halawa told him that he (Abu Halawa), had carried out an attack at the NII with two other individuals at the direction of regional Force 17 commander Mahmoud Damara ("Damara"). See Tolchin Decl., Ex. 12 (custodial statement of Al Khatib, dated April 24, 2002) at 1-2 [Dkt. No. 331-12].

Like Maslamani, Al Khatib subsequently denied the truth of his custodial statements as they related to the NII attack. He testified at his deposition in this case that he provided the statements to Israeli police because "I was under torture, and I

-7-

was threatened regarding my wife and kids. . . .   So that was the only way out for me is to write this[.]"   Tolchin Decl., Ex. E (deposition tr. of Al Khatib, dated Dec. 5, 2011) ("Al Khatib Tr.") at 25:21-25 [Dkt. No. 330-5].   When asked whether he had had "any communication with Abu Halawa about [the NII] operation," he responded, "No. Not - not once," and further stated that "the entire National Insurance case, we have nothing to do with it."   Id. at 24:4-6, 28:11-13.

Like Maslamani, Al Khatib was prosecuted and convicted for his involvement in another attack involving Israelis but was never prosecuted for or convicted of any involvement in the NII attack.   SOMF ¶ 13.

**B.   Procedural Background**

On April 18, 2001, Plaintiffs filed this action against Defendants PA and PLO, as well as eleven of their current and former employees (the "Individual Defendants"), seeking compensation for Gilmore's death under the ATA and various common law theories.   See generally Compl.

Defendants PA and PLO and the Individual Defendants initially failed to answer the Complaint, prompting the Court to enter a default.   On January 29, 2002, however, they appeared through counsel and moved to vacate their default and to dismiss

-8-

the Complaint pursuant to Fed. R. Civ. P. 12(b). After granting the Motion to Vacate, the Court denied Defendants PA and PLO's Motion to Dismiss but granted the Individual Defendants' Motion to Dismiss for lack of personal jurisdiction. See <u>Gilmore v. Palestinian Auth.</u>, 422 F. Supp. 2d 96 (D.D.C. 2006).

Defendants PA and PLO then fired their attorneys and failed to file an Answer to the Complaint, prompting the Court to enter a second default against them on January 29, 2007 [Dkt. No. 92]. They subsequently retained new counsel and, on November 15, 2007, filed a Motion to Vacate the second entry of default, which the Court granted on December 28, 2009. See <u>Gilmore v. Palestinian Auth.</u>, 675 F. Supp. 2d 104, 111-13 (D.D.C. 2009) ("<u>Gilmore I</u>").

The parties then entered a two and-a-half year period of discovery, during which Plaintiffs took nine depositions, eight of which were non-party witness depositions conducted pursuant to the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters ("Hague Convention"). These included the December 2001 depositions of Maslamani, Mahmoud Mater, and Ziad Wahadan; the December 2011 depositions of Al Khatib, Damara, Abdel Karim Aweis ("Aweis"), and National Insurance Institute designee Ya'akov Aravot; and the June 2012

-9-

deposition of Israeli journalist Avi Issacharoff ("Issacharoff"), co-author of the book The Seventh War, How We Won and Why We Lost the War with the Palestinians ("The Seventh War"), which, as discussed infra, contains a passage implicating Abu Halawa as the gunman in the NII attack.

On August 9, 2012, Defendants filed the instant Motion for Summary Judgment, arguing, inter alia, that after more than two years of fact discovery, Plaintiffs' only evidence to support their core theory that Abu Halawa killed Gilmore is inadmissible hearsay. See generally Defs.' Mot. [Dkt. No. 285].

Plaintiffs did not immediately oppose Defendants' Motion but instead, on September 6, 2012, moved under Fed. R. Civ. P. 56(d) for additional time to complete discovery. See generally Pls.' Mot. for Relief Pursuant to Rule 56(d) [Dkt. No. 290]. They explained that they were in the process of moving, in Israeli court, to compel Issacharoff to disclose the identity of sources who allegedly told him that Abu Halawa was the gunman in the NII attack. Id. at 1-2, 4, 6, 7-8, 10-11. They also argued that an extension of time was necessary "because expert discovery has not started yet . . . and plaintiffs will oppose defendants' claim that the existing statements identifying Abu Halawa as the murderer are inadmissible, with expert

foundational testimony showing that they are admissible." Id. at 2, 10-11. On September 19, 2012, the Court granted Plaintiffs' Motion for Relief Pursuant to Rule 56(d) and extended their time to oppose Defendants' Motion for Summary Judgment until after the completion of expert discovery and Issacharoff's deposition [Dkt. No. 297].

Six months later, on March 19, 2013, Defendants moved to resume briefing on their Motion for Summary Judgment, noting that Plaintiffs had withdrawn their motion in the Israeli court to compel Issacharoff to reveal his sources and that expert discovery was at a standstill because Plaintiffs had not provided any expert disclosures [Dkt. No. 298].

While that motion was pending, on April 19, 2013, Plaintiffs filed a Motion to Compel Production of Late-Disclosed Documents [Dkt. No. 303]. On June 6, 2013, after reviewing in camera the documents Plaintiffs sought to compel, the Court denied the Motion to Compel and set dates for the completion of summary judgment briefing [Dkt. No. 314].[6]   Thereafter, on

---

[6]   Plaintiffs also filed a "Renewed Motion to Compel" GIS documents on December 23, 2013 [Dkt. No. 352], which the Court treated as a motion for reconsideration and denied [Dkt. No. 365]. See Gilmore v. Palestinian Interim Self-Government Auth., No. 01-853, 2014 WL 1193728 (D.D.C. Mar. 24, 2014) ("Gilmore II").

October 1, 2013, Plaintiffs filed their Opposition to Defendants' Motion for Summary Judgment [Dkt. No. 329]. On October 25, 2013, Defendants filed their Reply [Dkt. No. 341].

## II.  LEGAL STANDARDS

### A.  The ATA

The civil liability provision of the ATA states that any United States national who is injured "by reason of an act of international terrorism," or that individual's "estate, survivors, or heirs," may sue in any "district court of the United States and shall recover threefold the damages he or she sustains."  18 U.S.C. § 2333(a).  An act of "international terrorism" is defined to include activities that:

> (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;
>
> (B) appear to be intended - (i) to intimidate or coerce a civilian population; (ii) to influence the policy of a government by intimidation or coercion; or (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and
>
> (C) occur primarily outside the territorial jurisdiction of the United States or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce[.]

18 U.S.C. § 2331(1).

"In other words, to prevail [on a civil ATA claim], a
plaintiff must prove that the defendant would have violated any
one of a series of predicate criminal laws had the defendant
acted within the jurisdiction of the United States." Estate of
Parsons v. Palestinian Auth., 651 F.3d 118, 122 (D.C. Cir. 2011)
("Estate of Parsons II").   In addition, the plaintiff must meet
the territorial requirements set forth in Section 2331((1)(C)
and prove that the conduct constituting the predicate criminal
offense satisfies one of three intent requirements in Section
2331(1)(B).   18 U.S.C. § 2331(1).

    **B.**    **Standard on Summary Judgment**

Summary judgment should be granted only if the movant
establishes that there is no genuine dispute as to a material
fact and that the case may be resolved as a matter of law.   Fed.
R. Civ. P. 56(a).   A fact is "material" if a dispute over it
might affect the outcome of the suit under governing law; a
dispute is "genuine" if the evidence is such that "'a reasonable
jury could return a verdict for the nonmoving party.'" Holcomb
v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006) (quoting Anderson
v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

A summary judgment movant may carry its initial burden by
"pointing out . . . that there is an absence of evidence to

support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). The nonmoving party must then come forward with "evidence showing that there is a triable issue as to [each] element essential to that party's claim." Arrington v. United States, 473 F.3d 329, 335 (D.C. Cir. 2006) (citing Celotex Corp., 477 U.S. at 322). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by[] citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute[.]" Fed R. Civ. P. 56(c)(1).

The court must view any admissible evidence in the light most favorable to the nonmoving party, draw all reasonable inferences in its favor, and abstain from making credibility determinations or weighing the evidence. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). If the nonmovant has presented competent evidence on which a reasonable juror could rule in its favor on each element of its claim, summary judgment must be denied. On the other hand, "[i]f evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Liberty Lobby, 477 U.S. at 249-50 (citations omitted); see also Athridge v. Aetna Cas. &

-14-

Sur. Co., 604 F.3d 625, 631 (D.C. Cir. 2010) (a mere "possibility that a jury might speculate in the plaintiff's favor" is not sufficient to defeat summary judgment).

As the Supreme Court stated in Celotex Corp., "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." 477 U.S. at 322.

### C.   Evidentiary Principles

As our Court of Appeals has observed, "[v]erdicts cannot rest on inadmissible evidence." Gleklen v. Democratic Cong. Campaign Comm., 199 F.3d 1365, 1369 (D.C. Cir. 2000). Therefore, while a party opposing summary judgment "is not required to produce evidence in a form that would be admissible at trial, the evidence still must be capable of being converted into admissible evidence." Id. (emphasis in original). If it were otherwise, "the objective of summary judgment - to prevent unnecessary trials - would be undermined." Id. (citations omitted).

-15-

In ruling on summary judgment motions, the court decides questions of evidentiary admissibility, and in so deciding, is not bound by the Rules of Evidence, except those of privilege. See Fed. R. Evid. 104(a).   Matters pertaining to the admissibility of evidence must be established by a preponderance of evidence.   Daubert v. Merrell Dow Pharmas., Inc., 509 U.S. 579, 592 n.10 (1993).

Under the Federal Rules of Evidence, "hearsay" is not admissible unless an exception applies.   Fed. R. Evid. 802. Hearsay is an out-of-court statement offered to prove the truth of the matter asserted, unless it is a prior inconsistent statement of a witness, a party admission, or deposition testimony offered under the circumstances set forth in Fed. R. Evid. 32.   See Fed. R. Evid. 801(c)-(d); Fed. R. Civ. P. 32. Our Court of Appeals has held that, absent an applicable exception, hearsay is not capable of being converted into admissible evidence and therefore "'counts for nothing' on summary judgment."   Greer v. Paulson, 505 F.3d 1306, 1315 (D.C. Cir. 2007) (citation omitted).   Consequently, it is proper for the Court to rule on the admissibility of hearsay evidence in the context of a motion for summary judgment and to grant the

-16-

motion if it finds that Plaintiffs' proffered evidence consists only of inadmissible hearsay.

As to expert testimony, as the Supreme Court held in Daubert v. Merrell Dow Pharmaceuticals, the trial judge also performs a "gatekeeping" function to ensure that such testimony "both rests on a reliable foundation and is relevant to the task at hand." 509 U.S. 579, 597 (1993). Thus, it is also proper for the trial judge "to screen out inadmissible expert testimony on summary judgment." Strauss v. Credit Lyonnais, S.A., 925 F. Supp. 2d 414, 437 (E.D.N.Y. 2013) (citing Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997)). "This is true even if the exclusion of expert testimony would be outcome determinative." Id. (citing Gen. Elec. Co. v. Joiner, 522 U.S. 136, 142-43 (1997)).

## III. DISCUSSION

Defendants advance two sets of arguments in support of summary judgment: first, that Plaintiffs lack any admissible, nonhearsay evidence to support their lynchpin theory that Abu Halawa killed Gilmore; and second, that even if Plaintiffs possessed admissible proof that Abu Halawa killed Gilmore, there is no basis under the ATA on which to hold Defendants liable for his conduct – vicariously or otherwise. Because, as discussed

-17-

below, Plaintiffs fail to identify any admissible evidence
supporting their core theory that Abu Halawa killed Gilmore, and
therefore cannot prevail on their claim, the Court need not and
shall not reach Defendants' second set of arguments.

### A. Plaintiffs Fail to Identify Admissible Evidence to Support their Theory that Abu Halawa Killed Gilmore

Plaintiffs do not disagree that, in order to survive
summary judgment, they must produce admissible evidence that Abu
Halawa killed Gilmore. See Pls.' Opp'n at 2. They claim to
possess four types of such evidence: (1) Israeli government
reports; (2) a passage in the book The Seventh War; (3)
testimony given by Al Khatib at the military trial of Damara in
2009; and (4) Maslamani's 2001 custodial statement. Plaintiffs
also rely on the opinion of their expert, former IDF department
head and Lieutenant Colonel, Alon Eviatar, which Defendants
argue is inadmissible under Federal Rule of Evidence 702.

At the outset, the Court notes that, although Plaintiffs
sought and received more than a year-long extension of time to
file their Opposition to the instant Motion, their Memorandum of
Law contains only nine pages, is almost entirely devoid of any
citations to their Statement of Undisputed Material Facts or the
record, consists largely of conclusory assertions, and, in many

-18-

places, lacks any explanation whatsoever. As our Court of Appeals recently observed:

> In this circuit, it is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones. Two sentences of argument, a threadbare conclusion, and a handful of marginally relevant citations do not provide us with enough to adequately assess the strength of their legal conclusions.

Allaithi v. Rumsfeld, No. 13-5096, 2014 WL 2575417, at *6 (D.C. Cir. June 10, 2014) (citing Davis v. Pension Benefit Guar. Corp., 734 F.3d 1161, 1166-67 (D.C. Cir. 2013) (internal quotation marks omitted). Plaintiffs' failure to properly cite or even to quote the documentary sources on which they rely in their Memorandum of Law is compounded by the fact that they filed an overwhelming 2500-plus pages of documents annexed as exhibits to their Opposition brief. See Bombard v. Fort Wayne Newspapers, 92 F.3d 560, 562 (7th Cir. 1996) ("It is not our function to scour the record in search of evidence to defeat a motion for summary judgment; we rely on the nonmoving party to identify with reasonable particularity the evidence upon which he relies.").[7]

---

[7]   Defendants argue that approximately nineteen of Plaintiffs' ninety-six exhibits are inadmissible under Fed. R. Civ. P. 37(c)(1) because they were produced to Defendants for the first time in opposition to this Motion. See Defs.' Reply at 3 ¶ 3.

With these observations in mind, the Court considers whether Plaintiffs have identified any admissible evidence to support their theory that Abu Halawa killed Gilmore.

### 1.   Israeli Government Reports

Plaintiffs first rely on two Israeli government "reports," which they claim "identify[] Force 17 and Abu Halawa as having executed the murder." Pls.' Opp'n at 2.   These "reports" are actually press releases appearing on the IMFA webpage that purport to transmit information from an unidentified "IDF Spokesman." Tolchin Decl. ¶ 26.

The first "report" is captioned "Force 17 Background Material - March 2001." It does not even mention Abu Halawa but rather accuses Damara of having directed a terrorist cell responsible for "numerous terrorist attacks," including a "shooting attack in Jerusalem, in which a security guard was

---

Defendants did not, however, support this assertion with an attorney affidavit, and Plaintiffs have not had an opportunity to respond to it due to the fact that Defendants made it for the first time on reply.  For these reasons, and because Defendants do not rest on their Rule 37(c) argument, but rather challenge all of Plaintiffs' evidence on its merits, the Court shall assume, for purposes of this Motion only, that the exhibits Defendants identified as late-produced are admissible.

killed and another wounded (30 October)." See Tolchin Decl., Ex. 60 [Dkt. No. 333-19].[8]

The second "report" is captioned "Force 17 Terrorist Mohand Said Muniyer Diriya – 5 – Mar – 2002." It announces IDF's assassination of Abu Halawa and claims that he was a "member of a Ramallah-based terrorist cell" who "personally took part in" a list of twelve attacks, including the NII attack. See Tolchin Decl., Ex. 61 [Dkt. No. 333-20].

Plaintiffs argue that these IMFA "reports" are admissible under Federal Rule of Evidence 803(8),[9] which states that a record or statement of a public office is admissible if: (1) it sets out either "a matter observed while under a legal duty to report[]" or "factual findings from a legally authorized investigation," and (2) "neither the source of information nor other circumstances indicate a lack of trustworthiness." Fed. R. Evid. 803(8)(A)(ii)-(iii), (B).

Plaintiffs have not provided one iota of information as to how the material in the IMFA webpages was compiled or from what

---

[8] Although Plaintiffs allege that Damara ordered or directed the NII attack, they have not attempted to prove the PA's responsibility for the attack through him alone.

[9] Plaintiffs cite "Rule 803(8)(C)," which, as Defendants rightly observe, does not exist. Defs.' Reply at 5. The Court assumes Plaintiffs meant to cite Rule 803(8)(A) and (B).

-21-

sources it is derived.   As discussed, the webpages purport to relay information from an "IDF Spokesman" but no information has been provided as to who that Spokesman is, where that person got his or her information, or for what purpose.

Plainly, without knowing anything about the source of the information, the Court cannot conclude that it sets out matters personally observed by any Israeli official, no less one with a "legal duty to report," or factual findings from a legally authorized investigation.[10]   See, e.g., United States v. El-Mezain, 664 F.3d 467, 497-507 (5th Cir. 2011) (holding reports inadmissible under Rule 803(8) absent information as to "where or how [the declarant] obtained the information," the "circumstances under which the documents were created, the duty of the authors to prepare such documents, [or] the procedures and methods used to reach the stated conclusions"); Gill v. Arab Bank, PLC, 893 F. Supp. 2d 542, 571 (E.D.N.Y. 2012) (finding official reports of the Israeli Security Agency inadmissible

---

[10] This is especially true given that the State of Israel never prosecuted anyone for the NII attack and a police report detailing the Israeli Police department's investigation of the NII attack neither mentions Abu Halawa nor indicates that Israeli police made any factual findings related to the identity of the gunman.   See Tolchin Decl., Ex. 59 (Israeli police report titled "Murder of Esh Kodesh Gilmore . . . National Insurance Institute Offices-East Jerusalem," dated Nov. 22, 2000) [Dkt. No. 333-18].

under Rule 803(8) because, inter alia, they relayed "information of uncertain provenance"); cf. Estate of Parsons II, 651 F.3d at 134 (Tatel, J., concurring) (accepting assertions in public record authored by unknown source as true "would require piling inference (about the reliability and knowledgeability of the statement's author) upon inference (about when the statement was written) upon inference (about the statement's evidentiary basis) – akin more to speculation than to reasonable fact-finding").

Further, Rule 803(8) "is based on the notion that public records are reliable because there is a lack of . . . motivation on the part of the recording official to do other than mechanically register an unambiguous factual matter." El-Mezain, 664 F.3d at 498-99 (5th Cir. 1985) (quoting United States v. Quezada, 754 F.2d 1190, 1194 (5th Cir. 1985)).   Thus, as previously stated, the Rule requires that "neither the source of information nor other circumstances indicate a lack of trustworthiness."  Fed. R. Evid. 803(8)(B).  The Court obviously cannot draw any conclusions about the "motivation[s]" of the recording officials when it lacks any information about who those officials are, where they got their information, and under what circumstances.   The complete absence of such information

-23-

"indicate[s] a lack of trustworthiness." Fed. R. Evid. 803(8)(B).

In sum, the Court concludes that the IMFA webpages are not admissible under Rule 803(8) and, therefore, do not create a genuine factual dispute that Abu Halawa killed Gilmore.[11]

### 2.   Passage from The Seventh War

Next, Plaintiffs rely on a passage in Issacharoff's book The Seventh War. The passage states that, after the attack at the National Insurance Institute, Abu Halawa "phoned Abdel Karim Aweis, a member of the General Intelligence apparatus from Jenin" and "told Aweis that he wanted to announce to the media that he assumed responsibility for the East Jerusalem attack on behalf of a new military wing of Fatah." Tolchin Decl. Ex. 54 [Dkt. No. 333-12]. The passage further reports that Abu Halawa and Aweis conferred on a name in which to announce responsibility for the attack and eventually settled on the name "Al Aqsa Martyrs Brigades," which Aweis allegedly preferred "since it did not contain the name Fatah," whose "leadership

---

[11] Indeed, Plaintiffs had previously acknowledged that they were "not aware of any rule of evidence that would permit the admission at trial of the [IMFA] statement[s]." See Pls.' Application for Issuance of a Letter of Request for Judicial Assistance Pursuant to the Hague Convention at 3 n.4 [Dkt. No. 213].

feared being identified with attacks." Id.[12]  At his deposition,
Issacharoff testified that this account was based on an
interview he conducted with Aweis in an Israeli prison in 2004.

Plaintiffs concede, as they must, that to admit the passage
as evidence that Abu Halawa killed Gilmore, they must establish
a basis to admit each out-of-court statement embedded within it,
namely: (1) Issacharoff's written account, (2) Aweis' statements
to Issacharoff at the interview in 2004,[13] and (3) Abu Halawa's
statement to Aweis after the NII attack.  Pls.' Opp'n at 3-4;
see Fed. R. Evid. 805 (excluding "hearsay within hearsay" unless
"each part of the combined statements conforms with an exception
to the rule").  The Court shall not reach whether Issacharoff's
written account is admissible because, as discussed below,

---

[12] Earlier in the passage, the book identifies Abu Halawa as the
gunman in the NII attack, but Plaintiffs do not seek to admit
that portion.  See Pls.' Opp'n at 3.

[13] Defendants argue that there is no "statement" of Aweis because
the book paraphrases rather than directly quotes the content of
his conversation with Issacharoff.  Defs.' Mot. at 21.
Assuming, however, that Issacharoff's written account was
admissible, the absence of a direct quote does not itself change
the analysis under the hearsay rules.  See Harris v. Wainwright,
760 F.2d 1148, 1152 (11th Cir. 1985) (testimony implying that
declarant had furnished the police with evidence was hearsay
although not retold verbatim); Keith v. Kurus, No. 3:08 CV 1501,
2009 WL 2948522, at *17 (N.D. Ohio Sept. 11, 2009)
("Paraphrasing or not repeating the witness's statement verbatim
does not exclude it from being hearsay.") (citations omitted).

Plaintiffs have not established a basis to admit the statements of either Abu Halawa or Aweis.

### i.   Abu Halawa's Statement

Plaintiffs argue that Abu Halawa's statement to Aweis "that he wanted to announce to the media that he assumed responsibility for the East Jerusalem attack on behalf of a new military wing of Fatah" is a statement against penal interest admissible under Rule 804(b)(3).

Rule 804(b)(3) provides that an out-of-court statement is admissible if: (1) the declarant is unavailable to provide testimony; and (2) the declarant's statement is "so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency . . . to expose the declarant to civil or criminal liability" that "a reasonable person in the declarant's position would have made [it] only if the person believed it to be true[.]"  Fed. R. Evid. 804(b)(3).

Because Abu Halawa is deceased, he is "unavailable" within the meaning of Rule 804(b)(3).  See Rule 804(a)(4).  However, his very desire to "assume responsibility" for the NII attack suggests that he perceived public attribution for the attack to be in his interest, not contrary to it.  As other courts have observed, "[u]nder the perverse assumptions of terrorists, an

armed attack on civilians reflects glory.  Taking 'credit' for such an attack is deemed a benefit, not a detriment[.]"  Gill, 893 F. Supp. 2d at 569; see also Strauss, 925 F. Supp. 2d at 449 ("While admitting to a violent attack on innocents typically is detrimental to a declarant's interests, the interests and motives of terrorists are far from typical.").  Applying this same reasoning, the Court concludes that Abu Halawa's announcement to Aweis that he would assume responsibility for the NII attack was a publicity-seeking effort that was not contrary to his perceived interests.  Therefore, his statement is not admissible under Rule 804(b)(3).

### ii. Aweis's Statements

Plaintiffs make two arguments for admitting Aweis's out-of-court statements to Issacharoff, both of which are similarly unavailing.

Vicarious Party Admission

Plaintiffs first argue that Aweis's statements are admissible as a vicarious party admission under Rule 801(d)(2)(D).  That rule provides that a statement offered against an opposing party is not hearsay if it "was made by the party's agent or employee on a matter within the scope of that relationship and while it existed[.]"  Fed. R. Evid.

801(d)(2)(D).   Thus,  to  establish  admissibility  under  this
exception,  Plaintiffs  must  demonstrate  both  that  Aweis  was
employed by the PA at the time of the interview with Issacharoff
and that the statements concerned a matter within the scope of
his employment.

It  is  undisputed  that  Aweis  served  as  an  intelligence
officer in the PA's General Intelligence Service ("GIS") between
1998 and 2002, when he was arrested by Israeli authorities.   It
is further undisputed that, at the time of his interview with
Issacharoff,  he  was  serving  "multiple  life  sentences"  in  an
Israeli  prison  for  his  involvement  in  a  number  of  terrorist
attacks.   See Eviatar Decl. ¶ 61 [Dkt. No. 345]; Defs.' Reply at
10.   Plaintiffs  argue,  however,  that  he  was  still  an  employee
of the PA at the time because the PA has a policy of promoting
and paying its officers while they are imprisoned in Israeli
custody. Pls.' Opp'n at 3-4.

The Supreme Court has held that where, as here, a rule or
statute uses "the  term  'employee'  without  defining  it,"  it
should be construed to describe "the conventional master-servant
relationship  as  understood  by  common-law  agency  doctrine."
Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 322-24 (1992)
(citations  omitted).   For  purposes  here,  it  is  sufficient  to

apply the simplest formulation of that doctrine:  an employee is "[a] person who works in the service of another person (the employer) under an express or implied contract of hire, under which the employer has the right to control the details of work performance." BLACK'S LAW DICTIONARY 602 (9th ed. 2009).  There is no evidence that Aweis performed any work or services for the PA while in prison.  While he testified that he received payments from the PA while in prison, he stated that the payments came from the "Prisoners Club," not GIS, and there is no indication that he was required to perform any services in order to receive them.  See Tolchin Decl., Ex. G (deposition tr. of Abdel Karim Aweis, dated Dec. 7, 2011) ("Aweis Tr.") at 21:23-24 [Dkt. No. 330-7].

Further, although the PA maintains a policy of promoting its officers who are imprisoned in Israeli custody, the evidence indicates that such promotions occur automatically with the passage of time.  See Tolchin Decl., Ex. F (deposition tr. of Mahmoud Damara, dated Dec. 6, 2011) at 8:20-9:17 [Dkt. No. 330-6] ("Q. So you were promoted while you were in jail, correct? A. Yes. . . .  And the reason is that our military ranks are subject to automatic promotion when the time factor matures. . . . It's all computerized lists.  As long as you meet the

standards, you get promoted."). There is no evidence that Aweis was required to do anything, or refrain from doing anything, in order to receive the promotions.[14] Consequently, the record does not establish that he continued to be employed by the PA for purposes of Rule 801(d)(2)(D) at the time of his interview with Issacharoff.[15]

Even assuming Aweis was still employed by GIS while he served out multiple life sentences in an Israeli prison, Plaintiffs have not shown that his statements to Issacharoff fall within the scope of that employment. There is no evidence that Aweis's job functions included gathering intelligence related to terrorist attacks generally, much less that the NII attack was the type of attack he would have investigated or did investigate. See Aliotta v. Nat'l R.R. Passenger Corp., 315

---

[14] Indeed, Abu Halawa was promoted posthumously after his assassination, clearly indicating that the mere fact of a promotion does not imply the ongoing provision of services. See Tolchin Decl., Ex. 67 (Abu Halawa employment records) at 1 [Dkt. No. 334-6].

[15] Plaintiffs contend that "the rationale underlying F.R.E. 801(D)(2)(d) [sic] is not the employee's provision of services to the employer but the employee's dependence on, and resulting loyalty to, the employer." Pls.' Opp'n at 3 (citing Nekolny v. Painter, 653 F.2d 1164, 1172 (7th Cir. 1981)). Loyalty may be one of the rationales underlying Rule 801(d)(2)(D), but loyalty alone does not suffice. The Rule requires that the employee have made the statement "while [the employment relationship] existed." Fed. R. Evid. 801(d)(2)(D).

F.3d 756, 762 (7th Cir. 2003) ("[T]he subject matter of the admission [must] match the subject matter of the employee's job description."); <u>Wilkinson v. Carnival Cruise Lines, Inc.</u>, 920 F.2d 1560, 1566-67 & n.12 (11th Cir. 1991) (holding that scope of cabin steward's employment did not include knowing whether door outside his work area was defective without a showing that "he [was] ordered to the area in question, or told of the problems with the doors in connection with his duties").

Plaintiffs rely on the Declaration of Majed Faraj, Head of Intelligence for GIS, to argue that "as a PA intelligence officer it was Aweis' job, <u>by definition</u>, to learn and obtain information about terrorist activity, such as the murder of Mr. Gilmore." Pls.' Opp'n at 4 (emphasis in original). However, Faraj's Declaration merely describes the general functions of GIS as an agency; it does not mention Aweis or anything about his specific position as an employee of GIS. <u>See</u> Pls.' Opp'n, Ex. 1 (Decl. of Majed Faraj) ¶¶ 4-6 [Dkt. No. 336-2]).

Further, even if Aweis's job included learning and obtaining information about the NII attack, his statements to Issacharoff pertained to selecting a name in which Abu Halawa would assume responsibility for the attack. There is no evidence that he and Abu Halawa ever discussed any intelligence

related to attack and no suggestion that his professional duties included media announcements assigning responsibility for terrorist attacks.    To the contrary, Abu Halawa purportedly wanted to take credit for the attack, not as an officer of the PA, but on behalf of a "new military wing of Fatah," suggesting that both men viewed their conversation as relating to activities independent of their responsibilities as PA employees.

For all of these reasons, Plaintiffs have not shown that Aweis's statements are admissible as a vicarious party admission under Rule 801(d).

Statement Against Penal Interest

Plaintiffs' second argument for the admission of Aweis's statements is that they were contrary to his penal interests under Rule 804(b)(3).   As discussed, to satisfy this exception, Plaintiffs must show both that Aweis is "unavailable" and that his statements had "so great a tendency" to expose him to criminal liability that a reasonable person in his position would not have made them unless believing them to be true.   Fed. R. Evid. 804(b)(3).

Plaintiffs argue that Aweis is unavailable because "at his deposition in this case he could not recall his

-32-

conversations[.]" Pls.' Opp'n at 3.  A declarant is considered to be "unavailable" if, among other things, he or she "testifies to not remembering the subject matter" of the prior statement. Fed. R. Evid. 804(a)(3). Plaintiffs do not, however, specify which conversation they contend Aweis could not recall – the conversation with Issacharoff or the one with Abu Halawa.  As Defendants point out, Aweis testified that he did remember his conversation with Issacharoff but could not recall specifically what he had told Issacharoff.  See Aweis Tr. at 40:20-24.

In any event, this definition of unavailability "applies only if the declarant is unable to remember the 'subject matter'" of the statement, "i.e., if 'he has no memory of the events to which his hearsay statements relate.'  The fact that the witness does not remember making the statements themselves is irrelevant." Lamonica v. Safe Hurricane Shutters, Inc., 711 F.3d 1299, 1317 (11th Cir. 2013) (citations omitted). Consequently, Aweis's inability to recall precisely what he said to Issacharoff does not render him unavailable under Rule 804(a)(3) so long as he remembered the underlying subject matter of which they spoke.  Id. at 1317.

Aweis did not testify to a lack of memory regarding the subject matter of his interview with Issacharoff, which was his

purported telephone conversation with Abu Halawa immediately
after the NII attack.  To the contrary, when asked whether he
had ever discussed the NII shooting attack with Abu Halawa, he
answered definitively "No, no."  Aweis Tr. at 41:21.  He also
testified that he had no knowledge regarding the NII shooting
and that he first met Abu Halawa in December 2001, more than one
year after the NII attack and purported conversation took place.
Id. at 41:4-17.  Because Aweis did not testify to a lack of
memory regarding the alleged conversation with Abu Halawa, but
rather that it never happened, he is not "unavailable."  See,
e.g., United States v. Uribe, 88 F. App'x 963, 964-65 (8th Cir.
2004) (holding that a declarant who "remembered what happened"
is not "unavailable" under Fed. R. Evid. 804(a)(3)).

Plaintiffs also have not shown that Aweis's statements were
contrary to his penal interests.  First, nothing about the
statement implicates Aweis in actually perpetrating the attack;
it merely gives him credit for helping to select the name in
which Abu Halawa took responsibility for the attack.  Second, at
the time Aweis made the statements, he was already serving
multiple life sentences, substantially diminishing the prospect
that he would be deterred from making statements that could
expose him to further criminal liability.  Third, as the Court

has already observed, efforts by known terrorists to associate themselves with terrorist activities are not perceived to be against their interests and do not qualify under Rule 804(b)(2). See Gill, 893 F. Supp. 2d at 569; Strauss, 925 F. Supp. 2d at 449.

In sum, even if the passage in The Seventh War qualifies as a recorded recollection of Issacharoff's interview with Aweis, it is still inadmissible for two other reasons, namely that the hearsay statements of both Aweis and Abu Halawa embedded in Issacharoff's account are inadmissible. Consequently, the passage in The Seventh War cannot be used to prove that Abu Halawa killed Gilmore.

### 3.   Statements of Bashar Al Khatib

Next, Plaintiffs contend that Al Khatib testified under penalty of perjury at Damara's military trial on January 12, 2009, that "his statements and handwritten accounts to the Israeli police implicating Abu Halawa in the murder were true." Pls.' Opp'n at 4. They argue that this testimony is "admissible under Rule 801(d)(1)(A) because Khatib repudiated that sworn trial testimony in his deposition in this case." Id.[16]

---

[16] Plaintiffs do not argue that Al Khatib's four custodial statements are independently admissible. Our Court of Appeals has observed that "statements made to investigating officials"

Rule 801(d)(1)(A) applies to prior inconsistent statements of a witness. Its "essential requirements" are that "(1) the declarant testifies at the trial [or deposition]; (2) the declarant is subject to cross-examination concerning the [prior] statement; (3) the statement is inconsistent with his [or her] present testimony; and (4) the prior statement was given under oath." United States v. Emor, No. 10-298 (PLF), 2012 WL 458610, at *1 (D.D.C. Feb. 13, 2012) (internal citations omitted).

As Defendants point out, Plaintiffs "seek to rely on a supposedly prior inconsistent statement without identifying the statement." Defs.' Reply at 14. Plaintiffs have not cited to any portion of the Damara trial transcript in which Al Khatib admitted, as they contend, "that his statements and handwritten accounts to the Israeli police implicating Abu Halawa in the murder were true[.]" Pls.' Opp'n at 4. The Court's own review of that transcript reveals none. Instead, Plaintiffs appear to hang their hat on a brief portion of the transcript in which, the prosecutor asked, "[a]ccording to what I understand from you, everything that you have said about Muhannad Abu Halawa,

---

are generally inadmissible under Rule 801(d)(1)(A) unless made in the course of formal proceedings in which certain guarantees of reliability are present. United States v. Livingston, 661 F.2d 239, 242-43 (D.C. Cir. 1981) (citing cases). As noted, Plaintiffs have not shown that such guarantees of reliability were present during Al Khatib's interrogation.

about Bashir Nafa, Omar Ka'adan, everything is correct but whatever is related to [Damara] is incorrect. Correct?" and Al Khatib answered "Yes." <u>See</u> Tolchin Decl., Ex. 18 (transcript of military trial of Mahmoud Damara, testimony of Bashar Al Khatib) at ECF p. 18 [Dkt. No. 331-18].

During Al Khatib's deposition in 2011, Plaintiffs' counsel did not confront Al Khatib with this testimony or ask him to explain it. Plaintiffs' counsel asked Al Khatib only whether he had been questioned about his custodial statements at Damara's trial. Tolchin Decl., Ex. E (Al Khatib tr.) at 29-31. He did not follow up by asking Al Khatib specifically about his one-word response to the prosecutor's question of whether everything he had said in his prior statements about Bashir Nafa, Omar Ka'adan, and Abu Halawa was correct. Because Rule 801(d)(1)(A) requires that a declarant be cross-examined about the specific statement sought to be introduced as inconsistent, this failure alone is grounds to exclude the 2009 testimony on which Plaintiffs rely. <u>See</u> Fed. R. Evid. 613(b), 801(d)(1).

Moreover, it is not at all clear that, in his response to the prosecutor's question at Damara's trial, Al Khatib understood himself to be affirming the truth of his prior statements implicating Abu Halawa in the NII attack (which is,

-37-

of course, the only way in which that statement would be inconsistent with his testimony in this case).  The prosecutor's question as to whether everything he had previously said "about Muhannad Abu Halawa, about Bashir Nafa, Omar Ka'adan, [was] correct" directly followed questioning related to an incident other than the NII attack.[17]  Earlier in the same examination, Al Khatib testified specifically about the NII attack, and that testimony was consistent with his testimony in this case.  In particular, when asked what he knew "about the attack at the National Insurance Institute in East Jerusalem[,]" Al Khatib answered:

> The National Insurance Institute case <u>has no connection to us</u>.  I was asked about this case.  I was interviewed about it, and they were unable to prove anything and then they threatened that they would bring in my wife, I don't want to talk about the nastiness there. . . .  I did not confess to that, it had nothing to do with me and it is not in my record.

---

[17] <u>See</u> Tolchin Decl., Ex. 18 (Damara Trial Tr. of Al Khatib) [Dkt. No. 331-18 at ECF p. 18] ("Q. Is it correct that in that same year, 2000-2001, you heard on the radio that there were confrontations with Israeli army forces in the Ein Arik area and you drove there with Nasser Nafez Darama, and then he got out and started shooting and you got angry at him?  A: Correct, but these are his words, not mine.  Q: But you said that to the police.  A: In another case.  Which is unrelated to this case . . .  You are talking about something that happened eight years ago.  Q:  According to what I understand from you, everything that you have said about Muhannad Abu Halawa, about Bashir Nafa, Omar Ka'adan, everything is correct but whatever is related to the Defendant is incorrect.  Correct?  A: Yes.")

Tolchin Decl., Ex. 18 (tr. of military trial of Mahmoud Damara, testimony of Bashar Al Khatib) at ECF p. 16 [Dkt. No. 331-18] (emphasis added). When asked again about the "attack at the National Insurance Institute in East Jerusalem," he responded "I have no connection to that" and further testified that he only signed the written statements "because they threatened to attack my wife." Id. at 17 (emphasis added). In sum, Al Khatib's testimony at Damara's trial was generally consistent, not inconsistent, with his testimony in this case. His one word response to a vague question by the prosecutor does not change that equation.

Because Plaintiffs have not shown that Al Khatib gave inconsistent testimony at Damara's trial, or that they ever cross examined him regarding such testimony, the testimony is not admissible under Rule 801(d)(1)(A) and cannot be used at trial to support their theory that Abu Halawa killed Gilmore.[18]

### 4. Statements of Maslamani

Fourth, Plaintiffs rely on Maslamani's January 18, 2001, custodial statement that Abu Halawa took credit for carrying out

---

[18] Having so concluded, the Court need not address Defendants' argument that "the Hebrew transcript from the Damara trial . . . does not even contain statements of Bashar Al Khatib" because he "testified in Arabic and the statements in the Hebrew transcript are those of an IDF soldier serving as an interpreter." Reply at 14.

the attack at the National Insurance Institute.   See Tolchin
Decl., Ex. 8 (custodial statement of Maslamani, dated January
18, 2001) at 1.   Plaintiffs contend that this statement is
admissible as a statement against penal interest under Rule
804(b)(3).   The Court disagrees.

First, as previously discussed, a statement against
interest is only admissible if the declarant is "unavailable."
See Fed. R. Evid. 804(b)(3).   Plaintiffs do not identify a basis
on which Maslamani is "unavailable" within the meaning of Rule
804, and none of the limited bases set forth under Rule 804(a)
apply.   Maslamani was deposed in this case, gave testimony
concerning the NII attack, and neither refused to answer
questions on that topic nor testified as to a lack of memory.
See Fed. R. Evid. 804(a)(2)-(5).[19]   Consequently, he is not
"unavailable."   See Grace United Methodist Church v. City Of
Cheyenne, 451 F.3d 643, 665 n.11 (10th Cir. 2006) (a "deposed
declarant . . . can never be 'unavailable' for purposes of an
exception under Rule 804(b)(3)"); see also Campbell ex rel.
Campbell v. Coleman Co., 786 F.2d 892, 896 (8th Cir. 1986)

---

[19] As discussed earlier, at his deposition, Maslamani repudiated
the truth of this statement as it pertained to the NII attack
and testified repeatedly that he knew "nothing about that
subject" and that Abu Halawa "never told me about that subject."
Maslamani Tr. at 19, 22.

(deposed declarant was not "unavailable" under Rule 804(a)(5) because that "subsection is concerned with the absence of testimony, rather than the physical absence of the declarant") (citations omitted).

Plaintiffs contend that Maslamani nevertheless is "unavailable" because they did not have the opportunity to redepose him after he purportedly agreed to the admission of his January 2001 custodial statement as evidence against him at his criminal trial in Israel in 2003. Pls.' Opp'n at 5. Even if this was relevant, Plaintiffs do not cite any evidence indicating that Maslamani agreed to the admission of his statement as it related to the NII attack, for which Maslamani was never charged. As Defendants point out, the "Israeli military tribunal quoted in its entirety the portion of the Misalmani custodial statement deemed admitted by consent, and it did not include the portion relating to the shooting of Gilmore at the National Insurance Institute . . . Rather, it relates to the shooting of Talia and Binyamin Kahane, for which Misalmani was convicted." Defs.' Reply at 17 (citing Tolchin Decl., Ex. 7 (verdict)) at 5, 28-31). Nor do Plaintiffs explain why Maslamani's agreement to admit statements inculpating Abu Halawa at his criminal trial is sufficiently relevant to this case that

their inability to redepose him on the subject renders him "unavailable."[20]

Second, even if Maslamani was unavailable, as Defendants point out, the part of his statement implicating Abu Halawa in the NII attack was exculpatory, not inculpatory. Maslamani did not confess any responsibility for the NII attack; he blamed Abu Halawa. As the Supreme Court has held, Rule 804(b)(3) "does not allow admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory." Williamson v. United States, 512 U.S. 594, 600-01 (1994); see also Fed. R. Evid. 804, Advisory Committee Notes to exception 3 ("[A] statement admitting guilt and implicating another person, made while in custody, may well be motivated by a desire to curry favor with the authorities and hence fail to qualify as against interest.").

Because Maslamani is available and his testimony about the NII attack was not contrary to his penal interests, his

---

[20] Plaintiffs argue that, under operation of Israeli military law, Maslamani's admission of the statement "constituted an endorsement by Maslamani of all the facts contained in the statement." Pls.' Opp'n at 5. Even if this is true, and even if Maslamani agreed to the admission of the entire statement as opposed to merely the portions pertaining to the attack for which he was convicted, Plaintiffs do not explain how the legal consequences of that admission under Israeli military law is relevant to the admissibility of the statement under the Federal Rules of Evidence.

custodial statement is not admissible under Rule 804(b)(3) and cannot be used at trial to prove that Abu Halawa killed Gilmore.[21]

### 5.   The Expert Opinion of Alon Eviatar

Fifth and finally, Plaintiffs have retained, as an expert witness, former IDF intelligence officer and Department Head of Palestinian Affairs, Alon Eviatar, who opines, among other things, that it is "more likely than not, that Muhanad Abu Halawa carried out the October 30, 2000 murder of Mr. Gilmore." See Corrected Decl. of Alon Eviatar ("Eviatar Decl.) ¶ 33 [Dkt. No. 345]. Plaintiffs argue that even if none of the foregoing evidentiary items are admissible, Eviatar's opinion is sufficient to take their case to a jury.

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. It provides that a witness who is qualified as an expert may "testify in the form of an opinion or otherwise if: (a) the expert's . . . specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of

---

[21] The Court also notes that even if Maslamani's own statement was admissible, it is double hearsay because it merely recounts Abu Halawa's own out-of-court statement, which the Court has already ruled is inadmissible.

reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

Defendants argue that Eviatar's opinion that Abu Halawa was "more likely than not" Gilmore's killer is inadmissible because he is "not applying any particular methodology or specialized expertise to his review of the Plaintiffs' inadmissible hearsay," but is merely "reviewing and weighing the evidence" in precisely the same manner as would an ordinary trier of fact. Reply at 19.[22]  The Court agrees.

First, Eviatar has not identified any particular methodology he used to form his opinion.  To the extent the Court can discern a methodology supporting his conclusion that Abu Halawa was "more likely than not" Gilmore's murderer, it is his statement that, "[a]s a rule, the strength (likely accuracy) of an assessment or conclusion is a function of three main variables:  (i) the nature and/or quality of available information and data; (ii) the variety and diversity of the sources and/or types of information and data; and (iii)

---

[22] Defendants note that Plaintiffs did not identify Eviatar as an expert witness in their Rule 26 disclosures.  Defs.' Reply at 4. However, they do not claim that his opinion is inadmissible on that basis.

cumulative experience and knowledge and professional instincts
and intuition." Eviatar Decl. ¶ 32.

Eviatar does not, however, even consider these variables in
reaching his conclusion that "it is very likely, and certainly
more likely than not, that Muhanad Abu Halawa carried out the
October 30, 2000 murder of Mr. Gilmore." Id. ¶ 33. Instead, his
analysis is devoted entirely to explaining why he believes
Plaintiffs' hearsay evidence is reliable. See id. ¶¶ 34-64.
His Declaration contains no discussion of "the variety and
diversity of the sources and/or types of information and
data[.]" Nor does he explain how his "cumulative experience and
knowledge" as an IDF intelligence officer, as opposed to
commonsense and general deductive principles that any non-expert
finder of fact would rely on, lead him to the conclusion that
Abu Halawa was the likely murderer.

Because Eviatar fails to consider the very factors he
claims should be considered in determining "the strength (likely
accuracy) of an assessment or conclusion," he has not "reliably
applied" his own methodology to the facts of this case and,
therefore, his opinion does not satisfy Rule 702(d). See, e.g.,
Strauss, 925 F. Supp. 2d at 441 ("[I]t is well settled that
'[u]nder Daubert and Rule 702, expert testimony should be

excluded if the witness is not actually applying [the] expert methodology.'") (citing <u>United States v. Dukagjini</u>, 326 F.3d 45, 54 (2d Cir. 2003)).

Second, even if Eviatar had faithfully applied his own methodology, his analysis is based entirely on hearsay evidence that the Court has already ruled is inadmissible. Eviatar Decl. ¶¶ 34-64.[23]   Although an expert is entitled to rely on inadmissible evidence in forming his or her opinion, the expert "must form his [or her] own opinions by applying his [or her] extensive experience and a reliable methodology to the inadmissible materials." <u>United States v. Mejia</u>, 545 F.3d 179, 197 (2d Cir. 2008) (quotation marks and internal citations omitted); <u>see also</u>

<u>Estate of Parsons I</u>, 715 F. Supp. 2d at 33 ("Expert opinions may be based on hearsay, but they may not be a conduit for the introduction of factual assertions that are not based on personal knowledge.") (citing Fed. R. Civ. P. 56(e)(1)); <u>Strauss</u>, 925 F. Supp. 2d at 445 (expert "testimony cannot be used as an excuse to introduce and summarize straightforward

---

[23]   Eviatar also relies on two other sets of out-of-court statements Plaintiffs do not rely upon: Al Khatib's custodial statements and an April 2001 edition of Force 17's official magazine, Humat al-Areen.  Eviatar Decl. ¶¶ 34-64.

factual evidence that has not been admitted, such as a webpage that says 'Hamas carried out a suicide bombing'").

Eviatar has not applied any specialized knowledge to the hearsay materials on which he relies.  Instead, his analysis consists entirely of deductions and observations that flow directly from the content of the hearsay statements and would be self-evident to a layperson.  For example, he suggests that Al Khatib's four custodial statements should be believed rather than his deposition testimony in this case because at his deposition, he did "not seem to have been a neutral or spontaneous witness, and his testimony was not continuous or complete, as it was in his statements to Israeli police." Eviatar Decl. ¶ 51.  Likewise, he opines that Maslamani's custodial statement is reliable because it is "fairly detailed in respect to both the circumstances in which Abu Halawa conveyed the information to Maslamani, and the particulars of the attacks."  Id. ¶ 56.  These are precisely the type of generalized inferences that a lay person, and the jury itself, could draw without any expert assistance.[24]

_____

[24]  The Court also notes that accepting some of Eviatar's assertions would require the suspension of common sense.  For example, he opines, without any explanation whatsoever, that Al Khatib's custodial statements are more reliable than his deposition testimony because Israeli police interrogations are

Eviatar's discussion of the other evidentiary sources he relies on is similarly generalized.   He states that he has "followed" Issacharoff's work over the course of his career and "found him to be knowledgeable, thorough, unbiased and honest" and has "no reason to doubt" his account.   Id. ¶ 44.   He does not, however, provide any facts regarding the basis of this opinion much less relate it to his specific experience and expertise.

The closest Eviatar comes to drawing on his extensive experience as an intelligence officer is his self-serving conclusory statements that it is "likely" that the IMFA webpages "would not have been issued by the State of Israel unless Israeli authorities" had a "high degree of certainty" regarding the facts reported.   Id. ¶ 37.   He opines that this is so because the Israeli government takes "formal, public accusations of this type" as "very serious matters" that "place[] Israel's credibility on the line . . . in the eyes of the international community" and carry the risk of "an unnecessary escalation of tensions with the Palestinians."   Id. ¶¶ 35-36.

Eviatar fails, however, to discuss the specific protections that constrain the IDF's and IMFA's decision to publish

"more personal, private and calm and less tense" than a civil deposition.   Eviatar Decl. ¶ 57.

intelligence information; the quantum of evidence necessary to satisfy the IMFA's concerns regarding maintaining its credibility in the international community and avoiding unnecessary conflict with the Palestinians; from whom in the IDF the IMFA would have obtained its information; the types of sources on which the IDF would have relied; and/or what protocols or processes the IMFA and IDF would have used to confirm the accuracy of sources prior to publication.

Because Eviatar's opinion consists entirely of generalized and conclusory assertions that lack any basis in his specialized knowledge, the Court concludes that he "is simply repeating hearsay evidence without applying any expertise whatsoever, a practice that allows [Plaintiffs] to circumvent the rules prohibiting hearsay." Mejia, 545 F.3d at 197 (quotation marks and internal citations omitted).

In sum, Eviatar's opinion is not based on any reliable "principles [or] methodology" reliably applied to the facts of the case, Daubert, 509 U.S. at 595, and does not draw on any specialized knowledge that would be helpful to the jury, as is required by Rule 702. Williams v. Illinois, 132 S. Ct. 2221, 2241 (2012). Instead, he merely weighs the evidence in precisely the same way as would a trier of fact.

"It has long been the law in this Circuit that 'where the jury is just as competent to consider and weigh the evidence as is an expert witness and just as well qualified to draw the necessary conclusions therefrom, it is improper to use opinion evidence for the purpose.'" Evans v. Wash. Metro. Area Trans. Auth., 674 F. Supp. 2d 175, 179-80 (D.D.C. 2009) (quoting Henkel v. Varner, 138 F.2d 934, 935 (D.C. Cir. 1943)); see also United States v. Boney, 977 F.2d 624, 628 (D.C. Cir. 1992) ("[Expert] testimony should ordinarily not extend to matters within the knowledge of laymen."); United States v. Farrell, 563 F.3d 364, 377 (8th Cir. 2009) (expert usurped jury function when she "opined on the strength of the Government's case and the credibility of its witnesses").

Consequently, Eviatar's opinion is not admissible to prove that Abu Halawa killed Gilmore.

### 6.  Plaintiffs Have Not Presented Any Admissible Evidence that Abu Halawa Killed Gilmore

As discussed above, Eviatar's expert opinion is inadmissible and Plaintiffs' only other evidence that Abu Halawa killed Gilmore is "sheer hearsay," which "'counts for nothing' on summary judgment." Greer, 505 F.3d at 1315. Nor have Plaintiffs demonstrated that any of the evidence on which they rely is capable of being converted into admissible evidence.

-50-

Therefore, Plaintiffs have not identified any admissible evidence to bring their case to a jury on their foundational allegation that Abu Halawa killed Gilmore and summary judgment must be **granted** for Defendants.[25]

###    B.    Plaintiffs' Supplemental Claims

Plaintiffs do not directly address whether their supplemental claims also require proof that Abu Halawa killed Gilmore. They argue solely that "the federal ATA claim requires plaintiffs to prove more elements than the garden-variety supplemental claims." Pls.' Opp'n at 8. However, Plaintiffs do not explain how their quantum of proof differs on their supplemental claims, nor do they suggest that such claims can prevail without proof that Abu Halawa killed Gilmore.

Because the Court has concluded that Plaintiffs have not presented any admissible evidence that Abu Halawa killed Gilmore, and Plaintiffs have advanced no other basis to support

---

[25] Defendants also argue that, even if Plaintiffs could prove that Abu Halawa killed Gilmore, they cannot prevail because the ATA does not permit civil lawsuits based on vicarious liability. Defs.' Mot. at 22-29. The ATA does not specify whether it permits actions based on vicarious liability and that issue is unresolved in this Circuit. See Estate of Parsons II, 651 F.3d at 133 (Tatel, J., concurring). Because the Court has already concluded that Plaintiffs fail to present any "proof concerning an essential element of [their] case," Celotex Corp., 477 U.S. at 323, it is unnecessary to reach this issue.

their supplemental claims, summary judgment shall be **granted** on these claims as well.

## IV.   CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment shall be **granted,** and the case shall be dismissed in its entirety. An Order shall accompany this Memorandum Opinion.


July 28, 2014                                     Gladys Kessler
                                                  United States District Judge



**Copies to**: attorneys on record via ECF